Shikes & Szocs
Stephen A. Shikes, SBN 171751 ; Bret D. Lewis (State Bar. 166819)
Steven L. Szocs, SBN 171037
12304 Santa Monica Blvd., #300
Los Angeles, California 90025
Shikes Tel: (310) 873-7680
Szocs Tel: (310) 500-8338
Shikes: sandslawgroup@gmail.com
Szocs: szocslaw@gmail.com

Attorneys for Plaintiff Frank Edward Edmonds

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

FRANK EDWARD EDMONDS,

                              Plaintiff,

vs.

CITY OF LOS ANGELES, LOS ANGELES POLICE DEPARTMENT, CHARLIE L. BECK, MICHEL R. MOORE, ZADI BORQUEZ-RIVERA, DELANO HUTCHINS, JEFFREY JOYCE, JUAN LOBO, MATTHEW MARTINEZ, EDWARD PERNESKY, AARON THOMPSON, REX INGRAM, ERNEST SPARKMAN, RYAN WHITEMAN, JENNIFER RAMIREZ, MATTHEW HOFFMAN, ACKLEY MAYER TUCKER, ALEXANDRE DELIEUZE, ALCENDA NEAL, CHARLES BALEY, ALFRED PASOS, JOSE SALAZAR, JAMES LINDER, TODD BURNS, and Does 1 through 100, inclusive,

                              Defendants.

Case No:

COMPLAINT FOR DAMAGES:

(1) DEPRIVATION OF CIVIL RIGHTS, 42 U.S.C. §1983, FABRICATION OF EVIDENCE;

(2) DEPRIVATION OF CIVIL RIGHTS, 42 U.S.C. §1983, EXCESSIVE FORCE;

(3) JOINT ACTION/CONSPIRACY TO VIOLATE CIVIL RIGHTS, 42 U.S.C. §1983, FABRICATION OF EVIDENCE;

(4) VIOLATION OF CIVIL RIGHTS, 42 U.S.C. §1983, SUPERVISORIAL LIABILITY;

(5) DEPRIVATION OF CIVIL RIGHTS, 42 U.S.C. §1983, MALICIOUS PROSECUTION;

(6) DEPRIVATION OF CIVIL RIGHTS, 42 U.S.C. §1983, *BRADY* VIOLATIONS;

(7) JOINT ACTION/CONSPIRACY TO VIOLATE CIVIL RIGHTS, 42 U.S.C. §1983, *BRADY* VIOLATIONS;

(8) DEPRIVATION OF CIVIL RIGHTS, 42 U.S.C. §1983, *MONELL* VIOLATIONS;

(9) VIOLATION OF CALIFORNIA CIVIL CODE §§ 51 *et. seq.* AND 52.1;

(10) VIOLATION OF STATE DUE PROCESS, CAL CONST. ART. I § 7(a);

(11) ASSAULT BY A POLICE OFFICER;

(12) BATTERY BY A POLICE OFFICER;

(13) FALSE ARREST AND FALSE IMPRISONMENT;

(14) MALICIOUS PROSECUTION;

(15) INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS;

(16) NEGLIGENT HIRING, SUPERVISION, DISCIPLINING AND RETAINING OFFICERS;

DEMAND FOR JURY TRIAL

For his Complaint for Damages (hereinafter "Complaint"), Plaintiff Frank Edward Edmonds (hereinafter "Plaintiff"), by and through his attorneys, is informed, believes, and thereupon alleges against Defendants, and each of them, as follows:

## I.   **INTRODUCTION**

1.   This action arises out of Plaintiff's unlawful detention, use of excessive force, false arrest, false imprisonment, malicious prosecution, wrongful conviction reversed on July 16, 2019 and wrongful incarceration that began September 5, 2016, Labor Day, at 10401 South Alameda Street which is located in the City of Lynwood, County of Los Angeles, State of California. The City of Lynwood (hereinafter "Lynwood") is a City that is geographically located outside the City of Los Angeles and outside the jurisdiction of Defendant Los Angeles Police Department (hereinafter "LAPD").

Defendant LAPD has no law enforcement or parking enforcement responsibility in Lynwood. The Los Angeles Sheriff Department (hereinafter "LASD") provides contract law enforcement services for Lynwood which has Public Safety Officers to enforce parking regulations.

2.     This action for money damages is brought by Plaintiff pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of state law of Plaintiff's clearly established rights as secured by the Fourth and Fourteenth Amendments to the United States Constitution, the California Constitution Article I, § 7(a), and California *Civil Code*, §§ 51 *et. seq.*, and 52.1 against (1) Defendants Zadi Borquez-Rivera (hereinafter "Borquez"), Delano Hutchins (hereinafter "Hutchins"), Jeffrey Joyce (hereinafter "Joyce"), Juan Lobo (hereinafter "Lobo"), Matthew Martinez (hereinafter "Martinez"), Edward Pernesky (hereinafter "Pernesky"), Aaron Thompson (hereinafter "Thompson"), Rex Ingram (hereinafter "Ingram"), Ernest Sparkman (hereinafter Sparkman), Jose Salazar (hereinafter "Salazar"), and James Linder (hereinafter "Linder") in their respective capacities as duly-certified law enforcement officers (collectively, the "DEFENDANT OFFICERS") employed by Defendants LAPD and City of Los Angeles (hereinafter "CLA"), for their respective violations of Plaintiff's right to be free from unlawful detention, use of excessive force, false arrest, false imprisonment, malicious prosecution, wrongful conviction and incarceration; (2) Defendants Ryan Whiteman (hereinafter "Whiteman"), Jennifer Ramirez (hereinafter "Ramirez"), Matthew Hoffman (hereinafter "Hoffman"),  Ackley Mayer Tucker (hereinafter "Tucker"), Alexandre Delieuze (hereinafter "Delieuze"), Alcenda Neal (hereinafter "Neal"), Charles Baley

(hereinafter "Baley"), and Alfred Pasos (hereinafter "Pasos") in their respective capacities as duly-certified law enforcement officers (collectively, hereinafter "FORCE REVIEW DEFENDANT OFFICERS") employed by Defendant LAPD and Defendant City of Los Angeles (hereinafter "CLA") during the administrative use of force investigation and or Departmental review (hereinafter "NCUOFR") for their respective violations of Plaintiff's right to be free from unlawful detention, use of excessive force, false arrest, false, imprisonment, malicious prosecution, wrongful conviction and incarceration by DEFENDANT OFFICERS; (3) Defendant Todd Burns (hereinafter "Burns") in his respective capacity as a duly-certified law enforcement officer employed by Defendants LAPD and CLA during the criminal investigation for his respective violations of Plaintiff's right to be free from the unlawful detention, use of excessive force, false arrest, false imprisonment, malicious prosecution, wrongful conviction and incarceration by DEFENDANT OFFICERS and FORCE REVIEW DEFENDANT OFFICERS; (4) Defendants CLA, LAPD, Charlie L. Beck (hereinafter "Beck"), former Chief of Police, and Michel R. Moore (hereinafter "Moore"), Chief of Police for their unconstitutional policies, customs and or practices under *Monell* and its progeny.

3.   Plaintiff's state-law claims form part of the same case and controversy, and are within the supplemental jurisdiction of the District Court. (28 U.S.C. § 1367.)

4.   Plaintiff's claims arise out of a course of conduct involving officials of the City of Los Angeles and the LAPD and within the jurisdiction of the United States District Court.

## II.   **JURISDICTION AND VENUE**

5.  The United States District Court has jurisdiction over federal questions pursuant to 28 U.S.C. § 1343 for violations of the 1871 Civil Rights Enforcement Act, as amended, including 42 U.S.C. §§ 1983, 1988 and under 28 U.S.C. § 1331.

6.  Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391 because Defendants actions and events giving rise to the action occurred in the Central District of California. Moreover, upon information and belief, all of the parties reside in the Central District of California.

7.  The acts and omissions complained of commenced on September 5, 2016 and continued until September 5, 2020 when Plaintiff was released from the custody of the LASD pursuant to a Release Order Number AK656110 issued September 1, 2020 by the Honorable Laura R. Walton (Judge Walton), Judge presiding, in the matter of *People of the State of California v. Frank Edward Edmonds*, Case No. TA141211 (hereinafter "*People v. Edmonds*".)

8.  Therefore, venue and assignment lies in the United States District Court, Central District of California pursuant to 28 U.S.C. § 1391.

## III.   **PARTIES**

9.  At all times relevant herein, Plaintiff, an African American male who was then 43 years old, was a citizen of the United States and resided within the jurisdiction of the State of California.

10. Defendant CLA, a political subdivision of the State of California, is a municipal corporation duly organized and existing under the Constitution and laws of the State of California and is and was the municipal employer of DEFENDANT OFFICERS, FORCE REVIEW DEFENDANT OFFICERS, Defendants Beck, former Chief of Police,

Moore, Chief of Police, Burns and Doe Defendants.

11. Defendant LAPD is a local government entity and an agency of Defendant CLA, and all actions of Defendant LAPD are the legal responsibility of the City of Los Angeles. Defendant CLA is sued in its own right on the basis of it's unconstitutional policies, customs, and or practices which gave rise to Plaintiff's federal and state rights claims.  Plaintiff bases all applicable and appropriate claims as to Defendants CLA and LAPD on the doctrines of respondeat superior or vicarious liability, and municipal liability pursuant to *Monell v. Dep't of Soc. Services of City of New York*, 436 U.S. 658 (1978) (*Monell*).

12. Defendant LAPD provides the vehicle through which Defendant CLA fulfills it's policing and law enforcement functions for the City of Los Angeles and it's residents, citizens and the general public.

13. On November 17, 2009, Defendant Beck was sworn in as the 56th Chief of Police of Defendant CLA and served until June 27, 2018. Defendant Beck, is and was, at all times relevant to this action, the Chief of Police and a policymaker for Defendants CLA and LAPD.

14. Defendant Beck, was employed by and working on behalf of Defendants CLA and LAPD, and resided within the jurisdiction of the State of California. In his capacity as the Chief of Police, Defendant Beck participated and ratified the policies, customs and or practices resulting in the unlawful detention, excessive use of force, false arrest, false imprisonment, malicious prosecution, wrongful conviction and incarceration of Plaintiff and other similarly situated individuals. Defendant Beck is sued in his individual and official capacity.

15. On June 27, 2018 Defendant Moore was sworn in as the 57th Chief of Police of Defendant CLA and presently serves in that capacity.

Defendant Moore is a 36-year veteran of Defendant LAPD and was promoted to the rank of Assistant Chief in 2010, and in 2015 was the Chair of the Department's Use of Force Review Board which evaluated all Categorical Uses of Force, including deadly force and hospitalizations and in 2016 was promoted to First Assistant Chief. Defendant Moore was at all times relevant to this action a policymaker for Defendants CLA and LAPD.

16.  Defendant Moore, is employed by and working on behalf of Defendants CLA and LAPD, and resided within the jurisdiction of the State of California. In his capacity as Chief of Police and prior assignments, Defendant Moore participated and ratified the policies, customs and or practices resulting in the unlawful detention, use of excessive force, false arrest, false imprisonment, malicious prosecution, wrongful conviction and incarceration of Plaintiff and other similarly situated individuals. Defendant Moore is sued in his individual and official capacity.

17.  By hiring DEFENDANT OFFICERS, FORCE REVIEW DEFENDANT OFFICERS, Defendant Burns and Doe Defendants and giving these Defendants an LAPD badge and various weapons, including but not limited to tasers, without adequate training and supervision or any threat of real consequences for mistreating members of the public, Defendants CLA, LAPD, Beck, and Moore were deliberately indifferent to members of the public, including Plaintiff, with whom DEFENDANT OFFICERS would foreseeably come in direct contact.

18.  Defendants CLA, LAPD, Beck, and Moore were deliberately indifferent to      Plaintiff and people like him when they approved and ratified DEFENDANT OFFICERS, FORCE REVIEW DEFENDANT OFFICERS, Defendant Burns and Doe Defendants conduct and

actions when the contact with Plaintiff occurred and the subsequent administrative use of force investigation occurred without adequate training and supervision or any threat of real consequences for mistreating members of the public such as Plaintiff.  This incident happened as a direct result thereof and was the direct and proximate cause of Plaintiff's injuries and damages alleged herein.

19. At all relevant time herein, Defendants CLA and LAPD equipped their patrol vehicles with a digital in car video system (hereinafter "DICVS") that when activated records events that are subsequently downloaded to Defendant LAPD servers. All dates, times and locations indicated are pursuant to the DICVS, Defendant LAPD's Incident Recall records, Defendant LAPD's CAD Summary Reports for DEFENDANT OFFICERS and Defendant LAPD's DEFENDANT OFFICERS' Reports generated herein.  In this instance, Units 18HL44, 18H53, and 18H30 DICVS were activated, captured and recorded both video and audio of the incident. The DICVS recordings provide a vivid and complete record of the violent DEFENDANT OFFICERS' assault on Plaintiff, and gave Defendants CLA, LAPD, Beck, Moore, and FORCE REVIEW DEFENDANT OFFICERS and Doe Defendants actual notice that DEFENDANT OFFICERS engaged in violent criminal activity and actively conspired to cover-up their official misconduct warranting their immediate discipline, termination, arrest and or referral for criminal prosecution.

20. At all relevant times herein, Defendants CLA and LAPD were deliberately indifferent to Plaintiff and people like him when they approved and ratified DEFENDANT OFFICERS and the FORCE REVIEW DEFENDANT OFFICERS' conduct and actions without adequate training and supervision or any threat of real consequences

for mistreating members of the public such as Plaintiff. This incident happened as a direct result thereof and was the direct and proximate cause of Plaintiff's injuries and damages alleged herein.

## IV.   DEFENDANT OFFICERS

21.   Defendant Borquez, Serial No. 40556 was a police officer and a resident of the State of California. Defendant Borquez was acting in his individual and official capacity under color of state law within the scope of his employment in full uniform and was assigned a marked patrol vehicle, Unit 18H53 whose DICVS captured the event. In his capacity as a police officer, Defendant Borquez actively participated in the investigation, use of force incident, physically assaulted Plaintiff, was involved in the transportation of Plaintiff, failed to disclose that Plaintiff was the victim of a 245 during Plaintiff's interview with Defendant Linder for booking while Defendant Martinez was present, failed to report his fellow Officers misconduct during the booking process, was involved in the transportation of Plaintiff and failed to disclose prior to or during his preliminary hearing testimony and his March 1, 2018 trial testimony that the use of force incident occurred in Lynwood when the resistance occurred resulting in the unlawful detention, use of excessive force, false arrest, false imprisonment, malicious prosecution, wrongful conviction and incarceration of Plaintiff.

22.   Defendant Hutchins, Serial No. 40288 was a police officer and a resident of the State of California. Defendant Hutchins was acting in his individual and official capacity under color of state law within the scope of his employment in full uniform and was assigned a marked patrol vehicle, Unit 18H35. In his capacity as a police officer, Defendant Hutchins actively participated in the investigation, use of

force incident, the transportation of Plaintiff, was listed as a witness
by the People in both trials, and failed to disclose the use of force
incident occurred in Lynwood resulting in the unlawful detention, use
of excessive force, false arrest, false imprisonment, malicious
prosecution, wrongful conviction and incarceration of Plaintiff.

23. Defendant Joyce, Serial No. 36944 was a police officer and a
resident of the State of California.  Defendant Joyce was acting in his
individual and official capacity under color of state law within the
scope of his employment in full uniform and was assigned a marked
patrol vehicle, Unit 18H46.  In his capacity as a police officer,
Defendant Joyce actively participated in the investigation of Plaintiff,
the use of force incident, was the first DEFENDANT OFFICER who
tased Plaintiff, then after the use of force incident, told DEFENDANT
OFFICERS that he's gotta get charged, we can't let him go with a
use of force while Defendants Sparkman, Thompson, and Pernesky
were present and were recorded by Defendant Thompson's [Unit
18HL44] DICVS at 03:28:17, and by 03:38:00 Defendant Joyce is
discussing Defendant Thompson emailing the Arrest Report to
Defendant Joyce to "cute and paste" and "we'll figure it out" with
Defendant Thompson stating"Okay" while Defendants Sparkman,
Pernesky and Whiteman, the uninvolved supervisor present to
conduct the administrative use of force investigation, were present
which was recorded on Defendant Thompson's DCIVS, and failed to
disclose during his trial testimony, at the first and second trial, that
the use of force incident occurred in Lynwood, testified during the
second trial that Plaintiff could not park on Alameda a major
thoroughfare that goes in and out of the Port of Long Beach, so it's a
very busy highway, wrote an Investigative Report that stated in part

"see attached report" referring to Defendant Thompson's Arrest Report and failed to disclose the use of force incident and arrest occurred in Lynwood when the resistance was given, according to Defendant Thompson's Arrest Report, Defendant Joyce gave the Admonition of Rights [Miranda Rights] verbatim to Plaintiff, who was at Saint Francs Hospital while Defendant Joyce was seeking medical treat at 77th and then returned to the Southeast Station where Defendant Thompson went after impounding Plaintiff's vehicle, was then interviewed by Defendant Whiteman at 7:05 p.m., and after 11:15 p.m. was involved in the transportation, booking and closed out the incident of Plaintiff, and during the second trial, when asked to your knowledge, can you have your car parked in that area, responded "No, Alameda is a major thoroughfare that goes in and out of the Port of Long Beach, so no it's a very busy highway resulting in the unlawful detention, use of excessive force, false arrest, false imprisonment, malicious prosecution, wrongful conviction and incarceration of Plaintiff.

24.    Defendant Lobo, Serial No. 39766 was a police officer and a resident of the State of California.  Defendant Lobo was acting in his individual and official capacity under color of state law within the scope of his employment in full uniform and was assigned a marked patrol vehicle, Unit 18H35.  In his capacity as a police officer, Defendant Lobo actively participated in the investigation, use of force incident, tased Plaintiff with Defendant Thompson's taser, was involved in the transportation of Plaintiff and failed to disclose the use of force incident occurred in Lynwood when the resistance occurred resulting in the unlawful detention, use of excessive force, false arrest, false imprisonment, malicious prosecution, wrongful

conviction and incarceration of Plaintiff.

25.   Defendant Martinez, Serial No. 32880 was a police officer and a resident of the State of California.  Defendant Martinez was acting in his individual and official capacity under color of state law within the scope of his employment in full uniform and was assigned a marked patrol vehicle, Unit 18H53 whose DICVS captured the event.  In his capacity as a police officer, Defendant Martinez, who had a sustained finding for dishonest not disclosed to Plaintiff (CF No. 98-3701), actively participated in the investigation, use of force incident, tased Plaintiff, handcuffed Plaintiff, was involved in the transportation of Plaintiff, failed to disclose that Plaintiff was the victim of a 245 when interviewed by Defendant Linder for booking while Defendant Borquez was present, failed to report his fellow Officers misconduct during the booking process, and failed to disclose the use of force incident and Plaintiff's arrest occurred in Lynwood when the resistance occurred resulting in the unlawful detention, use of excessive force, false arrest, false imprisonment, malicious prosecution, wrongful conviction and incarceration of Plaintiff.

26.   Defendant Pernesky, Serial No. 36950 was a police officer and a resident of the State of California.  Defendant Pernesky was acting in his individual and official capacity under color of state law within the scope of his employment in full uniform and was assigned a marked patrol vehicle, Unit 18H46.  In his capacity as a police officer, Defendant Pernesky actively participated in the investigation, use of force incident, was involved in the transportation and booking of Plaintiff, and failed to disclose the incident occurred in Lynwood, failed to report his fellow DEFENDANT OFFICERS misconduct when Defendant Joyce was discussing with Defendant Thompson emailing

the Arrest Report to Defendant Joyce to "cute and paste" and "we'll figure it out" and Defendant Thompson stated "Okay", referring to the Arrest Report while Defendant Sparkman was present resulting in the unlawful detention, use of excessive force, false arrest, false imprisonment, malicious prosecution, wrongful conviction and incarceration of Plaintiff.

27. Defendant Thompson, Serial No. 39424 was a police officer and a resident of the State of California. Defendant Thompson was acting in his individual and official capacity under color of state law within the scope of his employment in full uniform and was assigned a marked patrol vehicle, Unit 18HL44 whose DICVS captured the event.  In his capacity as a police officer, Defendant Thompson actively participated in the investigation, use of force incident, purportedly wrote an Arrest Report that failed to disclose the use of force incident and arrest occurred in Lynwood where the resistance was given, failed to disclose this information to Defendants Ingram and Sparkman, the FORCE REVIEW DEFENDANT OFFICERS, Defendant LAPD and other named and unnamed Defendants that the location of the use of force incident and Plaintiff's arrest was in Lynwood, discussed with Defendant Joyce emailing the Arrest Report to Defendant Joyce to "cute and paste" and "we'll figure it out", and failed to disclose during his testimony at the Preliminary Hearing, and the first and second trial, that the use of force incident and Plaintiff's arrest occurred in Lynwood when the resistance was given, falsely testified to a "red curb" and posted "no parking" signs at the location, testified that Plaintiff's vehicle was a "foot, foot and half to two feet" from the curb resulting in the unlawful detention, use of excessive force, false arrest, false imprisonment, malicious prosecution,

wrongful conviction and incarceration of Plaintiff.

28. On October 28, 2019, following the reversal of Plaintiff's conviction on California *Penal Code* (hereinafter "*Penal Code*") § 69, in Count 1 by the California Appellate Court, Defendant Thompson, along with Defendant Burns and Deputy District Attorney Alfred Coletta (hereinafter "DDA Coletta"), revisited the scene, took various measurements and photographs at the location and wrote a Follow-Up Investigation that documented the use of force incident and arrest occurred in Lynwood and not in Los Angeles.

29. Defendant Ingram [1], Serial No. 38094 was a sergeant and a resident of the State of California.  Defendant Ingram was acting in his individual and official capacity under color of state law within the scope of his employment as a supervisor in full uniform and was assigned a marked patrol vehicle, Unit 18L30 whose DICVS captured the event.  In his capacity as a supervisor, Defendant Ingram actively participated in the investigation, use of force incident, tased Plaintiff, was involved in the transportation of Plaintiff, acted as an investigator during the trial proceedings, produced discovery (911query for Defendant Thompson printed April 2, 2018), and failed to disclose prior to or during his trial testimony at the first and second trial that the use of force incident and Plaintiff's arrest occurred in Lynwood when the resistance was given resulting in the unlawful detention, use of excessive force, false arrest, false imprisonment, malicious prosecution, wrongful conviction and incarceration of Plaintiff.

30. Defendant Sparkman, Serial No. 31327 was a sergeant and a resident of the State of California.  Defendant Sparkman was acting

---

[1]   Sergeant I Ingram was subsequently promoted to Sergeant II.

in his individual and official capacity under color of state law within the scope of his employment as a supervisor in full uniform and was assigned a marked patrol vehicle, Unit 18H30.  In his capacity as a supervisor, Defendant Sparkman actively participated in the investigation of Plaintiff and took command and control of the incident.  Thus, when Defendant Sparkman asked why Plaintiff was not already in custody, Defendant Thompson responded "because he was covered in blood. He didn't do anything wrong." "The evidence also showed there had been no investigation to determine if Plaintiff was in fact under the influence of alcohol or narcotics, and no alcohol, drugs, or weapons of any kind were recovered. (FN7[2])" (*People v. Edmonds* [3], Court of Appeal Second Appellate District Division Two, B291146, 07/16/2019, Not to be Published in the Official Reports, pp. 11-12 (hereinafter "*Edmonds*").)

31.   Defendant Sparkman instructed the DEFENDANT OFFICERS to put gloves on, which the DEFENDANT OFFICERS understood to mean they would be "taking the suspect into custody" even though there was no probable cause to arrest Plaintiff, DEFENDANT OFFICERS physically assaulted, tased and physically extracted Plaintiff from the vehicle, handcuffed Plaintiff and booked Plaintiff without probable cause that led to Plaintiff's incarceration during the criminal proceedings.

32.   On September 6, 2016, pursuant to Defendant Sparkman's "Daily

---

[2] FN 7 In this regard, the trial court also sustained on relevance grounds the prosecution's objections to questions about any investigation the officers conducted regarding whether appellant was under the influence of alcohol or narcotics.

[3] The *Edmonds* Court's Opinion maybe found at California Appellate Court's Official Website at https://www.courts.ca.gov/opinions/nonpub/B291146.PDF.

Activity Report", Defendant Sparkman "stayed over to assist 18HL44, 18H46, and 18H53 with their use of force incident."  Defendant Sparkman failed to disclose prior to or during his testimony at the first and second trial that the incident occurred in Lynwood when the resistence occurred resulting in the unlawful detention, use of excessive force, false arrest, false imprisonment, malicious prosecution, wrongful conviction and incarceration of Plaintiff.

## V.    FORCE REVIEW DEFENDANT OFFICERS

33.    Defendant Whiteman [4], Serial No. 34900 was then a Sergeant and a resident of the State of California. Defendant Whiteman was acting in his individual and official capacity under color of state law and within the scope of his employment as a supervisor in full uniform assigned Unit 18H20.  In his capacity as a supervisor, Defendant LAPD assigned Defendant Whiteman to conduct an administrative use of force investigation under Case No. 2022790, NCUOFR which listed the address as "10401 Alameda Avenue South, Los Angeles, CA 90002."  Defendant Whiteman conducted the administrative use of force investigation under NCUOFR on behalf of Defendant LAPD and interviewed DEFENDANT OFFICERS [Defendants Borquez on 09/05/2016 at 6:00 p.m., Martinez on 09/05/2016 at 6:05 p.m., Ingram on 09/05/2016 at 6:10 p.m. at Saint Francis Hospital; Defendant Thompson on 09/05/2016 at 6:30 p.m., Defendant Lobo on 09/05/2016 at 6:40 p.m., Defendant Hutchins on 09/05/2016 at 6:45 p.m., Defendant Pernesky on 09/05/2016 at 7:00 p.m., Defendant Joyce on 09/05/2016 at 7:05 p.m. at the Southeast Police Station, Defendant Sparkman on 09/05/2016 at 8:55 p.m.]

---

[4]    Sergeant Whiteman was subsequently promoted to Acting Captain.

Defendant Whiteman read Plaintiff the Admonition of Rights verbatim at Saint Francis Hospital (11/12/2016 LAPD 314, p. 1, item 3.), reviewed Defendant Thompson's Arrest Report and Defendant Joyce's Investigative Report but failed to immediate correct or subsequently correct Defendant Thompson's Arrest Report regarding the items listed in his first LAPD 314 (09/15/2016) and his second LAPD 314 (11/12/2016) for the nine (9) items set forth therein, which failed to correctly document the use of force incident and arrest occurred in Lynwood, reviewed DICVS video of the use of force incident but failed to identify Defendant Ingram's DICVS captured the use of force incident, wrote the NCUOFR, approved by FORCE REVIEW DEFENDANTS and Defendant LAPD, which failed to correctly identify the use of force incident and arrest occurred in Lynwood, a city outside of the jurisdiction of Defendant LAPD and DEFENDANT OFFICERS, failed to document any prior authority from LASD for the LAPD to arrest Plaintiff (victim of 245 per LASD communications) in Lynwood, and failed to disclose at both trials that the use of force incident and Plaintiff's arrest occurred in Lynwood. These actions further resulted in the unlawful detention, use of excessive force, false arrest, false imprisonment, malicious prosecution, wrongful conviction and incarceration of Plaintiff during the criminal proceedings.

34. Defendant LAPD's NCUOFR went through several levels of Departmental review between September 5, 2016 through March 31, 2017 by the FORCE REVIEW DEFENDANT OFFICERS. The "Los Angeles" address listed in the NCUOFR was false as the use of force incident and arrest occurred in Lynwood. Defendant Whiteman, FORCE REVIEW DEFENDANTS OFFICERS, Defendant LAPD and

Doe Defendants failed to correct the location of the use of force incident having occurred in Lynwood and failed to disclose this exculpatory information to Plaintiff prior is preliminary hearing, both trials and even after the reversal by the Appellate Court discussed below.

35. Even after Plaintiff filed a Complaint of Employee Misconduct on August 30, 2019 against the involved DEFENDANT OFFICERS and FORCE REVIEW DEFENDANT OFFICERS concerning the NCUOFR, Defendants CLA, LAPD, Moore, FORCE REVIEW DEFENDANT OFFICERS, Defendant Whiteman and Doe Defendants failed and refused to correct the address of the use of force incident that occurred as being in Lynwood and not Los Angeles, outside of the jurisdiction of Defendants LAPD and CLA.

36. Plaintiff is informed pursuant to the Los Angeles County, Assessor Portal, Map Search, PAIS, Assessor Internet for AIN: 6066-003-069, the correct address for "10401 S. Alameda Street" is Lynwood and not Los Angeles. (Source: https://portal.assessor.lacounty.gov/parceldetail/6066003069.)

37. Defendant Ramirez, Serial No. 40084 was a police officer and a resident of the State of California. Defendant Ramirez was acting in her individual and official capacity under color of state law within the scope of her employment assigned to investigate and or review the NCUOFR involving the DEFENDANT OFFICERS and other named Defendants.  In her capacity as a police officer, Defendant Ramirez actively participated in the investigation and or review of the NCUOFR resulting in the unlawful detention, use of excessive force, false arrest, false imprisonment, malicious prosecution, wrongful conviction and incarceration of Plaintiff.

38.   Defendant Hoffman, Serial No. 37585 was a Sergeant and a resident of the State of California. Defendant Hoffman was a acting in his individual and official capacity under color of state law within the scope of his employment as a supervisor assigned to investigate and or review the NCUOFR involving the DEFENDANT OFFICERS and other named Defendants.  In his capacity as a supervisor, Defendant Hoffman actively participated in the investigation and or review of the NCUOFR resulting in the unlawful detention, use of excessive force, false arrest, false imprisonment, malicious prosecution, wrongful conviction and incarceration of Plaintiff.

39.   Defendant Tucker, Serial No. 33738 was a police officer and a resident of the State of California.  Defendant Tucker was acting in his individual and official capacity under color of state law within the scope of his employment assigned to investigate and or review the NCUOFR involving the DEFENDANT OFFICERS and other named Defendants.  In his capacity as a police officer, Defendant Tucker actively participated in the investigation and or review of the NCUOFR resulting in the unlawful detention, use of excessive force, false arrest, false imprisonment, malicious prosecution, wrongful conviction and incarceration of Plaintiff.

40.   Defendant Delieuze, Serial No. 36584 was a police officer and a resident of the State of California.  Defendant Delieuze was acting in his/her individual and official capacity under color of state law within the scope of his/her employment assigned to investigate and or review the NCUOFR involving the DEFENDANT OFFICERS and other named Defendants.  In his/her capacity as a police officer, Defendant Delieuze actively participated in the investigation and or review of the NCUOFR resulting in the unlawful detention, use of

excessive force, false arrest, false imprisonment, malicious
prosecution, wrongful conviction and incarceration of Plaintiff.

41. Defendant Neal, Serial No. 30599 was a Captain and a resident of
the State of California.  Defendant Neal was acting in his individual
and official capacity under color of state law within the scope of his
employment as a Captain assigned to investigate and or review the
NCUOFR involving the DEFENDANT OFFICERS and other named
Defendants.  In his capacity as a Captain, Defendant Neal actively
participated in the investigation and or review of the NCUOFR
resulting in the unlawful detention, use of excessive force, false
arrest, false imprisonment, malicious prosecution, wrongful
conviction and incarceration of Plaintiff.

42. Defendant Baley, Serial No. 31153 was a Lieutenant and a resident
of the State of California.  Defendant Baley was acting in his official
capacity under color of state law within the scope of his employment
as a supervisor assigned to investigate and/or review the NCUOFR
involving the DEFENDANT OFFICERS and other named Defendants.
In his capacity as a Lieutenant, Defendant Baley actively participated
in the investigation and or review of the NCUOFR resulting in the
unlawful detention, excessive use of force, false arrest, false
imprisonment, malicious prosecution, wrongful conviction and
incarceration of Plaintiff.

43. Defendant Pasos, Serial No. 25501 was a Captain and a resident of
the State of California.  Defendant Pasos was acting in his individual
and official capacity under color of state law within the scope of his
employment as a Captain assigned to investigate and or review the
NCUOFR involving the DEFENDANT OFFICERS and other named
Defendants. In his capacity as a Captain, Defendant Pasos actively

1    participated in the investigation and or review of the NCUOFR

2    resulting in the unlawful detention, use of excessive force, false

3    arrest, false imprisonment, malicious prosecution, wrongful

4    conviction and incarceration of Plaintiff.

5   44.   Each of the named FORCE REVIEW DEFENDANT OFFICERS, Doe

6    Defendants and Defendant LAPD failed to disclose the use of force

7    incident occurred in Lynwood and not in the City of Los Angeles.

8   45.   Defendants CLA, LAPD, Beck, and Moore approved and ratified the

9    conduct and actions of DEFENDANT OFFICERS, FORCE REVIEW

10    DEFENDANT OFFICERS, other named Defendants, Doe

11    Defendants and Defendant Burns.

12   46.   Defendant LAPD document, tracks, evaluates, and publishes

13    statistical analysis for Officers involved in use of force incidents that

14    occurred outside of Defendant LAPD's jurisdiction and publishes Use

15    of Force Year-End Reviews disclosing this information to the public.

16    Pursuant to the LAPD, Use of Force Year-End Review for 2016, it

17    stated in relevant part at page 332 of 410 thereof that:

18      In 2016, 25 of the Department's NCUOF incidents
occurred outside the Department's jurisdiction, an increase
19      of six incidents, or 32 percent, compared to 2015. One
percent of the Department's NCUOF incidents occurred in
20      areas outside the Department's jurisdiction (Department –
1,925; Outside Areas 25). In the four-year period from
21      2012 through 2015, 95 NCUOF incidents occurred in
areas outside the Department's jurisdiction, resulting in an
22      annual average of 24 incidents. The total incident count for
outside areas in 2016 exceeded the 2012 through 2015
23      annual average by one incident, or four percent.

| 2012 - 2016 Non-Categorical Use Of Force Incidents | | | | |
|---|---|---|---|---|
| Area | 2012 | 2013 | 2014 | 2015 | 2016 |
| Outside Jurisdiction | 25 | 21 | 30 | 19 | 25 |

24     

25      (http://lapd-assets.lapdonline.org/assets/pdf/2016-use-of-f
orce-year-end-review-small.pdf)

26

27   47.   On an unknown date, Defendant LAPD posted portions of the LAPD

28    Manual for Responsibility of on Duty Officers on the internet available

to the general public. This public information is available at the LAPD
website with the direct link to the LAPD Manual for Employee
Conduct at https://www.lapdonline.org/lapd
_manual/volume_1.htm#210._EMPLOYEE_CONDUCT.

48.   The LAPD Manual under the Heading "Personal Conduct" at Section
230.05 [Responsibility of on Duty Officers.] states in relevant part:

> **On Duty, Within City, Fully Responsible.** On-duty
> officers within the City limits, after considering the tactical
> situation, are to take all steps reasonably necessary and
> consistent with their assignment to effect the enforcement
> of the penal provisions of the City, State, and Nation, and to
> protect life and property.
>
> **On Duty, Outside of City, Fully Responsible for
> City Matters.** On-duty officers outside the City limits who
> become aware of a situation requiring police action must
> first consider the tactical situation, then take all steps
> reasonably necessary on police matters of direct concern to
> the City of Los Angeles.

49.   DEFENDANT OFFICERS actions and conduct, occurring in Lynwood
and outside of the jurisdiction of Defendant LAPD, thereby violated
Defendant LAPD's policies and procedures and California State law.
DEFENDANT OFFICERS had no authority to detain, investigate, use
any force and arrest Plaintiff as municipal police officers employed by
Defendants CLA and LAPD.

## VI.   DEFENDANT APPROVING THE ARREST REPORT

50.   Defendant Salazar, Serial No. 35827 was a Sergeant and a resident
of the State of California. Defendant Salazar was acting in his
individual and official capacity under color of state law within the
scope of his employment as a Watch Commander. In his capacity as
a Watch Commander, Defendant Salazar actively participated in the
investigation by approving the Arrest Report purportedly authored by
Defendant Thompson [as set for below] all without probable cause
resulting in the unlawful detention, use of excessive force, false

1    arrest, false imprisonment, malicious prosecution, wrongful

2    conviction and incarceration of Plaintiff.

3    **VII.   DEFENDANT APPROVING PLAINTIFF'S BOOKING**

4    51.   Defendant Linder, Serial No. 33254 was a Sergeant and a resident of

5    the State of California.  Defendant Linder was acting in his individual

6    and official capacity under color of state law within the scope of his

7    employment as a supervisor when he interviewed Plaintiff and

8    approved Plaintiff's booking for a violation of *Penal Code*, §§ 69

9    [obstructing an executive officer] and 243(B) [battery on police

10   officer] without probable cause.  In his capacity as a supervisor,

11   Defendant Linder actively participated in the investigation resulting in

12   the unlawful detention, use of excessive force, false arrest, false

13   imprisonment, malicious prosecution, wrongful conviction and

14   incarceration of Plaintiff. Defendant Linder falsified information in the

15   Booking Approval of Plaintiff by intentionally omitting that Plaintiff was

16   a victim of a 245 having been jumped and failing to properly

17   document the interview with Plaintiff that was recorded on the DICVS

18   Unit 18H53 as witnessed by Defendants Martinez and Borquez as

19   set forth herein below. Defendants Martinez and Borquez had an

20   obligation to disclose this information to Defendant Thompson and

21   other DEFENDANT OFFICERS for inclusion in the Arrest Report but

22   was not documented therein. Defendant Martinez and Borquez

23   further failed to report a fellow Officers misconduct to an uninvolved

24   supervisor but Plaintiff's believes that this obligation was not

25   complied with. [As Discussed Below] (See also CF No. 98-3701.)

26   **VIII.  DEFENDANT APPROVING PROBABLE CAUSE**

27   **DETERMINATION**

28   52.   Defendant sued herein as Doe 1 (hereinafter "Doe 1") was a

supervisor and a resident of the State of California.  Defendant Doe 1 was acting in his/her individual and official capacity under color of state law within the scope of his/her employment as a supervisor. In his/her capacity as a supervisor, Defendant Doe 1 approved Defendant Thompson's Declaration of Probable Cause (Declaration) on September 7, 2016 and actively participated in the investigation resulting in the unlawful detention, use of excessive force, false arrest, false imprisonment, malicious prosecution, wrongful conviction and incarceration of Plaintiff.

## IX.    DEFENDANT ASSIGNED THE INVESTIGATION

53. Defendant Burns, Serial No. 31549 was a Detective and a resident of the State of California. Defendant Burns was acting in his individual and official capacity under color of state law within the scope of his employment as a Detective. In his capacity as a Detective, Defendant Burns actively participated in the criminal investigation, executed the Felony Complaint in the matter of *People v. Edmonds* that was filed with the Superior Court of the State of California, County of Los Angeles, conducted investigation(s) and the production of discovery, including but not limited to the DICVS [Units 18HL44 and 18H53] and investigation of the scene on October 28, 2019 with Defendant Thompson and Deputy District Attorney Alfred Coletta that documented the location of the use of force incident occurred within Lynwood and not Los Angeles resulting in the unlawful detention, use of excessive force, false arrest, false imprisonment, malicious prosecution, wrongful conviction and incarceration of Plaintiff.

54. Each named Defendant, including Doe Defendants, in their capacity as police officers for Defendants CLA and LAPD, actively participated in the investigation and or review of the use of force incident resulting

in the unlawful detention, use of excessive force, false arrest, false imprisonment, malicious prosecution, wrongful conviction and incarceration of Plaintiff.

55.   Defendants sued as Does 1 through 100, were police officers, law enforcement officers, agents, and employees of Defendants CLA and LAPD, acting within the course and scope of such agency and employment, under color of state law and Defendants are statutorily liable under California law pursuant to California *Government Code*, § 820.  Doe Defendants were duly appointed officers, employees, or agents of Defendants CLA and LAPD subject to oversight and supervision by the City of Los Angeles elected and non-elected officials.

56.   Plaintiff is ignorant of the true names and capacities of Defendants sued herein as Does 1 through 100, inclusive, and therefore sue these Doe Defendants by such fictitious names.  Doe Defendants are sued in their individual and official capacities.  Doe Defendants, in addition to the named Defendants, are responsible in some manner for the damages and injuries alleged.

57.   Defendants, and each of them, were the agents, servants and employees of the other Defendants, and were acting at all times within the scope of their agency and employment and with the knowledge and consent of their principal and employer, who were employed by Defendant CLA and Defendant LAPD.

58.   Plaintiff alleges that the practices, policies, and customs of Defendant CLA and or Defendant LAPD caused the unlawful action taken against Plaintiff and was the direct and proximate cause of Plaintiff's injuries and damages alleged herein.

59.   Each Defendant is the agent of the other.  Plaintiff alleges that each

of the Defendants named as a "Doe" was in some manner responsible for the acts and omissions alleged herein, and Plaintiff will seek leave of this Court to amend the Complaint to allege such names and responsibility when that information is ascertained.

## X.   GENERAL ALLEGATIONS

60.  At all times herein mentioned, each Defendant was the agent and/or employee and/or co-conspirator of each of the remaining Defendants, and in doing the things herein alleged, was acting within the scope of such agency, employment and/or conspiracy, and with the permission and consent of other co-defendants.

61.  Each paragraph of this Complaint is expressly incorporated into each cause of action which is a part of this Complaint.

62.  Plaintiff's vehicle was parked along the curb on the westside of Alameda, south of 103rd Street, in Lynwood. The excluded "proffered evidence" during the second trial would have established the location was in Lynwood when the resistance was given and Plaintiff's vehicle was not illegally parked.

63.  The acts and omissions of all named Defendants were engaged in maliciously, callously, oppressively, wantonly, recklessly, and with deliberate indifference to the rights of Plaintiff.

## XI.   COMPLIANCE WITH GOVERNMENT CLAIM

64.  On September 9, 2020, Plaintiff presented a Government Claim (hereinafter "Claim") pursuant to California *Government Code*, section 910 et. seq. to the City Clerk – City of Los Angeles regarding the incident and occurrence, giving rise to any and all federal causes of action and state causes of action.

65.  On September 22, 2020, Plaintiff's Claim against Defendant CLA assigned Claim Number 20-11622601*001.  Within the statutory

period, Plaintiff presented his Claim and Defendants CLA rejected the Claim. Thus, all administrative claims have therefore been exhausted.

## XII.   FACTUAL ALLEGATIONS

66.   This action arises from the unlawful detention, use of excessive force, false arrest, false imprisonment, malicious prosecution, wrongful conviction and wrongful incarceration of Plaintiff for a crime that he did not commit by the conduct and actions of Defendants.

67.   Plaintiff served his custody in a county jail and state prison and was therefore subject to severe limitations and indignities inherent in such settings. Plaintiff experienced depression, fear and anxiety of being wrongfully imprisoned with State offenders. Most fundamentally, Plaintiff lost 4-years of his life to such wrongful incarceration for a crime that he was never convicted of by the State. On September 22, 2016, 17-days after his wrongful arrest, Plaintiff's daughter B.E. gave birth to Plaintiff's first grandchild A.J..  Plaintiff was deprived of interacting with his child, grandchild and his stepdaughter D.H. as a direct and proximate cause of Defendants actions and conduct herein.

68.   From Plaintiffs' unlawful detention and throughout his 4-years in custody, Plaintiff proclaimed his innocence and relentlessly worked to procure his release by showing that a miscarriage of justice occurred. Even after the reversal by the California Appellate Court on July 16, 2019, Plaintiff refused to accept any plea bargain on a misdemeanor time served offer(s) by the District Attorney, always maintaining his innocence of violating *Penal Code*, § 69. (*Edmonds, supra*, B291146, p. 16.)

69.   Plaintiff's resilience and knowledge that he was innocent of the

violation of *Penal Code*, § 69 allowed him to survive his incarceration, but tragically, some of the best years of his life were taken from him based on the unconstitutional acts of Defendants which deprived Plaintiff of his civil rights and privileges our society holds most dear such as freedom, the ability to care and raise a family and pursue a career.

## XIII.   Arrest, Conviction and Incarceration Due to Fabrication of Evidence

70.   On September 5, 2016 at 2:56 p.m., Defendant Thompson was on duty, received information from a private citizen that there was a parked vehicle at 10401 Alameda with someone sleeping in the driver's seat with blood on his face and head.  Defendant Thompson located the vehicle, found Plaintiff in the reclined driver's seat with blood on his head, was unable to arouse Plaintiff and requested Fire Rescue to respond. At that point, Plaintiff had violated no laws.

71.   At 2:59:41 p.m., LAPD Communications Division (hereinafter "Dispatch") broadcast "verify your at Alameda South 103 in LA not Lynwood" which Defendant Thompson acknowledged.  At 3:00:13 p.m., Defendant Thompson broadcast "It maybe Lynwood I'm on the westside of the street on Alameda." Dispatch "Roger". (18HL44 DICVS.)

72.   Pursuant to the Incident Recall entry 09/05/16 15:02 stated 'County FD #36 NTFD W/S of Street per LAFD is County" per Operator G9033.  At 15:04, Incident Recall documented "Task Created: B3 18HL44 have Sheriffs Respond" per Operator V9008.

73.   At 3:08:28 p.m. LACFD personnel arrived on scene.  Defendant Thompson asked LACFD personnel "so this is Sheriff right?" At 3:08:52 p.m., LACFD Squad 16 which included Paramedic Nielsen

arrived on scene.  At 15:09, Incident Recall documented "FD 177 Advsd they are Responding with County FD Inc 806" per Operator N4382.  At 15:12, Incident Recall documented "Task assumed: B3 18HL44 have Sheriffs Respond" per Operator N4558.  At 15:15, Incident Recall documented "Sheriffs Notified Ack by Dispatch Farbrough" per Operator C9314.

74.   At 3:11:09 p.m. Defendant Thompson and Defendant LACFD personnel are talking with Plaintiff who tells them "I'm alright" and "they already came and seen me."  At 3:11:17 p.m. Plaintiff tells Defendants Thompson and LACFD personnel that this is the second time an ambulance came. At 3:11:22 p.m. Plaintiff tells Defendant Thompson that this is the second time for me parking on the street. At 3:11:46 p.m. Defendant Thompson states the Sheriff's Department is on their way.  At 3:12:31 p.m. Defendant Thompson broadcasts his location over the radio requesting additional units for back-up and to notify the Sheriff's.  At 3:12:39 p.m. Defendant Thompson broadcast to downgrade the back-up to one additional unit. (18HL44 DICVS.)

75.   Defendant Thompson's downgrade prior to the arrival of any uniform personnel because Defendant Thompson believed that Plaintiff was no longer a threat when the downgrade was voiced to Communications Division.

76.   At 3:12:55 p.m. Plaintiff tells Defendant Thompson don't come with that bullshit, I studied the law.  At 3:13:22 p.m. Paramedic Nielsen says we want to talk to you and Plaintiff responded I don't have to do shit.  (18HL44 DICVS.)

77.   At 3:15:32 p.m. prior to additional back-up Units arriving, Defendant Thompson downgraded the request for back-up to one additional Unit.  (18HL44 DICVS.)

78. At 3:15:59 p.m., Defendant Ingram arrived on scene with his DICVS activated. (18HL44 DICVS.)  Around 3:16:42 p.m., Defendant Ingram suggested to Defendant Thompson and Paramedic Nielsen that of Plaintiff did not want medical treatment, "then that's on him," and asked Plaintiff if he could drive. Plaintiff responded that the car don't work. (18HL44 DICVS.)

79. At 3:17:18 p.m. Defendant Thompson broadcast Code 4 to Dispatch. At 3:18:24 p.m. a LACFD personnel believed to be Paramedic Nielsen stated "We can't keep getting called out on this guy. He's being an idiot."  (18HL44 DICVS)(See *People vs. Edmonds*, Feb. 15, 2018, Reporter's Supplemental Transcript on Appeal (Pursuant to Notice Dated Nov. 20, 2018), p. 16:22-27 (hereinafter "RSTA").)

80. At 3:19:00 p.m. Defendant Ingram was provided information from LACFD personnel that the general area had been annexed by the City of Los Angeles.  Defendant Ingram failed to verify this information which was incorrect.

81. At 3:19:09 p.m., Defendants Borquez-Rivera and Martinez arrived on scene.  At 3:21:25 p.m., Defendants Lobo and Hutchins arrived on scene.  At 3:21:52 p.m., Defendants Pernesky and Joyce arrived on scene.  (18L30 DICVS.)

82. At 3:23:09 p.m. Defendant Thompson telephoned Fontenot Towing to have the vehicle towed which met with negative results. (18HL44 DICVS.)  At 3:23:46 p.m., during the Defendant Officers' discussion what to do with Plaintiff and the car, Plaintiff got out of the car and kneeled down on the ground. (18H53 DICVS.)

83. At 3:23:47 p.m., a Los Angeles Deputy Sheriff ("Deputy") is observed on Defendant Thompson's DICVS and by 3:23:55 p.m. the Deputy walks out of camera range. (18HL44 DICVS.)  The Arrest Report

failed to document any Deputy arrived on scene, any Deputy spoke

with any Defendant Officers or the Deputy gave the Defendant

Officers any legal authority to act in Lynwood.

84. At 3:24:27 p.m. as Defendant Sparkman walks northbound toward
the scene, Plaintiff reentered the front driver side of car.  At that
point, Defendant Thompson's DICVS captures Defendant Ingram on
his cell phone with his watch commander trying to clarify jurisdiction.
(18HL44 DICVS.)

85. Plaintiff was now seated in the reclined driver's seat with the driver
side door open with LACFD personnel speaking with Plaintiff.

86. At 3:24:46 p.m. Defendant Sparkman, Defendant Thomson's
supervisor, questioned why Plaintiff was not already in custody.
Defendant Thompson responded, "because he was covered in blood.
He didn't do anything wrong."  At 3:24:50 p.m. Paramedic Nielsen
who was standing outside of the open driver side door states "Do you
want me to yank him out" to DEFENDANT OFFICERS.  (18HL44
DICVS.)

87. At 3:24:51 p.m. Defendant Sparkman instructed DEFENDANT
OFFICERS to put gloves on, which the DEFENDANT OFFICERS
understood to mean they would be "taking the suspect into custody."
DEFENDANT OFFICERS then discuss putting on their gloves.
(18HL44 DICVS.)

88. At 3:25:02 p.m. after putting on his gloves and clapping his hands,
Defendant Joyce stated "We can't have you sitting in the middle of
the road right here. You either go with the ambulance or you go with
the police, I'm going to let you decide" to Plaintiff.  (18HL44 DICVS.)

89. Plaintiff, who was still seated inside the car, reasonably understood
Defendant Joyce's statement to be a threat to his personal safety,

1   well being and a violation of his civil rights.

2   90.   At 3:25:20 p.m. a DEFENDANT OFFICER makes the statement
3         "Grab the keys." (18H53 DICVS.)  At 3:25:23 p.m. Defendant Joyce
4         entered the car, removed the keys from the ignition, and tossed them
5         on top of the car.  Defendant Pernesky, who was standing behind
6         Defendant Joyce, reached over and removed the keys from on top of
7         the car.

8   91.   At 3:25:28 p.m. Plaintiff is observed exiting the car and standing up
9         facing towards Defendant Joyce.  (18H53 DICVS)  Plaintiff asks
10        where are my keys.

11  92.   At 3:25:31 p.m., with his right hand, Defendant Joyce unsnapped the
12        holster of the taser holster and deployed his taser.  By 3:25:33 p.m.
13        Defendant Joyce is observed moving his taser across the front of his
14        body from his right hand to his left hand.  (18H53 DICVS)

15  93.   Aware that his rights were being violated by DEFENDANT
16        OFFICERS out-of-control, malicious and thuggish officers acting out
17        of animus and other illegitimate motives while escalating the
18        situation, Plaintiff asked where are my keys.  DEFENDANT
19        OFFICERS responded "don't worry about it" even though Plaintiff had
20        civil rights under the federal and state constitutions to complain about
21        what he perceived to be official misconduct as Plaintiff did not want
22        medical treatment, the car was legally parked and there were no
23        parking regulations or painted curbs that prohibited the car from
24        being parked in Lynwood.

25  94.   At 3:25:34 p.m. after being told "don't worry about it", Plaintiff turned
26        away from Defendant Joyce and bent over to reenter the car to avoid
27        a confrontation. At 3:25:36 p.m., with the driver's side door open,
28        Defendants Joyce and Borquez-Rivera grabbed a hold of Plaintiff.

Defendant Joyce, while now holding his taser in his left hand, placed his right hand on Plaintiff. Defendant Borquez is pulling on Plaintiff's left arm as Plaintiff reenters the car. (18H53 DICVS.)

95.     DEFENDANT OFFICERS did not have an arrest warrant, lacked probable cause to investigate Plaintiff in Lynwood and did not advise Plaintiff that he was being detained or under arrest before physically assaulting Plaintiff.

96.     At 3:25:38 p.m., with Defendant Borquez still pulling on to Plaintiff left arm, Defendant Joyce let go of Plaintiff with his right hand, stated "I'm going to tase you", turned his upper body and immediately discharged his taser into Plaintiff's chest.  Plaintiff then stated to Defendant Joyce "Why did you tase me?"  Defendant Joyce claimed that Plaintiff purportedly kicked Defendant Joyce in the leg and that is why he deployed his taser.  The purported kick was not captured on any DICVS. (18HL44; 18L30; or 18H53 DICVS.)  At no point during the physical interaction with Plaintiff were any DEFENDANT OFFICERS recorded stating Plaintiff kicked Defendant Joyce.

97.     Defendant Thompson's Arrest Report failed to document the relevant fact that Defendant Borquez grabbed Plaintiff before reentering the car.  The Arrest Report fabricated that DEFENDANT OFFICERS were conducting a "narcotic's investigation" and that Plaintiff dove back into the car; began kicking at Defendant Joyce; and that's when Defendant Joyce deployed his taser and began to issue a Garner warning, "Stop resisting or I'm going to" and then tased Plaintiff. Defendant Joyce had deployed his taser at 3:25:31 p.m. approximately seven (7) seconds earlier which was clearly captured on Defendants Borquez and Martinez's DICVS.  (18H53 DICVS.) The sequence of events depicted on the DEFENDANT OFFICERS'

DICVS were fully known to FORCE REVIEW DEFENDANT OFFICERS who approved and ratified the NCUOFR as being within Departmental policy and procedures so that the DEFENDANT OFFICERS would avoid departmental discipline, possible criminal prosecution and/or civil liability for their misconduct.

98. The Arrest Report under the Heading Use of Force stated in relevant part "Believing that Edmonds was about to reenter his vehicle to arm himself with a possible weapon, Officer Joyce immediately grab hold of the suspects pants to keep him from reentering his vehicle due to him previously reaching underneath the seats as if he was about to obtain a possible weapon." "As Officer Joyce attempted to grab hold of the suspect, the suspect dove back into his vehicle and began kicking at Officer Joyce. Officer Joyce deployed his taser and began to issue a Garner warning, 'Stop resisting or I'm going to.'" "At that time, the suspect abruptly kicked at Officer Joyce." Defendant Officers narrative is false and fabricated. Defendant Joyce deployed his departmental taser seven (7) seconds earlier while Plaintiff was standing next in the car. DEFENDANT OFFICERS conducted no investigation to determine if Plaintiff was under the influence of alcohol [during the first trial Defendant Thompson testified "Myself personally, I've never administered a filed sobriety test." (*People v. Edmonds*, Reporter's Dailey Transcript of Proceedings, Feb. 9. 2018, Vol. 1, p. 59:22 (RDTP))] or narcotics, and no alcohol, drugs, or weapons of any kind were recovered. During the first trial, Defendant Thompson testified Plaintiff "did not meet the criteria of 5150 at that point." (RDTP, Feb. 10, 2018, Vol. 2, p. 93:24-25.)

99. Pursuant to Defendant Thompson's Arrest Report, Defendant Joyce tased Plaintiff in the chest [*first taser discharge*]; Defendant Hutchins

entered the car to assist with the extraction, using bodily force with
both hands pushed Plaintiff; Defendant Pernesky entered the front
passenger door and struck Plaintiff's right forearm twice with an open
right hand; Defendant Pernesky used both hands to apply a firm grip
to Plaintiff's right wrist and arm; Defendant Ingram tased Plaintiff in
the upper chest with both taser darts [*second taser discharge*];
Defendant Ingram applied the taser to Plaintiff's left leg and
conducted a five second drive stun [*third taser discharge*]; Defendant
Thompson applied a firm grip to Plaintiff's left leg with both hands;
Defendant Borquez applied a firm grip to Plaintiff's right leg and
attempted to force Plaintiff's right leg out from inside the driver's
lower panel; Defendant Martinez applied a firm grip to Plaintiff's right
leg and attempted to force Plaintiff's right leg out from inside the
driver's lower panel; Defendant Martinez deployed his taser and
conducted a drive stun to the inside of Plaintiff's right thigh [*fourth
taser discharge*]; Defendant Lobo retrieved Defendant Thompson's
taser, entered the rear driver's door and discharged the taser into
Plaintiff's back for the full five second cycle [*fifth taser discharge*];
Defendant Lobo deployed another full five second cycle of the taser
*[sixth taser discharge*]; Defendant Hutchins applied a firm grip on
Plaintiff's left wrist with both hands; Defendant Pernesky applied a
firm grip to Plaintiff's right wrist with both hands; Defendants Hutchins
and Pernesky then pulled Plaintiff out of the passenger front door of
the car and onto sidewalk and grass area; while Plaintiff was on the
ground, Defendant Borquez applied a firm grip to both of Plaintiff's
thigh and shin area and maintained control of them; Defendant Joyce
applied a firm grip to Plaintiff's left wrist and hand; Defendant
Martinez applied a firm to  Plaintiff's right wrist and hand, taking

control of them; Defendant Martinez guided Plaintiff's right hand behind his back and applied a handcuff to Plaintiff's right wrist; Defendant Joyce with the same firm grip guided Plaintiff's left arm behind his back and Defendant Martinez completed the cuffing of Plaintiff; Defendant Martinez double locked the handcuff causing Plaintiff's pain and discomfort and placed Plaintiff in a seated position; Defendants Martinez, Thompson, and Joyce lifted Plaintiff onto a gurney where all four of Plaintiff's limbs were strapped secured by paramedics Mulk and Hubbard; and Defendant Sparkman "was present during the use of force and continually directed the officers." (Arrest Report, pp. 2 - 4.)

100.  During this period, Plaintiff was physically dragged from the car by DEFENDANT OFFICERS against his will and without his consent.

101.  At 3:28:57 p.m. while Plaintiff had two taser darts impaled in his back, Plaintiff was lifted up by Defendants Martinez, Joyce and Thompson and placed Plaintiff on his back on the gurney with all four of his limbs then physically restrained.  Plaintiff told the DEFENDANT OFFICERS that he could not breath.  (18HL44 DICVS.)

102.  DEFENDANT OFFICERS acted without a warrant, without reasonable suspicion or probable cause that Plaintiff was engaged in criminal activity. In fact, Plaintiff was the victim of a crime which was known to DEFENDANT OFFICERS and failed to document this relevant information in the Arrest Report.

103.  Defendant LAPD violated it's legal obligations under *Brady* by failing to disclose that DEFENDANT OFFICERS arrested Plaintiff in Lynwood which would have negated a material element of engaged in the lawful performance of a duty at the time the resistance occurred.  (*Edmonds*, *supra*, B291146, p. 16)(See *People v.*

*Gutierrez* (2013) 214 Cal.App. 4th 343, 348-349 (*Gutierrez*), petition for review, denied June 19, 2013 ["failure to apprise the magistrate of material exculpatory evidence on the issue of guilt 'violate[s] the mandates of *Ruthford* and *Brady*'"]; *California v. Gutierrez*, No. 13-347, Cert. Denied, Dec. 2, 2013; *Bridgeforth v. Superior Court* (2013) 214 Cal.App.4th 1074, 1087 ["right to present evidence to 'establish an affirmative defense, negate an element of a crime charged, or impeach the testimony of a prosecution witness ....; and a right to due process'"], petition for review, denied June 19, 2013.)

104. As a direct and proximate cause of being tased six (6) times and physically dragged from the car, Plaintiff suffered great bodily injury by the taser darts being lodged in his chest and back causing puncture wounds due to the application of the taser darts that required medical treatment.

105. At 3:28:17 p.m. Defendant Joyce stated to the other DEFENDANT OFFICERS "we can't let him go with a use-of-force he's gotta get charged."  At no point during the incident are DEFENDANT OFFICERS recorded stating Plaintiff kicked Defendant Joyce. (18HL44; 18L30 and 18H53 DICVS.)

106. At 3:31:17 Plaintiff told the DEFENDANT OFFICERS that he can't feel his hands after being handcuffed.  (18H53 DICVS.)

107. At 3:32:00 p.m. Plaintiff is being taken away on a gurney to an ambulance (18H53 DICVS) and then transported to St. Francis Hospital for medical treatment. Defendants Borquez, Martinez, Hutchins, Lobo and Ingram were involved in the transport of Plaintiff to St. Francis Hospital.  (Incident Recall, entry 09/05/16 15:45, p. 2 of 5; 18H53 DICVS at 3:32:06.)

108. At 3:33:20 DEFENDANT OFFICERS are recorded discussing their

involvement in the use of force incident with Plaintiff before an uninvolved supervisor arrived on scene.  (18H53 DICVS.)

109.  At 3:35:15 p.m. Defendant Whiteman arrived on scene to conduct a use of force investigation spoke with DEFENDANT OFFICERS. (18HL44 DICVS.)

110.  At 3:38:00 p.m. Defendants Sparkman, Thompson, and Joyce are recorded discussing Defendant Thompson writing the Arrest Report regarding the source of activity, emailing it to Defendant Joyce to "cut and paste" the report and "we'll figure it out" while Defendants Whiteman and Pernesky were present. (18HL44 DICVS.)

111.  At 3:38:13 p.m. Paramedic Nielsen stated to the Defendant Thompson "you guys find anything, any dope or anything?" Defendant Thompson responded "No, there's nothin."  (18HL44 DICVS.)

112.  At 3:39:10 p.m. Defendant Sparkman is recorded telling Defendant Thompson "[t]his is your call unless you want to do the whole thing this is your call."  (18HL44 DICVS.)

113.  At 3:39:18 p.m. Defendant Joyce stated to Defendant Thompson "listen you just type up a source of activity. I don't know what the fuck it was." Defendant Thompson responded "Okay." (18HL44 DICVS.)

114.  The Arrest Report failed to document which DEFENDANT OFFICERS authored which portions of the arrest report pursuant to the foregoing conversation.  (18HL44 DICVS.)

115.  At 3:48 p.m. Plaintiff was admitted to St. Francis Hospital.

116.  As a direct and proximate cause of having two (2) taser darts lodged in his back causing puncture wounds and bleeding, Plaintiff required medical treatment from Doctor Ferrell to remove the taser darts imbedded in his back.

117. Pursuant to the Incident Recall entry 09/05/16 4:09 p.m. showed Defendant Thompson follow-up at the Southeast station.

118. Pursuant to the Incident Recall entry 09/05/16 6:13 p.m. showed Defendants Joyce and Pernesky at the Southeast station.

119. Pursuant to the NCUOFR, p. 17 of 50, Defendant Whiteman interviewed Defendant Borquez on 09/05/2016 at 6:00 p.m. and his "Statement consistent with the account of UOF incident as depicted in related report."

120. Pursuant to the NCUOFR, p. 8 of 50, Defendant Whiteman interviewed Defendant Martinez on 09/05/2016 at 6:05 p.m. and his "Statement consistent with the account of UOF incident as depicted in related report."

121. Pursuant to the NCUOFR, p. 12 of 50, Defendant Whiteman interviewed Defendant Ingram on 09/05/2016 at 6:10 p.m. and his "Statement consistent with the account of UOF incident as depicted in related report."

122. Pursuant to the NCUOFR, p. 13 of 50, Defendant Whiteman interviewed Defendant Thompson on 09/05/2016 at 6:30 p.m. and his "Statement consistent with the account of UOF incident as depicted in related report."

123. Pursuant to the NCUOFR, p. 14-15 of 50, Defendant Whiteman interviewed Defendant Lobo on 09/05/2016 at 6:40 p.m. and his "Statement consistent with the account of UOF incident as depicted in related report."

124. Pursuant to the NCUOFR, p. 13 of 50, Defendant Whiteman interviewed Defendant Hutchins on 09/05/2016 at 6:45 p.m. and his "Statement consistent with the account of UOF incident as depicted in related report."

125.  Pursuant to the NCUOFR, p. 11 of 50, Defendant Whiteman interviewed Defendant Pernesky on 09/05/2016 at 7:00 p.m. and his "Statement consistent with the account of UOF incident as depicted in related report."

126.  Pursuant to the NCUOFR, p. 9 of 50, Defendant Whiteman interviewed Defendant Joyce on 09/05/2016 at 7:05 p.m. and his "Statement consistent with the account of UOF incident as depicted in related report."

127.  Pursuant to the NCUOFR, p. 7 of 50, Defendant Whiteman interviewed Defendant Sparkman on 09/05/2016 at 8:55 p.m. and his "Statement consistent with the account of UOF incident as depicted in related report."

128.  At 10:52 p.m. Plaintiff was discharged from St. Francis Hospital into Defendant LAPD custody. At 10:58 p.m. Plaintiff while handcuffed was transported from St. Francis Hospital by Defendants Borquez and Martinez accompanied by Defendant Ingram to the LAPD Southeast Station.  (Incident Recall, entry 09/05/16 22:58, p. 3 of 5.)

129.  Upon arriving at Southeast station, Plaintiff seated in the back of Defendants Borquez and Martinez's patrol vehicle was questioned by Defendant Linder who asked "Plaintiff do you know why you're here"; "Plaintiff do you know why you're here"; Plaintiff responded "I got jumped on"; "you got jumped on by who" and   Plaintiff responded "some Mexicans .... two Mexicans and his girlfriend."  "Do you have any questions or concerns for me?"  "I'll just put refused."  (See 40566@20160905225419 MPG Video File (VLC) 879,827 KB at 20:26 - 21:20.)

130.  Defendant Thompson's Arrest Report failed to document the above questioning and responses of Plaintiff which evidenced that he was

the victim of a crime having been "jumped on" by "two Mexicans and his girlfriend". Plaintiff is informed that Defendants Thompson, Joyce and Pernesky were at the Southeast station at this time.

131. At 11:15 p.m. Plaintiff's booking approval was signed by Defendant Linder.

132. At 11:21 p.m. Plaintiff was transported by Defendants Borquez and Martinez accompanied by Defendants Ingram, Joyce and Pernesky to the LAPD 77th Jail. (Incident Recall, entry 09/05/16 23:21, p. 3 of 5.)

133. At 11:39 p.m. Plaintiff was refused booking at LAPD 77th Jail and transported to LAPD MDC Jail.  (Incident Recall, entry 09/05/16 23:39, p. 3 of 5.)

134. At 11:48 p.m. the Incident Recall was updated which stated in relevant part "ARREST 1 FOR 69 PC" and the serial number for the entry listed Defendant Thompson.  (Incident Recall, entry 09/05/16 23:48, p. 3 of 5.)

135. Pursuant to the CAD Summary Report printed on 11/18/2019 for Defendant Thompson produced on December 3, 2019 to Plaintiff, Defendant Thompson went end of watch on September 5, 2016 at 11:50 p.m. and failed to list any arrests. The City Attorney Disclosure Statement dated 9/5/16 listed Defendant Thompson as the arresting officer.

136. At 11:50 p.m. Plaintiff was taken to MDC Jail.

137. On September 6, 2016 at 1:30 a.m. Plaintiff was transported by Defendants Borquez and Martinez accompanied by Defendants Ingram, Joyce and Pernesky to County Twin Towers.  (Incident Recall, entry 09/06/16 01:30, p. 4 of 5.)

138. At 2:10 a.m. Plaintiff was not booked at County Twin Towers but

transported by Defendants Borquez and Martinez accompanied by Defendants Ingram, Joyce and Pernesky to Los Angeles County USC Medical Center for medical treatment.  (Incident Recall, entry 09/06/16 02:10, p. 4 of 5.)

139.  At 4:04 a.m. Plaintiff was transported by Defendants Joyce and Pernesky accompanied by Defendant Ingram to LASD County Twin Towers and booked. (Incident Recall, entry 09/06/16 04:04, p. 4 of 5.)

140.  Defendants Ingram, Joyce and Pernesky returned to the Southeast station.  (Incident Recall, entry 09/06/16 04:31, p. 4 of 5 and Defendant Ingram's Sergeant's Daily Report, p. 2 of 2.)

141.  Pursuant to the CAD Summary Report printed on 11/18/2019 for Defendants Lobo and Hutchins went end of watch on September 5, 2016 at 3:03 p.m. before the use of force incident occurred.

142.  Pursuant to the CAD Summary Report printed on 11/18/2019 for Defendants Joyce and Pernesky went end of watch on September 6, 2016 at 4:53 a.m. and listed one felony arrest.  The City Attorney Disclosure Statement listed Defendants Joyce and Pernesky's role in arrest as A/O.

143.  At 4:53 a.m., Defendant Joyce closed out the incident.  (Incident Recall, entry 09/06/16 04:53, p. 4 of 5.)

144.  At 5:39 a.m., Defendant Salazar approved Defendant Thompson's Arrest Report and Defendant Joyce's Investigative Report which failed to disclose that the event occurred in Lynwood. Defendant Thompson's Arrest Report [who had gone End of Watch on September 5, 2016 at 11:50 p.m.] (See Incident Recall, LPD160905002878, p. 4/5.) documented the transport and booking well after Defendant Thompson went End of Watch.

145. The CAD Summary Report printed on 11/18/2019 for Defendants Borquez and Martinez produced to Plaintiff failed to list the date and time these Defendants went end of watch.

146. The CAD Summary Report printed on 11/18/2019 for Defendant Sparkman produced to Plaintiff, stated Defendant Sparkman went end of watch on September 6, 2016 at 3:50 a.m..

147. Defendant Sparkman's "Daily Activity Report", dated September 5, 2016 produced on April 18, 2018 [following the mistrial] to Plaintiff, stated in relevant part "I stayed over to assist 18HL44, 18H46, and 18H53 with their use of force incident."

148. The CAD Summary Report printed on 11/18/2019 for Defendant Ingram produced to Plaintiff failed to list the date and time Defendant Ingram went end of watch.

149. Defendant Ingram's Sergeant's Daily Report dated September 5, 2016 produced on April 18, 2018 [following the mistrial] to Plaintiff stated Defendant Ingram went end of watch at 5:30 a.m..  Defendant Ingram Sergeant's Daily Report for Inc# 2878 stated in relevant part "I monitored the entire MT at St Francis, and pre-booking procedures (See report for details). I did not return to SOE station until 0430 hours and completed admin".  An entry at 11:30 [a.m.] Hours under Inc# 2009 indicated that Defendant Ingram was involved in a "Female W/Mental Illness" where MEU was contacted and a SMART Unit was dispatched.

150. Shortly after the use of force, Defendant Whiteman [5] arrived, conducted an administrative use of force (UOF) investigation on behalf of Defendant LAPD and prepared the NCUOFR that went

---

[5] Defendant Whiteman was subsequently promoted to Acting Captain.

1   through several levels of Departmental review from September 5,

2   2016 through March 31, 2017 by FORCE REVIEW DEFENDANT

3   OFFICERS. (NCUOFR, p. 47/50 and 48/50.)

4   151.  The NCUOFR and Defendant Whiteman's Follow-Up Investigation

5   dated September 15, 2016 and Follow-Up Investigation dated

6   November 12, 2016 were in the possession of Defendant LAPD

7   before the preliminary hearing but not disclosed to Plaintiff until after

8   the preliminary hearing on January 17, 2018 by the People despite

9   several attempts to obtain the NCUOFR.

10  152.  The NCUOFR is in the possession of Defendant LAPD and FORCE

11   REVIEW DEFENDANT OFFICERS.

12  153.  Defendant Whiteman's NCUOFR (p. 3/5) stated in relevant part

13   "reviewed all involved DICVS [Digital In Car Video System] related to

14   the incident. Unit 18HL44 and 18H53 vehicles were positioned in a

15   vantage point to capture the UOF." However, the UOF was captured

16   on three separate DICVS by the responding Units.  Defendant

17   Ingram' DICVS captured the UOF but was not disclosed by

18   Defendant LAPD until the afternoon of March 2, 2018 which resulted

19   in a mistrial.

20  154.  Defendant LAPD failed to disclose Defendant Ingram's DICVS before

21   the preliminary hearing and first trial, a discovery violation under

22   *Penal Code*, §§ 1054.1 and 1054.7, and *Brady* as well as a violation

23   of federal and state due process rights that denied Plaintiff a fair trial

24   and the right to present a defense.

25  155.  Defendant LAPD's NCUOFR (p. 1/50) under Case Details listed the

26   address "10401 Alameda Avenue South, Los Angeles CA 90002".

27   Defendant LAPD's NCUOFR incorrectly documented the location of

28   the UOF because the UOF occurred in Lynwood, a city outside of the

jurisdiction of the LAPD and not in Los Angeles. [See Defendant Thompson's Follow-Up Investigation dated October 29, 2019]

156. The DEFENDANT OFFICERS statements obtained by Defendant Whiteman during his investigation were before Defendant Thompson's Arrest Report was approved on September 6, 2016 at 5:39 a.m. by Defendant Salazar. In fact, Defendant Thompson had gone End of Watch on September 5, 2016 at 11:50 p.m. which was over five and a half hours earlier.  Defendant Thompson did not submit his "Probable Cause Determination" until September 7, 2016 at 8:00 a.m.. The approving supervisor's name and serial number was illegible and is identified herein as DOE _.

157. On September 7, 2016 at 8:00 a.m., Defendant Thompson signed a Declaration of Probable Cause which was approved Defendant Doe 1 which failed to document reasonable suspicion that Plaintiff was engaged in any criminal activity and failed to disclose that the incident occurred in Lynwood. Defendant Thompson's Arrest Report and Declaration failed to document any prior authority from the LASD for DEFENDANT OFFICERS to arrest Plaintiff in Lynwood and failed to disclose the city where the arrest occurred.

158. Defendants CLA, LAPD, Chief Beck and Chief Moore, knew or should have known that they had a major incident on their hands that was well documented by three DICVS that captured the event for the DEFENDANT OFFICERS.  DEFENDANT OFFICERS were operating out of their geographic area of responsibility. Defendants, including but not limited to, Borquez, Hutchins, Joyce, Lobo, Martinez, Pernesky, Thompson, Ingram, Sparkman, Whiteman, Linder, Salazar, Burns, Ramirez, Hoffman, Tucker, Delieuze, Neal, Baley, Pasos, and Doe Defendants, at all times reasonably knew or should

have known that DEFENDANT OFFICERS were located in Lynwood when the use of force occurred. Defendants Whiteman, Ramirez, Hoffman, Tucker, Delieuze, Neal, Baley, Pasos, Salazar, Linder, Burns, and Doe Defendants, sought to cover-up the location to avoid having DEFENDANT OFFICERS held accountable for their misconduct. The three DICVS recordings were available at all times to Defendants CLA, LAPD, FORCE REVIEW DEFENDANTS, Salazar, Linder, Burns, and Doe Defendants, and show that DEFENDANT OFFICERS feloniously assaulted Plaintiff without any justification or probable cause. Instead of arresting DEFENDANT OFFICERS for their crimes, however, and securing Plaintiff's immediate release from custody, DEFENDANT OFFICERS sought to coverup the malfeasance which was further aided by the FORCE REVIEW DEFENDANT OFFICERS who failed to conduct a reasonable investigation in a timely fashion to determine the use of force occurred in Lynwood. During the Departmental review of the use of force incident, Defendants only identified two DICVS capturing the incident. Defendant Whiteman's Follow-Up Investigations were not to determine accountability for the DEFENDANT OFFICERS, but to assist the DEFENDANT OFFICERS in covering-up their malfeasance and gross misconduct.

159. In the months and years following the use of force incident, Defendants CLA, LAPD, Chief Beck, Chief Moore and FORCE REVIEW DEFENDANT OFFICERS, and Defendant Does ratified and endorsed the wrongful conduct of DEFENDANT OFFICERS. Even after Plaintiff filed his Complaint of Employee Misconduct, Defendants failed to take corrective action and secure Plaintiff's release from custody.

160.  While the causes of police brutality are complex, there is no doubt that in this particular incident animus played a major role in the reasons for the initial contact and in DEFENDANT OFFICERS' extreme reactions to Plaintiffs reasonable, foreseeable, and fully understandable responses to the unwarranted police aggression.

161.  At all relevant times herein, Plaintiff's vehicle was awfully parked along the curb on the westside of Alameda, south of 103rd Street, in Lynwood. The excluded "proffered evidence" during the second trial would have established the location was in Lynwood when the resistance was given and Plaintiff's vehicle was not illegally parked.

162.  On September 7, 2016, Defendant Burns caused a Felony Complaint in the matter of *People v. Edmonds* to be filed by the Los Angeles District Attorney's Office ("District Attorney") all without a warrant or probable cause.  Defendant Burns failed to disclose that the event occurred in Lynwood.

163.  The Felony Complaint alleged two counts. Count 1 alleged a violation of *Penal Code*, § 69[6], as a Felony and Count 2 alleged a violation of *Penal Code*, § 243.2(a)[7], as a Misdemeanor. The Felony Complaint

---

[6] Count 1 stated in relevant part: On or about September 5, 2016, in the County of Los Angeles, the crime of RESISTING EXECUTIVE OFFER, in violation of PENAL CODE SECTION 69, a Felony, was committed by FRANK EDWARD EDMONDS, who did unlawfully attempt by means of threats and violence to deter and prevent JEFFREY JOYCE, who was then and there an executive officer, from performing a duty imposed upon such officer by law, and did knowingly resist by the use of force and violence said executive officer in the performance of his/her duty.

[7] Count 2 stated in relevant part: On or about September 5, 2016, in the County of Los Angeles, the crime of BATTERY ON SCHOOL, PARK, OR HOSPITAL PROPERTY, in violation of PENAL CODE SECTION 243.2(a), a Misdemeanor, was committed by FRANK EDWARD EDMONDS, who did willfully and unlawfully use fore and violence upon PHILIP CASTRO while on school and park property and on the grounds of a public and private hospital.

further alleged additional allegations as to Count 1.

164. On September 9, 2016, Plaintiff, who was in custody, appeared in
     pro per, entered a plea of not guilty and denied the allegations.  Bail
     was set in the amount of $175,000.00. Following Plaintiff's
     arraignment, Plaintiff's claim for false imprisonment ended and the
     malicious prosecution claim began.

165. On September 16, 2016, Plaintiff retained counsel Shikes and Szocs
     who substituted into the criminal matter and obtained discovery.

166. On September 19, 2016, Plaintiff filed and served his first Request
     for Informal Discovery and *Brady* material on the District Attorney.
     The court also signed an Order for the preservation evidence.

167. Plaintiff's criminal matter was continued several times.

168. On October 17, 2016, Plaintiff's counsel declared a doubt as to
     competence pursuant to *Penal Code*, § 1368, the criminal
     proceedings were ordered adjourned and Plaintiff was transferred to
     Department 95.

169. Between October 31, 2016 and June 6, 2017, Plaintiff's competency
     matter under Case No. ZM033671 was continued several times. On
     June 22, 2017, that Superior Court found Plaintiff mentally competent
     and the matter was ordered returned to Dept 14-Compton set on
     June 23, 2017 with criminal proceedings reinstated that date as day
     0 of 10.

170. Between June 23, 2017 and October 3, 2017, Plaintiff's criminal
     matter was continued several times for discovery compliance by the
     District Attorney.

171. On October 18, 2017, the District Attorney was represented by
     Deputy District Attorney Cody Smith ("DDA Smith") and the
     magistrate heard Plaintiff's *Penal Code*, § 1538.5 motion to suppress

concurrently with his preliminary hearing.  During the preliminary examination, DDA Smith called two witnesses [8] and the following relevant questioning of Defendant Thompson occurred regarding the location of the offense in Count 1.

Mr. Smith:  What is your current occupation and assignment?

Thompson:        Police Officer 3, assigned to the Southeast Division.

                 (*People v. Edmonds*, Reporter's Transcript of Preliminary Hearing, Oct. 18, 2017, p. 8:26-28, p. 9:1 (hereinafter "PHT").)

Mr. Smith:  Were you on duty Monday, September 5, 2016, around 3:20 p.m.?

Thompson:        Yes.  (PHT, p. 9:5-7.)

Mr. Smith:  And on that date and time, did you go to 10401 South Alameda Street in the County of Los Angeles?

Thompson:        Yes. (PHT, p. 9:10-12.)

172.   During the cross-examination Defendant Thompson testified:

Mr. Szocs: Okay. So where was he parked? You indicated he was parked in a red zone?

Thompson:        He was parked in the red zone, but he was parked in the No. 2 lane where traffic usually is driving through, so he was blocking traffic and if traffic were try to come, so I parked right behind him. He had a green '99 Toyota, I believe. (PHT, p. 17:18-42.)

Mr. Szocs: Yes. Was there any marking or parking regulation on that side of the street?

Thompson:        I don't – I wasn't looking for one.

---

[8]  Defendant Borquez-Rivera testified as to Count 2 only.

1   Mr. Szocs: I understand that.

2   Thompson:        I would have to go back and look at signs. I'm pretty sure

3                         there is no parking or stopping sign. The curb was red.

4                         Usually if there is a red curb, sir, there is no parking

5                         there, and it was right in the middle – he was blocking the

6                         lane, so I actually positioned my vehicle so no one could

7                         actually hit him or I while we were out there.

8   Mr. Szocs: Was the car parked against the curb?

9   Thompson:        It was. There is not a shoulder. It is a lane, so you are not

10                        supposed to stop or park on that street.

11  Mr. Szocs: Where is the traffic sign or traffic control device?

12  Thompson:        On Alameda at some point. I don't know exactly the

13                        coordinates from the curb but . . . (PHT, p. 18:4-14.)

14  Mr. Szocs: And the report you provided in this case, is that complete a

15                        report on all relevant evidence and --

16  Thompson:        All the relevant evidence, yes, sir.

17  Mr. Szocs: And you reviewed that report for accuracy and relevancy for the

18                        statements being made?

19  Thompson:        Yes.  (PHT, p. 20:4-10.)

20  The Court: Did any Sheriff's Deputies arrive?

21  Thompson:        I believe one arrived. I believe there was one and left and

22                        didn't - -

23  Mr. Szocs: Did you have any conversations with the Sheriff when he

24                        arrived?

25  Thompson:        I did not.  (PHT, p. 43:14-20.)

26  Mr. Szocs: Did you make a statement to the Sheriff regarding Defendant's

27                        condition?

28  Mr. Smith: Objection. Asked and answered.

1    The Court: Overruled.  Did you?

2    Thompson:      No, I didn't speak to - - I personally didn't speak to the

3                        Sheriff.  (PHT, p. 44:14-19.)

4    Mr. Szocs: Did you make a determination to arrest Defendant?

5    Thompson:      No.

6    Mr. Szocs: Who made that determination?

7    Mr. Smith:  Objection. Relevance.

8    The Court: Do you know who made the decision to arrest? It's overruled.

9    Thompson:      No. I was not the one kicked by Mr. Edmonds. Another

10                        Officer was that was kicked by the – by Mr. Edmonds, so

11                        I believe that he was the one to make the determination

12                        based on his actions.  (PHT, p. 56:5-15.)

13    Mr. Szocs: When you are detaining someone specifically your practice is

14                        to investigate whether a crime was committed, correct?

15    Thompson:      Yes.

16    Mr. Szocs: So you, yourself had not detained Mr. Edmonds, because you

17                        were there to help him? He had not committed any crime?

18    Thompson:      Right.

19    Mr. Szocs: Did you believe that Mr. Edmonds was intoxicated? The mere

20                        fact that you were there to render assistance, you could have, if

21                        in your opinion Mr. Edmonds was under the influence, you

22                        could have arrested him for DUI, correct?

23    Thompson:      If that was my intention, correct.

24    Mr. Szocs: But you didn't have information that would lead you to believe

25                        Mr. Edmonds was driving under the influence at that moment in

26                        time, did you?

27    Thompson:      Right.

28    Mr. Szocs: Okay, so why did you have to – why did L.A.P.D. Officers have

1    to extract Mr. Edmonds from the vehicle?

2    Thompson:        Because at the time he was being combative and

3                     aggressive towards Officers.  (PHT, p. 59:3-25.)

4    Mr. Szocs: Officer Joyce grabbed Mr. Edmonds' pants leg, and you are

5                     now indicating that you saw Mr. Edmonds kicking at Office

6                     Joyce several times?

7    Thompson:        Yes.

8    Mr. Szocs: At that point, was a taser deployed by any Officer, to your

9                     knowledge, and used on Mr. Edmonds?

10   Thompson:        At that point, Officer Joyce deployed his taser and started

11                    to issue the Garner warning.

12   Mr. Szocs: Just so we are clear, Officer Joyce is holding Mr. Edmonds'

13                    pant leg with one hand and pulling out the taser with his other

14                    hand?

15   Thompson:        No. That is not what –

16   Mr. Szocs: Well, please walk me through what happened.

17   Thompson:        Officer Joyce grabbed his pants to not let him go back

18                    into the vehicle. That is when Mr. Edmonds started

19                    kicking at when he went into the vehicle.  He started

20                    kicking at Officer Joyce. Officer Joyce then deployed the

21                    taser.  (PHT, p. 70:9-27.)

22   173.  During the preliminary examination, Plaintiff's counsel marked three

23         Exhibits that were admitted into evidence.  (PHT, p. 106:5-21.)

24   174.  The magistrate's findings, at the conclusion of the testimony, on the

25         denial of the motion to suppress maybe found at pages 114, lines 1-

26         28 through page 115, lines 1-28 of the Preliminary Hearing

27         Transcript.

28   175.  Plaintiff made a motion to dismiss for insuffiencey of the evidence.

The magistrate denied the motion. The magistrate held "[i]t appearing to me from the evidence presented the following offenses have been committed, and there is sufficient cause to believe that the defendant is guilty thereof, Count 1, *Penal Code* section 69, and Count 2, *Penal Code* section 243.2 subsection (a)" and "order[ed] that the defendant be held to answer and admitted to bail." (PHT, p. 116:1-16.)

176. The charged offense *Penal Code*, § 69 having occurred in Lynwood, a city outside of the jurisdiction of Defendant LAPD and DEFENDANT OFFICERS was unknown to Plaintiff at that time, was not raised during the preliminary hearing, and was not disclosed by DEFENDANT OFFICERS, FORCE REVIEW DEFENDANT OFFICERS and Defendant LAPD.  (*Brady* Violation)  Defendant Thompson's failed to disclose the event occurred in Lynwood which was a material and contested element of the charged offense. DEFENDANT OFFICERS, FORCE REVIEW DEFENDANT OFFICERS, and Defendants Burns and LAPD failed to disclose the event occurred in Lynwood. (*Brady* violation) (*Edmonds*, *supra*, B291146, pp. 6 FN3, 7 FN4, 11-13, 16.)

**XIV.  FELONY INFORMATION**

177. On November 1, 2017, the District Attorney filed a Information containing the same two Counts and special allegations as to Count 1 as alleged in the Felony Complaint.

178. On January 17, 2018, Plaintiff was provided an incomplete redacted copy of the NCUOFR by the District Attorney that was obtained from Defendant LAPD.  The NCUOFR, at page 1 of 50 listed the address of the use of force as "10401 Alameda Avenue South, Los Angeles, CA 90002".  (*Brady* violation)

179. Plaintiff is informed that between September 5, 2016 and March 31,

2017, Defendant Whiteman's NCUOFR was reviewed at various levels by Force Review Defendant Officers.  (NCUOFR, pp. 47 of 50 and 48 of 50.)  The NCUOFR failed to document Defendant Officers had any authority in the first instance to detain Plaintiff as found by the Appellate Court in order to conduct any investigation and failed to correct the NCUOFR that the event occurred in Lynwood outside the jurisdiction of the LAPD.  (*Brady* violation)

180.  The findings were entered on March 31, 2017 by Defendant Hoffman over six (6) months before the preliminary hearing.

181.  Pursuant to the NCUOFR at page 22 of 50, the following types of force were used by Defendant Officers on Plaintiff:

| UOF Type | Qty | Employee & Role | Body Area |
|---|---|---|---|
| Firm Grip | 1 | Borquez Rivera, Zadi - 40556 Applied | Right Leg |
| Firm Grip | 1 | Hutchins, Delano - 40288 Applied | Left Wrist |
| Firm Grip | 1 | Joyce, Jeffrey - 36944 Applied | Left Leg |
| Firm Grip | 1 | Joyce, Jeffrey - 36944 Applied | Left Leg, Right Leg |
| Firm Grip | 1 | Joyce, Jeffrey - 36944 Applied | Left Wrist |
| Firm Grip | 1 | Martinez, Matthew - 32880 Applied | Right Hand |
| Firm Grip | 1 | Martinez, Matthew - 32880 Applied | Right Leg |
| Firm Grip | 1 | Pernesky, Edward - 36950 Applied | Right Wrist |
| Firm Grip | 1 | Thompson, Aaron - 39424 Applied | Right Leg |
| Motion | 1 | Hutchins, Delano - 40288 Applied | Back |
| Motion | 1 | Hutchins, Delano - 40288 Applied | Left Wrist |
| Motion | 1 | Joyce, Jeffrey - 36944 Applied | Left Arm |
| Motion | 1 | Martinez, Matthew - 32880 Applied | Right Hand |
| Motion | 1 | Pernesky, Edward - 36950 Applied | Right Wrist |
| Palm | | | |

| Heel Strike 2 | | Pernesky, Edward - 36950 Applied | Right Arm |
|---|---|---|---|
| TASER | 1 | Ingram, Rex - 38094 Applied | Chest |
| TASER | 1 | Ingram, Rex - 38094 Applied | Left Leg |
| TASER | 1 | Joyce, Jeffrey - 36944 Applied | Chest |
| TASER | 1 | Martinez, Matthew - 32880 Applied | Right Leg |
| TASER | 2 | Ingram, Rex - 38094 Directed | Back |
| TASER | 2 | Lobo, Juan - 39766 Applied | Back |

182. Pursuant to the four taser logs [Addenda Item, NCUOFR] produced by Defendant LAPD, Plaintiff was TASED five (5) times by Defendant Officers and the time stamp denoted on each taser log were inconsistent with the Arrest Report. The Force Review Defendant Officers failed to address and/or correct the inconsistencies between the taser logs and the Arrest Report.

183. Pursuant to the NCUOFR at page 22 of 50, Plaintiff was TASED eight (8) times by Defendants Ingram (4 times), Joyce (one time), Martinez (one time), and Lobo (2 times).  The FORCE REVIEW DEFENDANT OFFICERS failed to address and/or correct these inconsistencies.

184. On September 15, 2016, Defendant Whiteman wrote a Follow-Up Investigation that stated the original arrest report face sheet, in the "Complaints/Evidence of Illness/Injury Whom Treated" section, Mr. Edmonds' injuries were inadvertently omitted. That Follow-Up Investigation was not produced to Plaintiff's counsel until February 15, 2018 [9] during the first trial. (*Brady* violation)

185. On November 12, 2016, Defendant Whiteman wrote a second

---

[9] See Emergency Motion to Dismiss Information for *Brady* Violations or Request for a Mistrial and Evidentiary Hearing on the Violations filed February 28, 2018 and denied March 2, 2018.

Follow-Up Investigation that listed nine items or corrections to

Defendant Thompson's Arrest Report. That Follow-Up Investigation

was not produced to Plaintiff's counsel until February 15, 2018 during

the first trial.  (*Brady* violation)

186.  The November 12, 2016 Follow-Up Investigation stated in relevant

part:

> The below listed corrections in regards to DR# 16-1817352, were inadvertantly omitted from the original arrest/investigative report. This follow-up investigation report will clarify the identified issues.
>
> 1. The UOF box should be marked on the investigative report with Officer Jeffery Joyce, Serial No. 36994 listed as the victim.
> 2.  On the DICVS footage it shows that Officer Joyce, Serial No. 36994, took custody of Deft Edmonds car keys. The car keys were given to Kelmark Tow Company when the vehicle was impounded subsequent to arrest.
> 3.  Sergeant II Ryan Whiteman, Serial No. 34900, read Deft Edmonds his Admonition of Rights. The arrest face sheet indicates that Officer Joyce, Serial No. 36944, read the admonition.
> 4.  Digital images were taken in relation to the UOF/Arrest investigation. The digital images were booked under D# 0588690 at TID.
> 5.  When additional units and (2) supervisors arrived to the scene of the UOF a tactical plan was discussed and implemented. Sgt. II Sparkman, Serial No. 31327, arrived a took command and control of the incident. The plan detailed efforts to de-escalate the situation utilizing verbal commands and the deployment of less lethal options, such as TASERS. Due to Deft Edmonds agitation, the fact that he was in a vehicle, and in need of medical treatment from injuries that were sustained prior to police arrival officers deployed in an effort to take Edmonds into custody that resulted in a UOF.
> 6.  Sergeant II Sparkman, Serial No. 31327, arrived at the scene of the UOF prior to the UOF occuring (sic). Sparkman assumed the role of incident commander and provided supervisory oversight and direction during the incident.
> 7.  Officer Thompson's narcotic expertise was inadvertantly omitted from the arrest report. It should read as follows: I, Officer Thompson, Serial No. 39424, have been employed by the Los Angeles Police Department since 2008. While at the LAPD Police Academy, I received approximatley (sic) 12 hours of trianing (sic) in the area of narcotics. This included identification of narcotics, manners in which narcotics are consumed, methods of

packing of narcotics for sale and distribution and the objective
symptoms of an individual under the influence of narcotics.
8.  Officer Thompson was flagged down a citizen and
directed to a male (Deft Edmonds) located at 10401 S.
Alameda Street. Upon arrival Officer Thompson showed
himself code six. Officer Thompson did not show himself
code six at the flag down
location or request and supervisor for the follow up.
9.  After the handcuffing was completed by Officer
Martinez, Serial No. 32880, Officer Martinez, Officer
Thompson and Officer Joyce lifted Edmonds up from a
seated position and placed him on the gurney for
transport. When Edmonds was lifted by the officers he was
no longer providing active resistance.

187.  Plaintiff is informed that the NCUOFR documented one (1) Follow-Up
Investigation completed and uploaded.  The FORCE REVIEW
DEFENDANT OFFICERS failed to address and/or correct that
Defendant Whiteman had authored a second Follow-Up
Investigation(s) addressing the Arrest Report.

188.  Defendant LAPD, FORCE REVIEW DEFENDANT OFFICERS and
Defendant Whiteman's NCUOFR and two Follow-Up Investigation(s)
failed to document any prior authority from the LASD for
DEFENDANT OFFICERS to arrest Plaintiff (victim of a 245 per LASD
communications) in Lynwood and failed to correctly document the
city where the arrest occurred.

189.  Defendant Whiteman's "DICVS Inspection UOF" under the NCUOFR
failed to document any review of Defendant Ingram's DICVS which
captured the incident.  (*Brady* violation)  The FORCE REVIEW
DEFENDANT OFFICERS failed to address and/or correct this
omission regarding the DICVS Inspection.

190.  Defendant Ingram's DICVS was not produced to Plaintiff until after
the March 2, 2018 mistrial.  (*Brady* violation)  The Force Review
Defendant Officers failed to address and/or correct this omission.

191.  On December 12, 2017, Plaintiff filed a Pretrial Discovery (*Pitchess*) Motion to obtain the NCUOFR. On January 9, 2018, the District Attorney agreed to informally provide the NCUOFR and on January 17, 2018 an incomplete redacted copy of the NCUOFR was emailed to Plaintiff's counsel. The NCUOFR at p. 1 of 50 listed the City as "Los Angeles" even though the event occurred in Lynwood.

### XV.  FEBRUARY 7, 2018 TRIAL

192.  On February 7, 2018, Plaintiff's matter came on for trial. The District Attorney was represented by DDA Smith.  Before trial, Plaintiff pled nolo contendere with the court's approval on Count 2 of the Information, a violation of *Penal Code*, §243.2(a), a Misdemeanor and the trial commenced.

193.  On February 9, 2018 Defendant Thompson testified.

194.  On February 9, 2018, Defendant Thompson testified in relevant part:

Mr. Smith:  When you state at some point the Sheriff needed to be notified, why did you say the Sheriff needed to be notified?

Thompson:      That's a tricky street. Uh, at one point Sheriff's – so Lynwood is to the left, and Sheriff's patrol Lynwood. At one point, we were – well, I was confused if the Sheriff's came on the north side – or the west side of Alameda as well and/or – because they switched back and forth out of – in the past years, so. To my knowledge. But I just needed to make sure – I wanted to make sure that it was either us, L.A.P.D., or Sheriff's side. (*People v. Edmonds*, Reporter's Transcript on Appeal, dated February 9, 2018, p. 646:10-21 (hereinafter "RT").)

195.  Defendant Thompson's testimony raised the issue that the location of the detention and arrest was not readily known to the DEFENDANT

OFFICERS.

196. On the morning of February 14, 2018, Plaintiff was a medical miss-out and the trial court trailed the trial till the next day.  Plaintiff's counsel revisited the location again and obtained two business cards where the event occurred. The business card for "10401 South Alameda Street" listed the City as Lynwood, the second business card for SA Recycling listed the City as Los Angeles and both businesses are located in Lynwood.

197. On February 15, 2018, Paramedic Nielsen during cross-examination [Defendant Ingram (investigating officer present in court)] testified:

Mr. Szocs: Okay. And when you indicated that the patient indicated his friends had rolled him up, what did you understand that to mean?

Mr. Nielsen:    That his friends beat him up.

Mr. Szocs: Beat him up.

Mr. Nielsen:    I felt bad for him. I mean, he was already, uh, agitated. As you saw, as soon as we got there, he was already agitated. But when I was talking to him about it, I felt bad for him, because I was like this guy is mad that his friends beat him up and now here we are giving him an even harder time, what he's assuming is a harder time; and all we're there is trying to help the guy out, you know.

(RSTA, Feb. 15, 2018, p. 37:12-24.)

198. On February 15, 2018, on direct examination DDA Smith elicited the following testimony from Defendant Ingram:

Mr. Smith: Okay. So when you stated whether he – if he wants to refuse M.T., what do you mean?

Sgt. Ingram:    Well, so, generally when we arrive on scene to assist the

1    Fire Department with a medical call, our primary

2    responsibility is to keep the peace. And in this situation,

3    based on the information I had up to that point, I believed

4    that we were simply there to keep the peace for the Fire

5    Department. And so I specifically gave some sort of

6    guidance to Officer Thompson.

7    And based on the video, my recollection is if he's a victim,

8    we're not going to get into a use of force with this

9    gentleman. If he refuses treatment, that's on him.

10   Basically that's on the Fire Department that's not us.

11   Mr. Smith:  And as a Sergeant, when you respond to a scene on a backup

12   call, what are your duties in your role as a Sergeant?

13   Sgt. Ingram:    So as a supervisor with the Department, first and

14   foremost to provide command and control and

15   supervisory oversight, any guidance, direction, and to

16   also make sure that the officers are acting within the

17   scope of the law under the department policy and

18   procedure and to basically be a liaison to request

19   additional resources and to keep the watch commander

20   informed of situational awareness on the scene.  (RSTA,

21   Feb. 15, 2018, p. 55:16-26.)

22   Mr Smith.   Okay. So can you describe from your perspective then how you

23   interact with the fire department in a situation like this.

24   Sgt. Ingram:    So generally as a supervisor, I speak to the fire captain,

25   which is also their equivalent to like a police sergeant, to

26   find out where we are, you know, in this, because, uh,

27   sometimes the boundaries can get very distorted and

28   blurred.

Complaint for Damages
60

1    In this case, there wasn't really any clear direction on

2    what was going on.

3    And it happened pretty quick once I showed up on scene.

4    And I was trying to figure out, well, first of all, are we in

5    the City of L.A. or are we in the County of Los Angeles,

6    as far as like jurisdictional boundaries, because the last

7    thing I want as a Supervisor, as a quasi department risk

8    manager, is to get involved in some sort of something, an

9    altercation or some incident that's not within the City of

10   L.A. so I wanted to make sure that in fact it was ours or it

11   was going to be the Sheriff's. So we were essentially just

12   keeping the peace.

13   Mr. Smith:   At some point, did you, uh, verify if this was your jurisdiction?

14   Sgt. Ingram:     Yes. I don't know which fireman first told me, but one of

15   the firefighters told me that we were in an area that had

16   just been annexed to the County of Los Angeles – I'm

17   sorry – from the County to the City of L.A.  So we were in

18   fact on city territory. But I hadn't confirmed that through

19   anyone.

20   The maps that I had previously seen, 103rd street, which

21   is just north of this location, and everything northwest of

22   that was City of L.A.; and everything South, which is were

23   we were at, would have been the City of Lynwood.

24   So I was a little confused, which is why I had to actually

25   call my watch commander, get on the phone and call the

26   watch commander, because I needed some clarification

27   and direction. I had only worked in southeast for a couple

28   of months up until this point. (RSTA, Feb. 15, 2018, pp.

1          57:7-28, 58:5-28, 59:1-5.)

2   Mr Smith:   And at some point, did you speak with the watch commander?

3   Sgt. Ingram:        Yes.

4   Mr. Smith:  And did you get direction from the watch commander?

5   Sgt Ingram:        Yes.  (RSTA, Feb. 15, 2018, p. 57:22-28, p. 58:1-28 and

6                      p. 59:1-11.)

7   Mr. Smith:  And at some point, you said, "Your car is illegally parked here"?

8   Sgt. Ingram:        Correct.

9   Mr. Smith:  What do you mean?

10  Sgt. Ingram:        Well, based on my knowledge of Alameda, I know that it

11                      is a major thoroughfare; and the traffic, the North and

12                      Southbound traffic -- but as I'm pulling up, I see he's the

13                      only car -- well, besides the fire department and the

14                      Officer's car -- the only car parked on Alameda in that

15                      area. So it's indicative to me -- I'm trying to do a scene

16                      size-up and see exactly what's going on -- that a

17                      reasonable person is not going to park their car in a major

18                      thoroughfare.

19  Mr. Szocs:  Objection, calls for speculation, move to strike, a reasonable

20                      person, your Honor.

21  The Court:  No, it's his assessment. So overruled.

22  Sgt. Ingram:        Based on my experience traveling on that street and my

23                      understanding of that street and seeing that the

24                      defendant's car was the only one parked in that area, I

25                      formed the opinion that his car was parked blocking the

26                      roadway, was parked in an illegal manner. (RSTA, Feb.

27                      15, 2018, p. 60:2-24.)

28  Mr. Smith:  You stated, "We will wait for Sheriffs."  What are you talking

| | |
|---|---|
| 1 | about? |
| 2 | Sgt. Ingram:      Well, it's very rare to see L.A. County Fire or another |
| 3 | jurisdictional public entity on scene with our Department. |
| 4 | So in my mind, in addition to all the other things that my |
| 5 | brain is doing trying to assess the situation, one of the |
| 6 | assessments I make is that, well, obviously this is |
| 7 | happening in the County. Although L.A. is still in the |
| 8 | County, it's happening in the unincorporated part of the |
| 9 | County, which would have the L.A. County Fire |
| 10 | Department response instead of L.A. City Fire. |
| 11 | Because if Officer Thompson requested the ambulance, |
| 12 | which I heard over the radio, L.A. City Fire would be |
| 13 | responding. So in my mind I'm forming the opinion that |
| 14 | the Sheriffs are coming to the scene, because L.A. |
| 15 | County Fire is on scene. |
| 16 | And that Officer Thompson was flagged down by a citizen |
| 17 | to this location. |
| 18 | So I don't know what he -- you know, where he was, as |
| 19 | far as traveling on that street.  (RSTA, Feb. 15, 2018, p. |
| 20 | 65:2-22.) |
| 21 | Mr. Smith:  And so at this point what are you trying to do? Or what are you |
| 22 | doing? |
| 23 | Sgt. Ingram:      So I'm trying to determine who is going to handle this call, |
| 24 | is it going to be L.A.P.D. or is it going to be L.A. County |
| 25 | Sheriff's.  (RSTA, Feb. 15, 2018, p. 66:22-27.) |
| 26 | Mr. Smith:  Okay. 3:20 and 23 seconds. [18HL44 DICVS] |
| 27 | Mr. Smith:  At this point, what – can you describe what it is you are doing. |
| 28 | Sgt. Ingram:      Uh, I was having a conversation with Officer Thompson |

1                               prior to that about it becoming L.A.P.D.'s jurisdiction,

2                               because I think I just had a phone call conversation or I

3                               was about to have one – I'm sorry. Strike that.

4                               The Firefighter had just told me that L.A. had just

5                               annexed that property six months prior. So based upon

6                               the Firefighter's assessment and my interaction with him,

7                               I gave minimal direction to Officer Thompson that it in fact

8                               would be our handle at that point.  (RSTA, Feb. 15, 2018,

9                               p. 67:3-16.)

10                                      (People's 3-A was played.)

11 Mr. Smith:  Well, at that point, did you ever speak with the Watch

12               Commander?

13 Sgt. Ingram:       Yes.

14 Mr. Smith:  Okay. And what did you determine?

15 Sgt. Ingram:       I determined that based on the Watch Commander's

16                               knowledge – he said that he believed – he also believed,

17                               without having factual information, that L.A.P.D. did in

18                               fact take that area over. So we were going to be the

19                               investigative body that would handle that situation.

20                               (RSTA, Feb. 15, 2018, p. 67:18-28, p. 68:1.)

21 Mr. Smith:  Okay. And are there any other – are you in charge of these

22               officers at this point?

23 Sgt. Ingram:       No, because I had seen Sergeant Sparkman arrive on

24                               scene, and I gave him some sort of verbal or eye contact

25                               affirmation with him. And, in fact, all of these Officers on

26                               scene did not report to me. They were – Sergeant

27                               Sparkman was their immediate Supervisor.  I just

28                               happened to be the first one on scene. So as a

1              Supervisor, I'm still going to take command and control of

2              that scene, but once I'm relieved by someone who is

3              higher ranking than me or has a line Supervisor over their

4              people, then just as a courtesy but also, you know,

5              Departmental Policy, we relinquish our role. So once I

6              saw him, Sergeant Sparkman shows up, it's kind of a

7              given.  I didn't say "Hey, you're taking over."  It's these

8              are your guys basically. (RSTA, Feb. 15, 2018, p. 69:4-

9              20.)

10  199.  On February 16, 2018, Plaintiff sought to introduce the two business

11        cards into evidence to question Defendant Ingram regarding the

12        location being in Lynwood, the two business cards were marked as

13        court exhibits and the trial court ruled the defense exhibits were

14        hearsay and did not allow any questioning on the issue. At noon, the

15        jury was excused until February 28, 2018.

16  200.  Plaintiff's counsel again raised the issue of the missing items from

17        the NCUOFR.  The Court stated in relevant part " Let me cut it short.

18        I'm Ordering you this afternoon to meet and confer over the use of

19        force packet. Anything you don't have, you will get today. All right?"

20        (RSTA, Feb. 16, 2018, p. 1591:16-20.)

21  201.  On February 22, 2018, Plaintiff's counsel obtained certified county

22        records depicting the area where the use of force incident occurred

23        was in Lynwood.

24  202.  On February 28, 2018, Plaintiff's counsel filed a Emergency Motion

25        to Dismiss Information for *Brady* Violations or Request for a Mistrial

26        and Evidentiary Hearing on the Violations based in part on the

27        incomplete NCUOF Report and lodged certified county records

28        evidencing the location of the use of force incident occurred in

1    Lynwood.

2    203.  On the morning of March 2, 2018, the court denied the Motion to

3          Dismiss Information for *Brady* Violations or Request for a Mistrial

4          ruling that the location of the incident was not relevant to the charge

5          and denied the defense the opportunity to inquire of the

6          DEFENDANT OFFICERS as to the actual location of the incident

7          being in Lynwood.

8    204.  On the afternoon of March 2, 2018, the following exchange occurred

9          on the record between the Court and counsel:

10   The Court:  Let's go on the record in the matter of People vs. Frank

11               Edmonds, TA141211. It has come -- Mr. Smith has let the

12               Court and counsel know that Sergeant Ingram made an effort

13               to check about a Dash-Cam video for his car for September the

14               5th of '16. One does exist. He may be of the opinion that it

15               doesn't show anything, but that opinion is not what counts. It is

16               discovery, and both sides here have to review it.  The Court is

17               informed that it would take two hours at the earliest to get

18               here. (RT–March 2, 2018, p. F-86:10-20.)

19   205.  Before closing argument, DDA Smith disclosed to the court and the

20          defense that Defendant Ingram' DICVS was not turned over to the

21          defense during discovery.

22   206.  The Court then inquired for financial hardship of the jurors, found

23          financial hardship resulting in the loss of jurors and the Court then

24          declared a mistrial.

25   207.  After the jury was excused and unsuccessful efforts to informally

26          resolve the omitted materials from the NCUOFR from the People,

27          Plaintiff's counsel brought the issue to the court's attention.  The

28          court stated in relevant part " Let me cut it short. I'm Ordering you

this afternoon to meet and confer over the use of force packet. Anything you don't have, you will get today. All right?" (RSTA, February 16, 2018, p. 1591:16-20.)  That afternoon the People produced the omitted items: Defendant Whiteman's two Follow-Up Investigations, the taser log for Defendants Ingram and Joyce, and the pages 27/50 through 50/50 of the NCUOFR.

208. Defendant LAPD's failure to disclose the arrest occurred in Lynwood, Defendant Whiteman's Follow-Up Investigations, the omitted taser logs, an accurate NCUOFR, Defendant Ingram's DICVS and Defendant Martinez sustained finding for dishonesty was a violation of *Penal Code*, § section 1054.1 and *Brady*. (See *Gutierrez, surpa*, 214 Cal.App.4th p. 349; *Bridgeforth, supra*, 214 Cal.App.4th p. 1087.)

209. On February 22 and 23, 2018, Plaintiff's counsel obtained certified records evidencing the general area of South Alameda Street South of 103rd Street where the event occurred as being in the City of Lynwood.

210. On February 28, 2018 before trial resumed, Plaintiff filed an Emergency Motion to Dismiss Information for *Brady* Violations or Request for a Mistrial and Evidentiary Hearing on the Violations. When the trial resumed, Plaintiff sought to introduce the certified records to establish the event occurred in Lynwood. The records were marked as court exhibits and the trial court ruled the records were irrelevant to the charge of *Penal Code*, § 69.

211. On March 2, 2018, the trial court heard Plaintiff's Motion to Dismiss (*Brady*) and denied the motion. Following the noon recess, the trial court and counsel conferred and DDA Smith informed the trial court that there may be an additional witness who was unavailable [Defendant Ingram's (18L30) DICVS].

212.  The untimely disclosure of Defendant Ingram's DICVS caused the trial court to declare a mistrial.

213.  On March 23, 2018, Plaintiff filed a supplemental *Vela* [*Vela v. Superior Court* (1989) 208 Cal.App.3d 141 (*Vela*)] motion for an in camera review by the court to determine whether Defendant LAPD determined that the use of force incident occurred outside the city limits of Los Angeles.

214.  On April 3, 2018, the Los Angeles City Attorney's (LACA) Office on behalf of Defendant LAPD, Real Party in Interest, filed an Opposition to the Motion for Pretrial Discovery (*Vela*) that stated in relevant part:

> **B.   *Kyles v. Whitley* (1995) 514 US 419 and *Brady* evidence.**
>
> As a general rule, Real Party does not have an obligation under *Brady* because it is not part of the prosecution team. However, when LAPD acts as an arm of the Prosecution they do have Brady obligations. The Prosecution's *Brady* obligation is non-delegable. Penal Code sections 1054(e) and 1054.1(e) mandate that The People provide *Brady* material to the defense. (Opposition to Motion for Pretrial Discovery (*Vela*), p. 5:22-25, p. 6;1.)

215.  On April 6, 2018, the Honorable Michael Shultz, Judge presiding, heard the supplemental *Vela* motion and prior to the hearing, read and considered the entire unredacted NCUOFR.  Plaintiff's counsel Szocs inquired of Judge Shultz, the question posed was whether or not the LAPD in the use of force investigation had determined whether or not the incident occurred outside the city limits of the City of Los Angeles.  The following exchange between Judge Schultz and Deputy City Attorney Neil Blumenkopf on behalf of the LAPD, Real Party in Interest, occurred on the issue:

The Court:  Okay. You know, I guess I would say this. I'm not sure that he has a right to have that question answered, or that it's even relevant. However, that said, do you have a problem?

1   Blumenkopf:      Well, it's not relevant to the issue of the use of force.

2   The Court: No. But actually, that kind of suggests that it might be relevant

3                   to some other issue.  And it might be a factual issue in the

4                   case. And it might lead to a witness who can testify to some,

5                   perhaps, exculpatory information such as it was not within the

6                   city limits.  Do you understand what I'm saying?

7   Blumenkopf:      I understand it, Your Honor, but it is outside of the scope

8                   of what a Vela motion would entitle that to.

9   The Court: Well, yes and no. If a witness has information that is germane

10                  to the case and that information is potentially exculpatory, then

11                  it would be Mr. Smith's duty to disclose that information. And in

12                  this respect since you're here and the motion has been filed, if

13                  there's information within that file directly on point that he's

14                  asking for, even if it is a witness who is not initially part of the

15                  police reports, I think he'd have a right to it.

16   Blumenkopf:      Well, I guess that's because if it's in a part of the report

17                  that the prosecution would not be entitled to receive.

18   The Court: That can't be. I mean, if there's exculpatory evidence.

19   Blumenkopf:  I mean, if it's in the part of the report that that's internal.

20   The Court: Doesn't have to be in any part of the report. There's

21                  exculpatory evidence even if Mr. Smith doesn't know that it's

22                  exculpatory or doesn't know it exists because it's some other

23                  police officer who has that evidence, he still has a duty to

24                  disclose it. He still has a duty.

25   Blumenkopf:      I understand the duty, but I would assume he would have

26                  to obtain it -- I mean, yet, he would not have access to

27                  that record.

28   The Court: So you would risk an adverse verdict for the defendant, him

Complaint for Damages

1    going to prison or getting convicted, and Mr. Smith didn't have

2    it when it's all in front of me right here and I could disclose it if it

3    exists, that seems like a really bad decision to make on behalf

4    of both the city and the DA's office.

5  Blumenkopf:    I realize the difficulty, Your Honor. I'm just trying to

6    balance not going down a  slippery slope with respect to

7    what they're entitled to out of that report versus the part

8    that the defense would not be entitled to.

9  The Court: No. It's a use of force report. That issue is not addressed

10    anywhere.  (*People v. Edmonds*, Reporters' Supplemental

11    Transcript on Appeal (Pursuant to Notice Dated November 7,

12    2018) dated Apr. 6, 2018, No. B291146, (RSTA–04/06/2018),

13    p. 2407:12-28, p. 2408:1-28, p. 2409:1-9.)

14  216.  After further argument, Judge Schultz stated "No. It's a Use of Force

15    Report. That issue is not addressed anywhere" and denied the

16    motion. (RSTA– 04/06/2018, p. 2407:1-4 and p. 2409:8-9 and p.

17    2409:13.)

18  217.  On the Motion to Compel Discovery, the following relevant exchange

19    occurred between Judge Schultz and counsel:

20  The Court: Let's go back on the record, then. I might have asked or

21    informed counsel to meet and confer with respect to the

22    discovery request that counsel orally articulated and wrote in

23    his motion as well, that is, the taser discharge reports or the

24    reports dealing with the taser. And Mr. Szocs, have you been

25    able to resolve this issue with Mr. Smith?

26  Mr. Szocs: Yes, you Honor. As far as the taser on item 20 and 21 at pages

27    18 and 19 of the motion, that is correct.

28  The Court: Excellent.  And with respect to the sergeant logs, Mr. Smith,

1            what's your position on the sergeant logs?

2 Mr. Smith: Well, if that's the same thing as the Court indicting would be a

3                      daily field activity report, then.

4 The Court: Well I'm no expert, but it is similar. It is not the same things. It

5                      is similar in that it's a log which accounts for their time. Now,

6                      I'm going to share with you that there have been in the past

7                      sometimes people have argued these are not relevant.  I'm

8                      going to tell you straight up that I always find that they're

9                      relevant for review because there are often – not often times,

10                     actually, sometimes. My experience has shown that there is

11                     information in the DFARs that might contradict the police report

12                     or might be in addition to the report. And I'm not going to be in

13                     a position where this case goes to trial and then all of a sudden

14                     they're not around. So I'm *ordering* you. I'm *compelling* you to

15                     get the sergeant's log of Sergeant Ingram and the DFARs.

16                     (Italics added)

17 Mr. Szocs: We would also request for Sergeant Sparkman. Although

18                      Sparkman was never requested he was the most senior

19                      supervisor.

20 The Court: Sparkman?

21 Mr. Szocs: Sparkman, S-P-A-R-K-M-A-N.

22 The Court: Same order for that, unless you turned it over already.

23 Mr. Smith: I don't have those.

24 The Court: Okay. Alright. Anything else?

25 Mr. Szocs: No, Your Honor.

26 The Court: All right.

27 Mr. Szocs: And the daily field activity reports.

28 The Court: That's right.

Complaint for Damages
71

Mr. Szocs:  Thank you.

The Court:  Of all the officers, daily field activity reports of all the officers at the scene.  (RSTA–04/06/2018, p. 2431:23-28; 2432:1-28; and 2433:1-15.)

218.  On April 11, 2018, the defense obtained additional certified county records, specifically a Parcel Map No. 24903 in the City of Lynwood, County of Los Angeles, State of California (Book 280, page 75) that evidenced the detention and arrest occurred in Lynwood, a city outside of the jurisdiction of Defendant LAPD and the DEFENDANT OFFICERS.

219.  On April 12, 2018, Plaintiff's matter was called for hearing. Prior to the hearing, DDA Smith produced the two (2) sergeant logs for Defendants Sparkman and Ingram and a one (1) page document "911query", time range 14:45:00-15:45:59, requestor listed Sgt. Ingram and printed 4/2/2018 to the defense.  DDA Smith represented that this was responsive to Judge Schultz's April 6, 2018 Order to produce the Daily Field activity Reports for "all the officers, daily field activity reports of all the officers at the scene."

220.  During the hearing, DDA Smith made the following representation on the record.

Mr. Smith:  Good morning, Your Honor. This case was brought back for another pretrial because the defense had subpoenaed some documents for a date that was not on calendar. So here we are.  Last court date the Court had ordered me to get some sergeant logs and over the People's objection I did obtain them. So I provided that to counsel. One is one page for Detective Sparkman. One is three pages for Sergeant Ingram. There was also a sheriff's dispatch recording that they had

subpoenaed. I guess it's in the court file, but it also was brought to the -- sent to the DA's office so I gave them the original and made a recording for myself. Lastly, the Court had ordered me to provide the daily field activity reports of the officers. And I informed counsel that as of January 2015, officers that have the MDC device don't fill out DFARS and in this case there was the MDC and that had already been provided to counsel. And so there's nothing to turn over in that regard.  (*People v. Edmonds*, Reporter's Transcript of Proceedings, Apr. 12, 2018, p. 1:25-28; p. 2:1-22)

221.  DDA Smith never produced the Daily Field Activity Reports [as discussed below] which was a violation under sections 1054.1 and 1054.7.

222.  On April 16, 2018, Plaintiff filed a Request for Judicial Notice to establish the event occurred in Lynwood.  Plaintiff also subpoenaed city officials for Lynwood to establish that the September 5, 2016 event occurred within Lynwood.  It was Plaintiff's theory during the second trial that a peace officer who lacks authority under section 830.1, subdivision (a) to detain a person or otherwise act is not engaged in the lawful performance of his duty, and that if Defendant Joyce was not acting lawfully, then Plaintiff could not be convicted of violating section 69. Accordingly, Plaintiff proffered evidence that Defendant Joyce was not acting under the authority given by section 830.1, subd. (a)(1), (2), or (3), and the prosecution could not sustain its burden of proof on this element of the offense.

**XVI.  <u>MAY 1, 2018 RETRIAL</u>**

223.  On May 1, 2018, Plaintiff's criminal matter was called for retrial before the Honorable Sean Coen, Judge presiding. The District

1   Attorney was represented by DDA Smith. Judge Coen heard

2   Plaintiff's 402 motions and excluded the proffered evidence, ruling

3   that any evidence regarding jurisdiction was irrelevant.  Trial

4   commenced and during trial, Plaintiff again sought to revisit the

5   jurisdictional issue and the court denied the request.

6   224.  During the retrial Defendant Thompson's 18HL44 DICVS was

7   marked for identification as People's 3 ("Video") at Volume 3, p. 624

8   ("People's Exhibit 3") and admitted into evidence.

9   225.  During the retrial Defendants Martinez and Borquez-Rivera's 18H53

10   DICVS was marked for identification as People's 6 ("CD") at Volume

11   3, p. 655 ("People's Exhibit 6") and admitted into evidence.

12   226.  On May 3, 2020, during direct examination Defendant Thompson

13   testified in relevant part:

14   Mr. Smith:  And you saw his car in the number 2 lane.

15   Thompson:          Yes, he was in the number two lane, which is the closest

16   lane to the curb.  *(People v. Edmonds*, Volume 3,

17   Reporter's Transcript on Appeal ("3RT") May 3, 2018, p.

18   619:2.)

19   Mr. Smith:  Okay. 3:24:51. Do you see yourself in this shot?  [People's 3]

20   Thompson:          Yes.

21   Mr. Smith:  You hear yourself say, "He was bloody. He didn't do anything

22   wrong"?

23   Thompson:          Uh-huh. (3RT, p. 647:6-11.)

24   Mr. Smith:  Okay. It's 3:25:41. At this point what part of the shot are you

25   generally? I suppose it's hard to say?

26   Thompson:          I'm, like, right in front of Sergeant Ingram and behind

27   Officer Joyce, so my head is, like, sticking up in the

28   middle right there.

| | |
|---|---|
| 1 | Mr. Smith: Okay, I guess from your vantage point, what, if anything, could |
| 2 | you see was happening? |
| 3 | Thompson: Officer Joyce went to grab Plaintiff before he could get |
| 4 | back into the car. He still was able to get in. He turned |
| 5 | around and started kicking at Officer Joyce.  That's when |
| 6 | Officer Joyce took the taser out and tased him.  (3RT, p. |
| 7 | 649:6-18.) |
| 8 | Mr. Smith: At this point where is the defendant? [People's 6] |
| 9 | Thompson: He kneeled down on the ground outside the car.  (3RT, p. |
| 10 | 657:28, p. 658:1-2.) |
| 11 | Mr. Smith: Okay. 3:25:49. Obviously, this is a different angle than what we |
| 12 | just talked about. You heard, "pull him out," what was |
| 13 | happening at this point?  [People's 3] |
| 14 | Thompson: They had taken the keys out of the ignition.  When he got |
| 15 | out, he got upset. He got out. As he was getting back into |
| 16 | the car, the Officers went to grab him before he could get |
| 17 | back in the car. And he still -- he still fought it and went |
| 18 | inside the car and then he started kicking at -- kicking at |
| 19 | the Officers that were right there. That's when he got |
| 20 | tased. |
| 21 | Mr. Smith: When you said "they," do you know who? |
| 22 | Thompson: It looks like it was Officer Joyce and I want to say |
| 23 | Borquez.  (3RT, p. 659:7-19.) |
| 24 | 227.  During cross-examination Defendant Thompson testified: |
| 25 | Mr. Szocs: You wrote the report in this matter; Did you not? |
| 26 | Thompson: Yes. |
| 27 | Mr. Szocs: And your report is true and accurate; Is that correct? |
| 28 | Thompson: Yes.  (3RT, p. 661:18-23.) |

Mr. Szocs: Did you document in your report what your background was as
far as your training through the academy as it related to
narcotics and narcotics investigation?

Thompson:      Not in this report.

Mr. Szocs: Isn't that important, relevant information when you generate a
report?

Thompson:      Not for this report.

Mr. Szocs: Not for this report. Well, why would it not be relevant for this
report as it relates to your training in the area of narcotics if you
believed that narcotics were involved in this incident?

Thompson:      He wasn't getting arrested for narcotics. He didn't get
arrested for narcotics.

Mr. Szocs: You arrest him for being under the influence of alcohol.

Thompson:      No.

Mr. Szocs: Did you document in your report that you smelled alcohol?

Thompson:      I don't recall. No. (3RT, p. 662:18-27.)

Mr. Szocs: At that point after you had lifted up his backpack and were
looking around, did you see any weapons inside the vehicle?
[illegal search and seizure]

Thompson:      No.

Mr. Szocs: See any knives?

Thompson:      No.

Mr. Szocs: Edged weapons?

Thompson:      Not in plain sight.

Mr. Szocs: Crowbar? Screwdriver?

Mr. Smith: Objection; asked and answered.

The Court: Excuse Me?

Mr. Smith: Asked and answered.

1  The Court: Overruled.

2  Thompson:        Not in plain view.  (3RT, p. 667:6-19.)

3  Mr. Szocs: Now, that photograph you can see the curb to the right of the

4           vehicle?

5  Thompson:        Yes.

6  Mr. Szocs: Just so we're clear, that picture is facing southbound on

7           Alameda coming from 103rd.

8  Thompson:        Yes.

9  Mr. Szocs: And there is no color on that curb, correct?

10  Thompson:        No red color, no.

11  Mr. Szocs: Okay. Now, are there signs on Alameda that say you're allowed

12           to park on that stretch of Alameda between 103rd heading

13           toward Martin Luther King Boulevard?

14  Thompson:        No.

15  Mr. Szocs: In the Southbound direction?

16  Thompson:        No, there are signs saying that you can't park on

17           Alameda.

18  Mr. Szocs: I'm sorry. Just so we're clear, there were signs that say no

19           parking?

20  Thompson:        Yes.

21  Mr. Szocs: And in what's been marked as Defense A, do you see any

22           signs that say No Parking as depicted in that still picture?

23           [Defense A, 3RT, p. 668 (still picture from Officer Thompson's

24           Dash Cam Video)]

25  Thompson:        Not in this picture, no.

26  Mr. Szocs: Your familiar with the area?

27  Thompson:        Yes, somewhat.

28  Mr. Szocs: And do you drive up and down Alameda quite frequently?

Complaint for Damages
77

| | |
|---|---|
| 1 | Thompson: |
| 2 | Mr. Szocs: |
| 3 | |
| 4 | |
| 5 | Thompson: |
| 6 | Mr. Szocs: |
| 7 | Thompson: |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | Mr. Szocs: |
| 17 | |
| 18 | |
| 19 | Thompson: |
| 20 | |
| 21 | Mr. Szocs: |
| 22 | Thompson: |
| 23 | Mr. Szocs: |
| 24 | |
| 25 | |
| 26 | Thompson: |
| 27 | Mr. Szocs: |
| 28 | Thompson: |

Thompson:      Yes.  (3RT, p. 669:27-28, p. 670:1-26.)

Mr. Szocs: At any point before the Fire Department arrived were you asked to verify your location being in Los Angeles and not in the City of Lynwood?

Thompson:      Yes. (3RT, p. 671:16-19.)

Mr. Szocs: And how did that occur?

Thompson:      They – dispatch came over and asked me am I in the City of Los Angeles or the City of Lynwood, and at that time – at that point I wasn't really sure 100 percent just because on that street the City of Los Angeles Officers are always trying to figure out the borders at times with other agencies and they change them quite often. So I just wasn't 100 percent. So I didn't have an answer, you know, a legitimate answer for her at the time.  (3RT, p. 671:20-28, p. 672:1.)

Mr. Szocs: Okay. And just so we're clear, your previous testimony was initially pulled up behind Plaintiff. At that point did you determine that Plaintiff was how far from the curb?

Thompson:      I guess my best guess would be about a foot, foot and a half to two feet away from the curb.

Mr. Szocs: A foot to a foot and a half to two feet?

Thompson:      Somewhere along there.

Mr. Szocs: Is there a difference between someone being parked within 18 inches of the curb and someone being parked over 18 inches from the curb?

Thompson:      Is there a difference?

Mr. Szocs: Yes.

Thompson:      Yes.

Complaint for Damages
78

Mr. Szocs: What's the legal significance as it relates to traffic regulation
stopping on a roadway based on your training and experience?

Thompson:         In a legally -- in a -- on a street that you can actually
legally park, I believe it has to be within 18 inches, I
believe.

Mr. Szocs: Approximately?

Thompson:         Approximately.

Mr. Szocs: And you didn't go out there with a tape measure and measure
the distance before you had Plaintiff vehicle towed away about
how far his rear wheel was from the edge of the curbing, did
you?

Thompson:         No.  (3RT, p. 674:7-28, p. 675:1-5.)

Mr. Szocs: At any point did anybody find any drug paraphernalia,
narcotics, heroin, cocaine, methamphetamine?  I'm sure I
probably left a few of the other narcotics.  Find anything in his
vehicle?

Thompson:         No, we did not find any narcotics in his vehicle.  (3RT, p.
698:2-28.)

Mr. Szocs: Okay. Now, did you request to have the Sheriff's Department
respond to your location?

Thompson:         Yes.

Mr. Szocs: Why did you do that, sir?

Thompson:         Two reasons.  Because I believe at one point he had
mentioned being stopped by the police or talked to the
police or something like that or I think one of the
firefighters even said that he -- the Sheriff's had been
over there. So that was probably one reason why I did.
Another reason why I did is because I wasn't sure if it

1                           was our jurisdiction or sheriff's jurisdiction. I kind of

2                           wanted to find out if they had been over there or if they

3                           wanted -- and if so and if it is their jurisdiction, you know,

4                           what do they need from us to assist them to -- to help

5                           Plaintiff along.  (3RT, p. 699:11-25.)

6 Mr. Szocs: You didn't talk to any Sheriffs who responded to the location,

7              did you?

8 Thompson:        I don't remember talking to sheriffs.

9 Mr. Szocs: Do you recall if any Sheriffs showed up?

10 Thompson:        I do recall Sheriffs showing up.  (3RT, p. 700:5-9.)

11 Mr. Szocs: Well, a what point did you make the determination, that is you

12              yourself, were going to arrest Plaintiff -- or, excuse me, detain

13              Plaintiff for narcotics investigation?

14 Thompson:        That's -- it didn't cross my mind to detain Officer

15              Edmonds for narcotics investigation.

16 The Court: Officer Edmonds?

17 Thompson:        Did I say Officer Edmonds?

18 The Court: I believe that's what I heard.

19 Thompson:        Sorry. Defendant.  (3RT, p. 705:28, p. 706:1-9.)

20 228.  Following the afternoon recess, Plaintiff counsel then sought to have

21       the City of Lynwood most knowledgeable person testify relating to

22       parking regulations on Alameda by way of impeachment.  Judge

23       Coen ruled "It's not relevant, counsel."

24 Mr. Szocs: Okay.  Just for the record, Your Honor, I want to make it both

25              under the Fifth Amendment, my client's right to due process, as

26              well as the Sixth Amendment and the Federal Constitution, my

27              client's right to present a complete defense as it relates to this

28              matter. We'll submit it on that. Thank you, Your Honor, and

1    have a nice day.  (3RT, p. 711:10-28, p. 712:1-13.)

2    229.  On May 7, 2020, the cross-examination of Defendant Thompson

3        resumed.

4    Mr. Szocs: Did you discuss emailing your report to any L.A.P.D. Officer

5        before it was submitted for review?

6    Mr. Smith: Objection; Relevance.

7    The Court: Sustained.  (5RT, p. 1204:3-6.)

8    Mr. Szocs: It's approximately 3:08:38.  Officer Thompson, why were you

9        asking the Fire Department if that was the Sheriff's area?

10   Thompson:    I wasn't quite sure exactly where our area ended and

11        where theirs began. I just was curious and wondering just

12        in case if it was Sheriff's, then I would try to get a Sheriff

13        out there to see what they wanted to do or, you know, if it

14        wasn't, if it was ours, then, of course, we'll continue to

15        handle.

16   Mr. Szocs: Just so we're clear, at some point someone is Southbound on

17        Alameda from West 103rd, you leave the City of Los Angeles;

18        is that correct?

19   Mr. Smith: Objection; Relevance.

20   The Court: Sustained.

21   Mr. Szocs: Well, at some point when you were heading South on Alameda

22        from 103rd, you actually go into the City of Lynwood; do you

23        not?

24   Mr. Smith: Objection; Relevance.

25   The Court: Sustained.

26   Mr. Szocs: Well, why were you asking the Fire Department if this was the

27        Sheriff's Department if you knew it was the City of Los Angeles

28        where you were?

1  Mr. Smith:  Objection; Asked and answered.

2  The Court:  Sustained. Counsel, you can move on now.  (5RT, p. 1206:5-
3              28, p. 1207:1-3.)

4  Mr. Szocs  3:13:27. Mr. Edmonds is, again, out of the vehicle. Is that the
5             point in time that you advise Plaintiff that you had a taser?

6  Thompson:      I believe so.

7  Mr. Szocs: And you – did you do something with your taser?

8  Thompson:      Yeah, I put it in my hand and then told him that I have the
9             taser and that was about pretty much it.

10  Mr. Szocs: Okay. And, just so we're clear, when someone says I deployed
11             a taser, that means the Officer, in this case you, you actually
12             removed your taser from your holster and were holding it in
13             your hand, yes?

14  Thompson:      Yes. I gave a warning as well, telling him that I had a
15             taser because of the – because he was pretty aggressive
16             with the firefighters and me and I we were just trying to
17             help him. So I probably could have taken it out a lot
18             sooner, but I decided to, that's when I did.  (5RT, p.
19             1210:11-28.)

20  Mr. Szocs: After the use of force occurred, did you hear any L.A.P.D.
21             Officer make the statement, quote, you can't let him go with
22             use of force, end quote?

23  Mr. Smith: Objection; Hearsay.

24  The Court: Sustained.

25  Mr. Szocs: Your Honor, may we approach sidebar?

26  The Court: Yes.

27             (The following proceedings were held at the bench:)

28  The Court: We're here at sidebar. Yes?

Mr. Szocs:  Your Honor, the way the question was phrased, it's not
hearsay.  I'm not asking him whether, in fact, that statement
was made. I'm merely asking him if he heard if that statement
was made.

The Court:  What's the relevance of whether or not he heard it?

Mr. Szocs:  Well, Your Honor, it goes to the Officer's bias and motive to
fabricate.

The Court:  That's too attenuating. Again, the objection is sustained. Now,
I'll have you move on now, counsel.  (5RT, p. 1220:22-28, p.
1221:1-16.)

230. Paramedic Nielson testified in substance the area where Plaintiff was
stopped could be "L. A. City, could be L.A. County, could be four
different stations' jurisdiction."  (3RT, p. 1246.)

231. Paramedic Nielsen acknowledged the curb where Plaintiff's vehicle
was stopped was not red; it was unpainted.  There were no parking
signs depicted on Defendant Thompson's DCIVS video indicating the
area where Plaintiff's vehicle was stopped was a "no parking" zone.
(3RT, p. 1256-1258.)

232. The evidence established that the responding Defendant officers, the
dispatcher, and the firefighters/paramedics were all unclear if the
incident happened in Lynwood or in Los Angeles. (3RT, p. 620-624,
671, 699:20-21 [Defendant Thompson: Another reason why I did is
because I wasn't sure if it was our was our jurisdiction or sheriff's
jurisdiction], 701, and 1246:17-23.) If the incident happened in
Lynwood, then the Defendant Officers were acting outside their
jurisdiction and were not "executive officers" pursuant to section 69.
If the incident took place in Lynwood, the prosecutor would have had
to adduce evidence showing these out of jurisdiction officers had the

authority to act because their conduct fell within the parameters of
section 830.1, subdivision (a).

233. While the second jury saw the video, the jury was prevented from
hearing Lynwood personnel testify that there, in fact, were no parking
restriction posted on southbound Alameda where Plaintiff's vehicle
was stopped. (3RT, pp. 711-712; 4RT, pp. 1627-1628.)

234. The "proffered evidence" directly contradicted Defendant
Thompson's, Paramedic Nielsen's and Defendant Joyce's testimony
that this was a "no parking" area and that there were parking
restriction signs south of Plaintiff's vehicle.  (3RT, pp. 707-708, 1238;
p.4 RT, p. 1517:20-26.)  The evidence would have called into
question the witnesses' credibility and would have established the
Plaintiff's vehicle was not illegally parked.  Absent a red curb or any
posted parking restrictions, the prosecution could not argue Plaintiff's
vehicle was illegally parked unless the prosecution proved Plaintiff's
vehicle was more than 18 inches from the curb.

235. California *Vehicle Code*, § 22502, subdivision (a) states in pertinent
part "a vehicle stopped or parked upon a roadway with adjacent
curbs ...shall be stopped or parked ... within 18 inches of, the right
hand curb..."

236. On direct examination Defendant Joyce was asked "Are you familiar
with that part of Alameda?" "Yes, sir."  "To your knowledge, can you
have your car parked in that area?"  "No, Alameda is a major
thoroughfare that goes in and out of the Port of Long Beach, so it's a
very busy highway." (*People v. Edmonds*, Reporter's Transcript on
Appeal, May 8, 2018, Volume 4 (4RT), p. 1517:20-26.)

237. Defendant Ingram noticed Plaintiff's vehicle was parked in a
thoroughfare in the roadway and that Plaintiff was bleeding from his

head.  (4RT, pp. 1670-1671.)

238.  Defendant Ingram was trying to ascertain as much information as possible in a limited amount of time and he knew they were on the far eastern border of their division, Plaintiff's vehicle was not parked in a safe manner, neither Plaintiff nor his vehicle had been searched, Plaintiff was bleeding from his head, and Plaintiff claimed he had car trouble. Defendant Ingram wanted to let the firefighters do their job, get the car out of the roadway, then determine who Plaintiff was. (4RT, pp. 1820-1821.)

239.  Judge Coen ruled that the location and parking regulations were not relevant to a violation of section 69. (*Edmonds, supra*, B291146, pp. 11-12.)

240.  On May 10, the jury returned a verdict on guilty on Count 1.

241.  On May 17, 2018, Plaintiff's motion to dismiss was denied and Judge Coen entered a judgment on the jury verdict on Count 1. (*Penal Code*, § 69.)  Judge Coen sentenced Plaintiff to state prison for a term of 9-years on Count 1 and 364-days in the County Jail on Count 2 to run consecutive to the sentence in Count 1. The total sentence as to the matter was 9-years 364-days.

## XVII. <u>REVERSAL OF CONVICTION ON COUNT 1</u>

242.  Plaintiff filed a timely Notice of Appeal and was appointed legal counsel.

243.  On July 16, 2019, the California Appellate Court issued it's unpublished Opinion in the matter of *People v. Edmonds, supra*, No. B291146 and reversed the conviction on Count 1 and affirmed as to Count 2.  The *Edmonds* Court conclude "the trial court abused its discretion in excluding the proffered defense evidence, and, because the error cannot be deemed harmless, we reverse the conviction as

1    to count 1, resisting an executive officer." [Footnote Omitted]

2    (*Edmonds, supra*, B291146, at pp. 3 and 16.)

3    244.  On October 17, 2019, the Remittitur issued and filed with the court.

4    **XVIII.    COMPLAINT OF EMPLOYEE MISCONDUCT**

5    245.  On August 30, 2019, Plaintiff filed a LAPD Complaint of Employee

6          Misconduct against DEFENDANT OFFICERS and FORCE REVIEW

7          DEFENDANT OFFICERS and served on the District Attorney's

8          Office, Public Integrity Division.  The "Complaint of Employee

9          Misconduct" included allegations of misconduct against

10         DEFENDANT OFFICERS and FORCE REVIEW DEFENDANT

11         OFFICERS, and at page 4 thereof specifically alleged in relevant

12         part:

13             See DICVS footage for Officer Thompson (**Exh.
          21(3)** (VTS_01_2.VOB)) beginning at approximately
14        03:28:17 PM where Officers can be heard discussing the
          Use-of-Force incident. Specifically, Officer Joyce is heard
15        making the statement "[h]e's gotta get charged. We can't
          let him go with a use-of-force."
16             By 03:38:00 PM Sgt. Sparkman, Officer Thompson,
          and Officer Joyce are discussing Officer Thompson writing
17        the Arrest Report regarding the source of activity and
          emailing it to Officer Joyce to "cut and paste" the Arrest
18        Report "we'll figure it out". Sgt. Whiteman and Officer
          Pernesky were present as depicted in the DICVS footage.
19             The Arrest Report failed to properly document which
          Officer authored which portions of the Arrest Report.
20             At 03:39:10 PM Sgt. Sparkman can be heard on the
          DICVS footage telling Officer Thompson "[t]his is your call
21        unless you want to do the whole thing this is your call."
               It should be noted that Officer Joyce, the purported
22        victim of the kicking, can then be seen and heard on the
          DICVS footage at 03:39:18 PM instructing Officer
23        Thompson "[l]isten you just type up a source of activity. I
          don't know what the fuck it was". Officer Thompson
24        responded "Okay." (**Exh. 21(3)** (VTS_01_2.VOB))

25    246.  Defendant LAPD assigned Plaintiff's "Complaint of Employee

26         Misconduct" case number CF No. 19-002601. Sergeant Pomeroy

27         was assigned the investigation.

28    247.  On October 3, 2019, Plaintiff's counsel appeared in court but

Plaintiff's matter was not on calendar. Plaintiff's counsel was informed that Deputy District Attorney Alfred Coletta (hereinafter "DDA Coletta") would be handling the case and served a second Request for Informal Discovery and *Brady* material.

248. On November 4, 2019, Judge Coen presiding, reviewed the remittitur and set a hearing after remittitur for November 15, 2019 for jury trial. Plaintiff's defense counsel was notified via US mail and Plaintiff was Ordered out from State prison.

249. On November 7, 2019, defense counsel went to the clerk's office in Compton to inquire of the status of the remittitur and then met with DDA Coletta to discuss the second Request for Informal Discovery and the People's burden of proof regarding the location (Lynwood) and the *Edmonds* Court's Opinion regarding jurisdiction.  DDA Coletta informed Plaintiff's counsel that he had not yet contacted Defendant LAPD regarding Plaintiff's second Request for Informal Discovery and *Brady* material and had no obligation to produce any discovery until thirty (30) days before trial. (See *Penal Code*, § 1054.1, subd. (f).)

250. On November 15, 2019, Plaintiff was present in court and Deputy District Attorney Alfred Coletta (hereinafter "DDA Coletta") made a no time offer that Plaintiff rejected.  Plaintiff's motion to be released on his own recognizance was heard and denied. The court then transferred Plaintiff's matter to the Honorable Judge Laura Walton ("Judge Walton") for all purposes.  Plaintiff filed a Motion to Compel Discovery and *Brady* Material, a Demurrer and a Nonstatutory Motion to Dismiss. DDA Coletta produced Defendant Thompson's Follow-Up Investigation dated October 29, 2019 and four (4) color photographs of the location. Defendant Thompson's Follow-Up Investigation

1    stated in relevant part Defendant Thompson "along with DDA Alfred

2    Coletta and Det. Burns #31549 went to the scene of the arrest for a

3    follow-up. We took measurements and photographs at the scene".

4  251.  Defendant Thompson, who testified during the preliminary hearing

5    and both prior trials, was the first Officer to arrive so his credibility

6    was clearly in issue concerning parking restrictions and the location

7    of the incident as well as the contents of his original Arrest Report

8    and his statements made during the administrative use of force

9    investigation to Defendant Whiteman.  Defendant Thompson's

10    Follow-Up Investigation contradicts the DEFENDANT OFFICERS

11    were located in Los Angeles as documented in the NCUOFR as well

12    as the Departmental review by FORCE REVIEW DEFENDANT

13    OFFICERS.

14  252.  On November 27, 2019, Plaintiff's counsel filed a third Request for

15    Informal Discovery and *Brady* material served on DDA Coletta which

16    stated in part:

17        1. The People produce any and all evidence to rebut the
         defense evidence as stated in the *Edmonds*' Opinion,
18        page 16 which stated in relevant part "[u]nless the
         prosecution were able to rebut the defense evidence, proof
19        of the charge would have failed." [*People v. Edmonds*,
         B291146 (Opinion), page 16]
20
         2.  Any exculpatory evidence, information, documents,
21        reports, statements, emails sent or received, and other
         materials in the possession of, or that have come to the
22        attention of, the prosecuting agency or of any law
         enforcement agency involved in the investigation of the
23        case against the Edmonds. (*Penal Code*, section
         1054.1(e), 1054 et. seq.; [i.e., anything that may have a
24        tendency to exculpate the defendant, impeach any witness
         or evidence, or lessen the punishment should he be
25        convicted pursuant to *Brady v. Maryland* (1963) 373 U.S.
         83 and its progeny; *Giglio v. U.S.* (1972) 405 U.S. 150];
26        (See also *In re Miranda* (2008) 43 Cal.4th 541, 575; *Imbler
         v. Pachtman* (1976) 424 U.S. 409, 427 n25; *U.S. v. Bagley*
27        (1985) 473 U.S. 667, 676.);

28        3.  Any and all information pursuant to *Brady v. Maryland*

(1963) 373 U.S. 83 and its progeny;

4.  All "*Brady* material" n the possession of The People and or the LAPD contained in the TEAMS II Chronological Summary Log System maintained by the LAPD, including but not limited to any materials documented within the TEAMS II System for each officer listed herein.

253.  On December 3, 2019, Plaintiff was present in court and the District Attorney was represented by Deputy District Attorney Shiraz Khalid ("DDA Khalid").  DDA Khalid, prior to the hearing on the motion to compel, produced Defendant LAPD's CAD Summary from September 5, 2016 for DEFENDANT OFFICERS which was printed on November 18, 2019. Judge Walton called Plaintiff's matter and the following exchange occurred on the record.

The Court:  Let's start with the discovery. I have the latest, which is a third Request for an Informal Discovery that was filed with the Court on November 27th, 2019, which is basically seeking, one, any informal discovery that has not been turned over by the People, and then a Request for Brady Material. Is there any outstanding discovery in the possession of the People that have not been turned over to defense counsel at this time?

Mr. Khalid:  The only – I have two items, your Honor, and, one, I don't believe it's outstanding. I'm turning it over in an abundance of caution. It is a Daily Field Activity Report for the Officers involved in this incident. There are six pages of DFAR's as well as an e-mail from the Detective confirming the existence of those reports, as well as an issue where the Officer's serial number and name don't match up in the reports. So it explains one of the reports. I'm turning over that e-mail. It's seven pages, and I'm turning it over on the record. Again, this is in an abundance of caution. I believe it would have likely been turned

1          over in the prior two trials. (*People v. Edmonds*,

2          Reporter's Transcript of Proceedings, dated Dec. 3, 2019

3          (RTP–12/03/2019), p. 2:23-28 and p. 3:1-7.)

4  Mr. Szocs:  Just for the record, your Honor, the discovery that has been

5          provided has Sergeant Ingram, his DFAR Report. We have

6          Sparkman, Sergeant Sparkman, Officer Martinez and Rivera,

7          Officer Joyce and Pernesky, Officer Lovall [Lobo] and Hutchins.

8          Might I add, your Honor, none of these documents were

9          provided to the defense during the first or second trial. And will

10         make the representation off the top of my head to this court.

11         Now, the information that we now received as far as Officer

12         Thompson was limited to, I believe, 3 o'clock or 3:30, which

13         was when this incident happened. He was arrested, ultimately, I

14         believe it was around 3:23 in the afternoon. Now, this CAD

15         Summary Report from Officer Thompson does indicate that the

16         last entry End of Watch, EOW is 23:50, which further supports

17         the defense's contention. And we'll be more than happy to go

18         discuss the People's new offer, and then come back and re-

19         visit the discovery issue on this point, your Honor. Thank you.

20         And the e-mail that was from the Detective. (*People v.*

21         *Edmonds*, RTP–12/03/2019, p. 13:9-28 and p. 14:1-3.)

22  Mr. Khalid:  Outside of that, I don't have any *Brady* material. Everything

23         else has been turned over, I believe, through the course of two

24         pretrials now in this case.

25  Mr. Khalid:  I believe that any other discovery that would be sought for that

26         purpose would be for a civil matter, not for this criminal case.  It

27         would have no bearing on *Brady* or any relevance to the case

28         at hand.

The Court:  All right. And for the defense, the People have turned over two additional items. They indicate they have nothing else currently in their possession that is discoverable to turn over to you.

(RTP– 12/03/2019, p. 3:21-24 and p. 4:3-10.)

254.  The representation to the Court and counsel of "not having any *Brady* material" was materially false. [Defendant Martinez's sustained finding for dishonesty](See Head Deputy Richard Doyle's (HD Doyle) Letter, November 16, 2020, Defendant Martinez sustained finding of dishonesty.

255.  DDA Khalid further represented on the record, to the court and Plaintiff's counsel, that the People had made previous offers to Plaintiff, time served, no probation which stated in relevant part:

Mr. Khalid:  It is offensive. And it is against the actual interest of their client for the criminal case because the People have made offers in the past. They're time served, no probation. It's a read herring. The only reason they're going after these HR reports, these time cards is because they have a civil case against the City. They are masquerading a civil issue under the guise of this criminal case.  It is offensive. And it is against the actual interest of their client for the criminal case because the People have made offers in the past. They're time served, no probation. They denied that. They rebuffed our ability to come to a mutual, intellectual agreement with Mr. Edmonds so he would be out of custody. And the, People, again are making a time served, no probation offer to Mr. Edmonds today for a Misdemeanor, a Count 1 PC 69.  And he can be out today. I want it on the record, and to state in front of Mr. Edmonds because I believe – the People believe the only reason for

1    going after these human resources reports, these time cards is
2    to assist in the civil case.  And – and as such, in the interest of
3    justice, in the interest of fairness to allow Mr. Edmonds to get
4    out today, we're offering a Misdemeanor Count 1 PC 69 for
5    credit time served. And to go forward, if he wants to put in a
6    request to expunge his record for that misdemeanor conviction,
7    he can do so – he can do so today and file it with the court and
8    the People will not oppose the expungement. (RTP-12/03/2019,
9    p. 7:5-28 and p. 8:1-4.)

10   256.  DA Khalid also represented that the People would be adding a
11         violation of Penal Code, § 245(a)(4), a Misdemeanor as a Count 3.
12         (RTP–12/03/2019, p. 15:6-15.)

13   257.  Following additional argument, the court denied Plaintiff's Motion to
14         Compel Discovery (RTP–12/03/18/2019, p. 2:14-28 – p. 14:1-3,
15         Recess, p. 14:7-28 – p. 26:1-2) and the demurrer.
16         (RTP–12/03/18/2019, p. 41:18-19.)  On that Non-Statutory Motion to
17         Dismiss, the Court denied the motion. (RTP–12/03/18/2019, p.
18         42:10-28 – p. 52:1-4.)

19   258.  Plaintiff's counsel had first requested the CAD Summary Reports for
20         the DEFENDANT OFFICERS on September 19, 2016 which was
21         over three (3) years and two (2) months before it was finally
22         disclosed. Additionally, previously on April 6, 2018, Judge Schultz
23         had Ordered and compelled the People to produce the Dailey Field
24         Activity Reports for each DEFENDANT OFFICER who responded.
25         On April 12, 2018, the People represented by DDA Smith produced
26         the two (2) sergeant logs for Defendants Sparkman and Ingram and
27         a one (1) page document "911query", time range 14:45:00-15:45:59,
28         requestor listed Defendant Ingram for Defendant Thompson and

1    printed 4/2/2018 to Plaintiff's counsel.

2    259.   On December 3, 2019 for the court hearing, Plaintiff's counsel
3           provided the CAD Summary Reports printed November 18, 2019 for
4           DEFENDANT OFFICERS to Sergeant Pomeroy of Defendant LAPD.

5    260.   On December 13, 2019, Plaintiff filed Motion for Formal Bail Hearing.

6    261.   On December 18, 2019, DDA Khalid filed an Amended Information
7           which added a Count 3, a violation of *Penal Code*, § 148(a)(1) as a
8           Misdemeanor [Resisting, Delaying or Obstructing a Public Officer,
9           Peace Office or Emergency Medical Technician (Jeffrey Joyce, a
10          peace officer)] and Count 4, a violation of *Penal Code*, § 242 as a
11          Misdemeanor [Battery Jeffrey Joyce as a person].  Plaintiff filed
12          Demurrer as to Count 3 and Judge Walton continued the matter.

13   262.   On January 6, 2020, Plaintiff filed a Supplemental Demurrer raising
14          the issue of statute of limitations and the factual inconsistent theories
15          from the prior trials.

16   263.   On January 8, 2020, Plaintiff was present in court and DDA Khalid
17          moved to dismiss Count 4 of the Amended Information.  Judge
18          Walton dismissed Count 4 and continued the matter until February
19          10, 2020.

20   264.   On January 27, 2020 filed and served his Re-Notice of Motion for
21          Request for Judicial Notice in support of his Demurrer.

22   265.   On January 28, 2020, Plaintiff filed a third Motion to Suppress and a
23          Pretrial Discovery *Pitchess* Motion and *Brady* material as to
24          Defendant Joyce only which was served on Defendant LAPD
25          Discovery Unit.

26   266.   On February 7, 2020, DDA Khalid filed Motion to Amend the
27          Information adding a Count 3 and a Second Amended Information
28          adding a Count 3, a violation of *Penal Code*, § 148(a)(1), a

Misdemeanor [Resisting, Delaying or Obstructing a Public Officer,
Peace Office or Emergency Medical Technician (Jeffrey Joyce, a
peace officer)].

267. On February 10, 2020, Judge Walton continued the hearing on the
Demurrer until February 24, 2020 to be heard with the Pretrial
Discovery *Pitchess* Motion and *Brady* material.

268. On February 24, 2020, Plaintiff was present in court.  Judge Walton
granted Plaintiff's Pretrial Discovery *Pitchess* Motion and *Brady*
material, conducted an in camera hearing and Ordered the
Custodian of Records, LAPD to produce information to Plaintiff's
counsel.  Judge Walton denied the motion to suppress and overruled
the Demurrer, Plaintiff was arraigned on the Second Amended
Information, pled not guilty and denied the special allegations as to
Count 1.  The matter was set for March 16, 2020 for a pretrial
hearing.

269. On March 4, 2020, Plaintiff filed his fourth Request for Informal
Discovery and *Brady* Material.

270. On March 11, 2020, Plaintiff received a copy of the February 24,
2019 Reporter's Transcript of Proceedings.

271. On March 13, 2020, Plaintiff filed a Pretrial Discovery *Pitchess*
Motion and *Brady* Material as to Defendants Borquez, Pernesky,
Thompson, Hutchins, Lobo, Martinez, Ingram, Sparkman, and
Whiteman.

272. On March 16, 2020, Plaintiff was present in court and requested a
stay of the proceeding to file a writ of prohibition and a writ of
mandate, Judge Walton took a time waiver, granted the stay and
adjourned criminal proceedings.  Plaintiff withdrew his Pretrial
Discovery *Pitchess* Motion and *Brady* Material.

273. On March 23, 2020 Plaintiff filed a writ of mandate in the California Appellate Court, No. B305075. On March 25, 2020, the Appellate Court issued an Order in No. B305075 staying the trial court proceedings pending resolution of the petition or further order of the Court.

274. On March 27, 2020 Plaintiff filed a writ of prohibition under No. B305129.

275. On April 3, 2020, Plaintiff served his fifth Request for Informal Discovery and *Brady* Material on DDA Khalid which was filed on June 10, 2020.

276. On May 15, 2020, Plaintiff served his sixth Request for Informal Discovery and *Brady* Material on DDA Khalid which was filed on June 10, 2020.

277. On May 15, 2020, Plaintiff also mailed the fifth and sixth Request for Informal Discovery and *Brady* Material on Defendant LAPD, Discovery Unit.

278. On June 9, 2020 the Appellate Court denied the writ of mandate in No. B305075, the stay was dissolved and denied the writ of prohibition in No. B305129.

279. On June 10, 2020, Plaintiff filed two (2) separate Pretrial Discovery *Pitchess* Motion and *Brady* Material against defendant LAPD for the NCUOFR and DEFENDANT OFFICERS involved in the use of force incident which was continued by the trial court.

280. On July 7, 2020 Plaintiff filed a second Nonstatutory Motion to Dismiss and a Request for Judicial Notice which moved the trial court for an evidentiary hearing and an Order to dismiss the Second Amended Information on the grounds that the People violated Plaintiff's constitutional rights of due process under the Fifth and

Fourteenth Amendments, state due process and *Brady v. Maryland* (1963) 373 U.S. 83 and it's progeny that was a deprivation of Plaintiff's substantial rights at the preliminary hearing.

281. On July 7, 2020, Plaintiff was present in court, Judge Walton was unavailable so the Honorable John Lonergan, Judge presiding pursuant to the General Order of the Presiding Judge continued the pretrial conference, the Pretrial Discovery *Pitchess* Motions and *Brady* Material and advanced and reset the hearing date on the Nonstatutory Motion to Dismiss until August 7, 2020.

282. On July 23, 2020, Plaintiff filed two separate Applications for Appointment of Expert Witness for trial.

283. On July 23, 2020, Plaintiff served his seventh Request for Informal Discovery and *Brady* Material on DDA Khalid.

284. On July 31, 2020, Plaintiff served his eighth Request for Informal Discovery and *Brady* Material on DDA Khalid.  The seventh and eighth Request for Informal Discovery and *Brady* Material were filed that same day.

285. On July 31, 2020, Plaintiff's counsel submitted a Public Records Request to Defendant LAPD, Discovery Unit for each DEFENDANT OFFICER involved in the use of force incident and for Defendant Burns as well as a separate Public Records Request for the NCUOFR.

286. On August 7, 2020, Plaintiff was present in court, Judge Walton was unavailable so the Honorable Kelvin Flier, Judge presiding continued the pretrial conference and motions.

287. On August 19, 2020, Plaintiff was present in court, Judge Walton was unavailable so the Honorable H. Jacke Clay, II, Judge presiding continued the matter and pending motions until September 1, 2020.

288. On August 28, 2020, Plaintiff's counsel received a letter from Defendant LAPD, Discovery Section, Legal Affairs Division that stated in relevant part "At this time, the Department is conducting a search for records, pursuant to Penal Code Section 832.7(b)(1)(A)-(C),pertaining to sustained complaints of sexual assault and/or dishonesty for Officer Martinez, Matthew-Serial No. 32880. (LAPD Letter Record Request #20-5295)"

## XIX.  DISMISSAL PURSUANT TO PENAL CODE § 1385

289. On September 1, 2020, following several continuance, Plaintiff was present in court for his pretrial (13 of 45 plus additional 30 days) with various motions then pending.  After calling the matter, Judge Walton stated "[s]o with that being said, the Court, on its own motion, dismisses the case pursuant to Penal Code section 1385[10].  So would any side like to be heard?" (*People v. Edmonds*, Reporter's Transcript of Proceedings, 09/01/2020, p. 6:23-25 (RTP-09/01/2020).) There was a brief recess in the proceedings for counsel to confer and after the recess, the following relevant exchange between the court and counsel occurred.

---

[10] *Pena Code*, § 1385 (a) The judge or magistrate may, either of his or her own motion or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed. The reasons for the dismissal shall be stated orally on the record. The court shall also set forth the reasons in an order entered upon the minutes if requested by either party or in any case in which the proceedings are not being recorded electronically or reported by a court reporter. A dismissal shall not be made for any cause that would be ground of demurrer to the accusatory pleading.

(b) (1) If the court has the authority pursuant to subdivision (a) to strike or dismiss an enhancement, the court may instead strike the additional punishment for that enhancement in the furtherance of justice in compliance with subdivision (a).

(2) This subdivision does not authorize the court to strike the additional punishment for any enhancement that cannot be stricken or dismissed pursuant to subdivision (a). (Amended by Stats. 2018, Ch. 1013, Sec. 2. (SB 1393) Effective January 1, 2019.)

The Court: Is my understanding of the case. I want the record to also reflect that in plea negotiations after this case was reversed by the Appellate Court, the People offered to give the Defendant a misdemeanor PC 69 for time served. (RTP–09/01/202, p. 5:13-17.)

Mr. Khalid: . . . . The People believe and know that we can prove this case beyond a reasonable doubt given the case law in People v. Rogers as well as the State of California laws as to the authority and jurisdiction of peace officers. . . . . (RTP–Sept. 1, 202, p. 10:18-21.)

Khalid: . . . . And we believe that we have met all of our obligations in terms of *Brady*, in terms of discovery, and that this case should be a case that – should be put forth to a jury to allow them to hold Mr. Edmonds responsible. . . . . (RTP-Sept. 1, 2020, p. 11:11-15.)

Mr. Szocs: No, your Honor. We'll stand on the Appellate Court's Opinion as far as the officer's conduct. (RTP-Sept. 1, 2020, p. 12:16-8.)

The Court: . . . . I was assuming in my decision to dismiss pursuant to P.C. 1385 that the People would be able to prove their case again in front of a jury and receive a guilty verdict as to PC 69, the felony. . . . .  (RTP–Sept. 1, 2020, p. 12:23-26.)

290.  The People's argument to Judge Walton and reliance on "*Rogers*" in misplaced as the *Edmonds* Court held that argument "lacks merit." (*Edmonds*, *supra*, B291146, pp. 14-15.) Prior to the dismissal, Judge Walton did not rule on Plaintiff's Non-Statutory Motion to Dismiss and Request for Judicial Notice.

291.  Defendant Martinez's sustained finding for dishonesty [*Brady*] (discussed below), was never disclosed by DEFENDANT

1  OFFICERS, Defendants LAPD, CLA, and Martinez prior to the
2  dismissal.

3  **XX.   RELEASE FROM CUSTODY**

4  292.  On September 5, 2020 at 17:45, Plaintiff was released from the
5  custody of the LASD.  The Release Reason listed "ORDS" and the
6  Reason Description list "COURT ORDER FOR RELEASE."  After 4-
7  years and 1-day of wrongful incarceration, Plaintiff was released from
8  custody.

9  293.  As of the date of filing this Complaint, Plaintiff is informed that
10  Defendant LAPD's Internal Affairs Investigation under Case No. 19-
11  002601 is still open.

12  294.  Defendant Joyce and the other DEFENDANT OFFICERS involved in
13  the use of force incident have been allowed to remain on the police
14  force and has demonstrated that Defendant Joyce and the other
15  DEFENDANT OFFICERS have not been adequately disciplined,
16  suspended, retrained, terminated, investigated, "flagged," or
17  supervised, which has continually placed members of the general
18  public in danger.

19  **XXI.  POST DISMISSAL *BRADY* NOTIFICATION**

20  295.  On November 20, 2020, Plaintiff's counsel received HD Doyle's letter
21  dated November 16, 2020 regarding Defendant Martinez's sustained
22  finding for dishonesty which stated in relevant part "It has come to
23  our attention that Officer Matthew Martinez, #32880, of the Los
24  Angeles Police Department, has a sustained finding for dishonesty
25  for an incident that occurred on June 8, 1998.  The evidence of
26  Officer Martinez's conduct constitutes potential impeachment
27  information and must be disclosed to the defendant."

28  296.  The *Brady* notification letter establishes that Defendant LAPD

violated it's constitutional obligations under *Brady v. Maryland* (1963) 373 U.S. 1 as well as it's discovery under sections 1054.1 and 1054.7. (See Form 8. Model Letter to Defense Attorney, page 25 of 27; Source: https://da.lacounty.gov/sites/default/files/policies/Brady_Compliance_Unit_Operations_Manual.pdf. )

297. On December 29, 2020, Plaintiff's counsel Szocs sent an email to Sergeant Pomeroy, LAPD, Internal Affairs and HD Doyle raising the *Brady* issue as to why Defendant Martinez's "sustained finding for dishonesty" had not been disclosed.

298. On December 30, 2020, HD Doyle responded and stated in relevant part "Thank you for your correspondence.  As this case has been dismissed, I am under no obligation to answer your questions.  I personally relayed the information contained in my letter to you within 6 days of receiving it."  The email response failed to disclose the date that Defendant LAPD disclosed Defendant Martinez's sustained finding for dishonesty to the District Attorney's Office.

## XXII. **LAPD UPLOADS DEFENDANT MARTINEZ MATERIAL**

299. On February 4, 2021, over five months after the dismissal, Defendant LAPD, Discovery Section, CPRA Unit, sent an email that stated in relevant part "[t]he Department has uploaded documents responsive to your request for Defendant Mathew Martinez, Serial No. 32880." "The Department will continue to search for, review and disclose records responsive to your request, and provide you with updates on any future developments regarding your request."

300. Defendant LAPD uploaded Defendant Martinez's information to the LAPD website at https://lacity.nextrequest.com/requests/20-5295.

301. Defendant Martinez's [*Brady* material] "sustained finding for

dishonesty" (CF No. 98-3701) was not disclosed by Defendants LAPD and CLA to Plaintiff until well after his criminal case had been dismissed.

302. Defendant Martinez's sustained finding for dishonesty occurred while the Justice Department was investigating the LAPD for excessive force violations. Pursuant to the consent decree, Defendants CLA and LAPD was required to prepare and implement a plan for inputting historical data into TEAMS II (the "Data Input Plan") that included Defendant Martinez's sustained finding for dishonesty. (See paragraph 42 of the consent decree.)

303. Defendant LAPD in the Findings under the heading <u>RATIONAL</u> stated in relevant part "Fortunately, Officer Martinez admitted that he provided false and misleading statements in his initial complaint interview. He said he did not want to get his partner, Officer Jones, in trouble for the aforementioned conduct." (Letter of Transmittal, CF No. 98-3701(Revised, April 21, 1999), Page 5, 6.4.)

304. Defendant LAPD in the Findings under the heading <u>PENALTY</u> stated in relevant part "It is recommended that Officers Jones and Martinez be directed to a **Board of Rights.**"

> There are two critical principals that have been violated in this case, as well as several rules. The first principal is the duty to enforce the law. This duty is covered in two of our Core  Values: Service to Our Communities and Reverence for the Law. It is a police officer's duty to enforce the law and this enforcement is essential to one of our functional objectives the "Movement Traffic." Not only must officers be diligent in their enforcement they can not back down when society expects us to act.
>
> The second principle, which may impose even more responsibility for officers, is that of integrity. The integrity of police officers of this Department must be beyond reproach of and question. Although they ultimately recognized their mistake, serious questions about their integrity remain. Their initial untruthful denials cause this commanding officer to question  their ability to continue to

perform as police officers. A lack of integrity causes the public, especially in dealing with our judicial system, to loose confidence in the Department and casts doubt on every action. The public trust is destroyed when officers do not perform their duties and responsibility with utmost diligence, honesty and professionalism.

The failures to follow department rules as to the request for a supervisor, the reporting of the loss of the citation book, and finally the unprofessional conduct with the violator are made even more serious by the primary, underlying failures.

The misconduct of Officers Jones and Martinez in this case is extremely serious and calls their continued employment as a Los Angeles Police Officer into question. Even though some consideration is given to the officers for eventually being forthright and for having a fairly good work and complaints history, the penalty in this case should clearly exceeds a twenty-two day suspension recommendation, and as a result the officers should be directed to a Board of Rights.  (Letter of Transmittal, CF No. 98-3701 (Revised, April 21, 1999), Page 6, 6.4.)

305.   Defendant LAPD in the finding under the heading <u>ADMINISTRATIVE</u>

<u>INSIGHT</u> stated in relevant part:

**Training Issues.** . . . . *In addition, the Area commanding officer will address the integrity issues, in particular the "Brady problems" for police officers who are found guilty of false and misleading statements at the March 10, 1999, Wilshire Area supervisors meeting.* (Italics added) ....

306.   Defendants LAPD and CLA had an obligation to disclose (1) the relevant exculpatory information that the arrest occurred in Lynwood, a city outside of the jurisdiction of Defendant LAPD and DEFENDANT OFFICERS; (2) Defendant Martinez's sustained finding for dishonesty; (3) the NCUOFR; (4) Defendant Whiteman's Follow-Up Investigation dated September 15, 2016; (5) Defendant Whiteman's Follow-Up Investigation dated November 12, 2016; (6) Defendant Ingram's DICVS; (7) DEFENDANT OFFICERS DFAR's; and (8) DEFENDANT OFFICERS CAD Summary Reports before the preliminary hearing as well as before the first trial and second trial.

307.   In March of 2021 after reviewing Defendant Martinez's sustained finding for dishonesty, Plaintiff's counsel re-reviewed the September 5,

2016 DICVS for Defendants Martinez and Borquez and determined that these Defendants transported Plaintiff from Saint Francis Hospital to the Southeast Police Station which was not documented in the Arrest Report.  While at the station, Plaintiff was interviewed by Defendant Linder at 11:15 p.m..  The contact was recorded [back seat video] by Defendants Martinez and Borquez's DICVS, who were present, and the following exchange was recorded between Defendant Linder and Plaintiff:

Sgt. Linder:      Know why you're here, are you sick?

Plaintiff:         Yeah, injury to my head.

Sgt. Linder:      How did that happen?

Plaintiff:         I got jumped on.

Sgt. Linder:      By who?

Plaintiff:         By two Mexicans and his girlfriend.

308.  At the end of the exchange, Defendant Linder stated "I'll just put refused."  (See DICVS: 40556@20160905225419.mpg begin 20:26 till 21:19.)  Defendant Linder's questioning was not documented in the Arrest Report, was false in that Plaintiff answered the questions put to him and did not refuse to answer any questions, and that Plaintiff was a victim of a crime having been jumped.  Defendants Martinez and Borquez failed to advise Defendant Thompson that Plaintiff was the victim of a crime and failed to report the misconduct of Defendant Linder for failing to correctly document the interview during the booking process.

## XXIII.      SUPPLEMENTAL COMPLAINT OF EMPLOYEE MISCONDUCT

309.  On March 26, 2021, Plaintiff's counsel served Sergeant Pomeroy of Defendant LAPD [Internal Affairs Group] with Plaintiff's "Supplemental

Complaint of Employee Misconduct" against Defendant Borquez, Defendant Martinez, and Defendant Linder as set forth herein above for failing to properly document that Plaintiff was the victim of an assault having been jumped and against Defendants Borquez and Martinez failing to report a fellow officers misconduct.

310. Plaintiff alleges that DEFENDANT OFFICERS acted in accordance with orders given by supervisors from the highest command positions, in accordance with policies and procedures instituted by Defendants LAPD and CLA.

XXIV. **LOS ANGELES CONSENT DECREE AND BRADY POLICY**

311. On November 3, 2000, the City of Los Angeles and the United States Department of Justice agreed to enter into a consent decree, which allowed for federal oversight of the LAPD reform process for a period of five years. On June 515, 2001, the consent decree was entered into law [2:00-CV-11769-GAF-RC] and called for an independent monitor – to oversee the implementation of the specific reforms listed in the consent decree under the guidance of a federal judge. Under the consent decree, the LAPD was required to develop a computerized database which would contain information on police officers including: all uses of lethal and non-lethal force; all officer-involved shooting incidents and firearms discharges; all incidents in which a complaint has been filed against the officer; and all arrest reports and citations made by the officers, including motor vehicle and pedestrian stops. In addition, the database would contain information about those persons detailed by the officer – including demographic information such as race, ethnicity, gender, and age.  Using information from this database, the LAPD must perform regular audits to be reported

quarterly to the Police Commission and Inspector General. (Source: https://www.pbs.org/wgbh/pages/frontline/shows/lapd/later/decree.html)

312. Pursuant to paragraph 39 of the consent decree, Defendant CLA was required to implement TEAMS II [Computer Information System] and stated in relevant part:

> The City has taken steps to develop, and shall establish a database containing relevant information about its officers, supervisors, and managers to promote professionalism and best policing practices and to identify and modify at-risk behavior (also known as an early warning system). This system shall be a successor to, and not simply a modification of, the existing computerized information processing system known as the Training Evaluation and Management System ("TEAMS"). The new system shall be known as "TEAMS II".

313. Pursuant to paragraph 41 of the consent decree, it stated in relevant part:

> TEAMS II shall contain information on the following matters:
> a. all non-lethal uses of force that are required to be reported in LAPD "use of force" reports or otherwise are the subject of an administrative investigation by the Department; ....
> e. all other injuries and deaths that are reviewed by the LAPD Use of Force Review Board (or otherwise are the subject of an administrative investigation); ....
> g. all Complaint Form 1.28 investigations;
> h. with respect to the foregoing clauses (a) through (g), the results of adjudication of all investigations (whether criminal or administrative) and discipline imposed or non-disciplinary action taken;
> l. all written compliments received by the LAPD about officer performance; ....
> l. all civil or administrative claims filed with and all lawsuits served upon the City or its officers, or agents, in each case resulting from LAPD operations, and all lawsuits served on an officer of the LAPD resulting from LAPD operations and known by the City, the Department, or the City Attorney's Office; ....
> q. all management and supervisory actions taken pursuant to a review of TEAMS II information, including non-disciplinary actions.
>
> TEAMS II further shall include, for the incidents included

Complaint for Damages
105

in the database, appropriate additional information about involved officers (e.g., name and serial number), and appropriate information about the involved members of the public (including demographic information such as race, ethnicity, or national origin). Additional information on officers involved in incidents (e.g., work assignment, officer partner, field supervisor, and shift at the time of the incident) shall be determinable from TEAMS II.

314. Pursuant to paragraph 42 of the consent decree, it stated "The Department shall prepare and implement a plan for inputting historical data into TEAMS II (the "Data Input Plan"). ...." (Source: https://www.justice.gov/crt/la-consent-decree-section-ii; see also https://www.justice.gov/crt/file/826956/download.)

315. Defendant Martinez's sustained finding for dishonesty occurred while the Justice Department was investigating Defendant LAPD for excessive force violations. Pursuant to the consent decree, Defendant LAPD was required to prepare and implement a plan for inputting historical data into TEAMS II (the "Data Input Plan") that included Defendant Martinez's sustained finding for dishonesty. (See paragraph 42 of the consent decree.)

316. On September 20, 2010 while the consent decree was still in force, District Attorney Steve Cooley issued Special Directive 10-05 subject "Possible *Brady* Material in the Possession of Law Enforcement" to all Deputy District Attorneys which stated on December 7, 2002, the District Attorney's office issued a comprehensive *Brady* policy set forth in Special Directive 02-07 and Special Directive 02-08. This Special Directive supersedes Special Directive 02-07.  (Source: https://da.lacounty.gov/sites/default/files/policies/Brady_sd10-05.pdf.)

317. District Attorney Steve Cooley also issued the office *Brady Compliance Unit Operations Manual* dated September 2010. (Source: (https://da.lacounty.gov/sites/default/files/policies/Brady_Compliance_

Unit_Operations_Manual.pdf)

318. On May 16, 2013, after twelve years the Consent Decree was lifted. (Source:

https://losangeles.cbslocal.com/2013/05/16/civil-rights-consent-decree-over-lapd-lifted-after-almost-12-years/.)

319. On June 4, 2013, District Attorney Jackie Lacey issued Special Directive 13-01 subject "General Policy Regarding Disclosure of Exculpatory Information" to all Deputy District Attorneys which stated in relevant part "Subject to any future changes in the law, this Special Directive sets forth the office policy regarding disclosure of exculpatory information pursuant to *Brady v. Maryland* (1963) 373 U.S.83, its progeny, and Penal Code Section 1054.1(e). To the extent that this Special Directive conflicts with previous policies, this Special Directive controls."

320. Special Directive 13-01 is available to the general public. (Source: https://da.lacounty.gov/sites/default/files/policies/Brady_Special_Directive_13-01.pdf)

321. Under federal and state due process, Defendants LAPD and CLA had a legal obligation under *Brady* to disclose the exculpatory evidence. (*Gutierrez, supra*, 214 Cal.App.4th 343.)

322. The District Attorney's Office issued a *Legal Policies Manual – February 10, 2017* available to the general public before Plaintiff's preliminary hearing. (Source: https://da.lacounty.gov/sites/default/files/policies/2017LPM-CH14.pdf)

323. On March 15, 2018, District Attorney Jackie Lacey issued Special Directive 18-02 to all Deputy District Attorneys subject Replacement of Chapter 14 of the Legal Policies Manual on Disclosure of Exculpatory and Impeachment Information which was issued before the second

trial. (Source:

https://da.lacounty.gov/sites/default/files/policies/Brady-sd18-02.pdf)

324. On December 17, 2019, Chief Deputy District Attorney Joseph P. Esposito issued Special Directive 19-08, to all Deputy District Attorneys subject "Discovery Compliance System Updates" . . . . which was issued before the filing of the First Amended Information and the Second Amended Information. (Source: (https://da.lacounty.gov/sites/default/files/policies/SD19-08-Discovery-Compliance-Updates.pdf)

325. At all relevant times herein, Defendants LAPD and CLA were aware of their *Brady* obligations.

**XXV. DAMAGES**

326. Due to the acts of the Defendants, Plaintiff has suffered, and continues to suffer, and is likely to suffer in the future, extreme and severe mental anguish as well as mental and physical pain and injury.

327. As a direct and proximate result of being unlawfully detained without a warrant or without probable cause, under color of authority by DEFENDANT OFFICERS, Plaintiff was assaulted, battered, subjected to excessive force, Tased six (6) times, falsely arrested, falsely imprisoned, maliciously prosecuted, and wrongfully incarcerated in County and State custody which caused Plaintiff to sustain damages in a sum to be determined at trial.

328. As a further direct and proximate cause Plaintiff suffered serious physically injury to his person and mind. As a further direct and proximate result, Plaintiff continues to experience and suffer, *inter alia*, significant emotional trauma and post-traumatic stress disorder fearing that law enforcement will continue to victimize Plaintiff in the future. Plaintiff has also suffered emotional harm, including but not limited to,

loss of appetite, loss of sleep, anxiety, fear, depression and anger. Plaintiff has flashbacks of the incident when he tries to go to sleep. Plaintiff feels he was punished for exercising his Constitutional Rights as a result of the DEFENDANT OFFICERS' use of excessive force during the incident. Instead of protecting citizens, like Plaintiff, DEFENDANT OFFICERS and FORCE REVIEW DEFENDANT OFFICERS, defendants Burns, Salazar, Linder, and Doe Defendants, and Defendants CLA and LAPD acted recklessly and wantonly during the use of force incident and the subsequent administrative review, and the polices and procedures that resulted in over four (4) years of wrongful incarceration which caused Plaintiff to sustain damages in a sum to be determined at trial.

329. As a further direct and proximate result of the aforesaid acts, omissions, customs, practices, policies and decisions of the Defendants, Plaintiff was injured in his health and person. He suffered and will continue to suffer great mental and physical suffering, anguish, fright, nervousness, anxiety, shock, humiliation, indignity, embarrassment, harm to reputation, and apprehension, which have caused Plaintiff to sustain damages in a sum to be determined at trial.

330. As a further direct and proximate result of the aforesaid acts, omissions, customs, practices, policies and decisions of the defendants, Plaintiff incurred medical and other expenses, and will incur future medical and other expenses, which have caused Plaintiff to sustain damages in a sum to be determined at trial.

331. As a further result of the conduct of each of these Defendants, Plaintiff has been deprived of familial relationships, including not being able to raise a family.

332. As a further direct and proximate result of the acts, omissions,

customs, practices, policies and decisions of Defendants, Plaintiff incurred various costs, expenses and other special damages, including but not limited to legal fees having to defend his lawful conduct during the criminal proceedings which have caused Plaintiff to sustain damages in a sum to be determined at trial.

333.  By reason of the above described acts and omissions of Defendants, Plaintiff was required to retain counsel to defend against the criminal charges and institute and prosecute the within action, and to render legal assistance to Plaintiff that he might vindicate the loss and impairment of his rights, and by reason thereof, Plaintiff requests payment by Defendants of a reasonable sum for attorney's fees pursuant to 42 U.S.C. § 1988 and California *Civil Code*, § 52.1 plus a multiplier as determined by the Court.

334.  As a further direct and proximate result of the acts, omissions, customs, practices, policies and decisions of Defendants, Plaintiff lost income and in the future will lose income in a sum to be determined at trial.

335.  The acts, omissions and decisions of individually named and Doe Defendants, excluding Defendants CLA and LAPD, was willful, wanton, malicious and oppressive, with reckless disregard for, and with the intent to deprive Plaintiff and others similarly situated of their constitutional rights and privileges, and did in fact violate the aforementioned rights and privileges, entitling Plaintiff to exemplary and punitive damages in an amount to be determined at trial.

336.  Punitive damages are available against Defendants Borquez, Hutchins, Joyce, Lobo, Martinez, Pernesky, Thompson, Ingram, Sparkman, Whiteman, Linder, Salazar, Burns, and Doe Defendants and are hereby claimed as a matter of federal common law under

1  *Smith v. Wade*, 461 U.S. 30 (1983).

2  **FIRST CLAIM FOR RELIEF**

3  **DEPRIVATION OF CIVIL RIGHTS 42 U.S.C. § 1983**

4  **FABRICATION OF EVIDENCE**

5  **(Against All Defendants)**

6  337. Defendants CLA, LAPD, Chief Beck, Chief Moore, Borquez, Hutchins,

7  Joyce, Lobo, Martinez, Pernesky, Thompson, Ingram, Sparkman,

8  Whiteman, Ramirez, Hoffman, Tucker, Delieuze, Neal, Baley, Pasos,

9  Salazar, Linder, Burns, and Doe Defendants, while acting under color

10  of law, deprived Plaintiff of his civil rights by violating rights guaranteed

11  by the Fourth and Fourteenth Amendments of the United States

12  Constitution to be free from excessive force, unreasonable detention

13  and arrest not based on reasonable suspicion or probable cause.

14  Defendants also falsified reports to cause imprisonment, and deprived

15  Plaintiff of the right to bail guaranteed by the Eighth Amendment.

16  338. Defendants CLA, LAPD, Chief Beck, Chief Moore, Borquez, Hutchins,

17  Joyce, Lobo, Martinez, Pernesky, Thompson, Ingram, Sparkman,

18  Whiteman, Ramirez, Hoffman, Tucker, Delieuze, Neal, Baley, Pasos,

19  Salazar, Linder, Burns, and Doe Defendants, while acting under color

20  of law, deprived Plaintiff of his civil rights, more particularly, his right to

21  due process of law, by providing false evidence in reports and

22  testimony, improperly influencing witnesses and fabricating and

23  concealing evidence, that resulted in depriving Plaintiff liberty because

24  they set in motion a reasonably foreseeable chain of events that led to

25  the presentation of false evidence at Plaintiff's 2018 criminal trials, his

26  conviction and incarceration in jail and prison.

27  339. Each defendant knew or should have known the evidence was false,

28  and each defendant's conduct was done with deliberate indifference to

1    and/or reckless disregard of Plaintiff's rights or for the truth.

2    340. Each defendant deliberately mis-characterized the parking regulations

3    at the location and the actual location of the use of force incident,

4    used investigation techniques, and testified falsely before the juries in

5    a manner so abusive that they knew or should have known that they

6    would, and are known to, yield false evidence.

7    341. Defendants Borquez, Hutchins, Joyce, Lobo, Martinez, Pernesky,

8    Thompson, Ingram, Sparkman, Whiteman, Ramirez, Hoffman, Tucker,

9    Delieuze, Neal, Baley, Pasos, Salazar, Linder, Burns, and Doe

10    Defendants concealed and fabricated evidence that led to a false and

11    wrongful conviction of Plaintiff that was reversed by the Appellate

12    Court on July 16, 2019.

13    342. Defendants CLA, LAPD, Borquez, Hutchins, Joyce, Lobo, Martinez,

14    Pernesky, Thompson, Ingram, Sparkman, Whiteman, Ramirez,

15    Hoffman, Tucker, Delieuze, Neal, Baley, Pasos, Salazar, Linder,

16    Burns, and Doe Defendants, knew or should have known that

17    evidence set forth above was false, and that the witnesses were

18    providing false evidence.

19    343. The constitutional source against using false evidence is primarily the

20    due process clause of the Fifth and Fourteenth Amendments, and

21    Plaintiff's due process rights were violated by the conduct alleged

22    herein. Plaintiff brings this claim as both a procedural and a

23    substantive due process violation. To the extent that any court were to

24    conclude that the source of Plaintiff's right to be free from concealed

25    and fabricated evidence that led to a false and wrongful conviction, is

26    any constitutional source other than due process (such as the Fourth

27    Amendment or Sixth Amendment right to a fair trial), this claim is

28    brought on those bases as well.

344. Where fabrication of evidence has a meaningful connection to a prosecution, conviction and incarceration, an independent cause of action exists under § 1983 for deprivation of substantive due process under the Fourteenth Amendment, despite the existence of probable cause. (*Halsey v. Pfeiffer*, 750 F.3d 273, 292-93 (3rd Cir. 2014); see also *Spencer v. Peters*, 857 F.3d 789, 801 (9th Cir. 2017) (rejecting the contention that a plaintiff must "prove that, setting aside the fabricated evidence, probable cause was lacking").)

345. Defendants LAPD, Chief Beck, Chief Moore, Borquez, Hutchins, Joyce, Lobo, Martinez, Pernesky, Thompson, Ingram, Sparkman, Whiteman, Ramirez, Hoffman, Tucker, Delieuze, Neal, Baley, Pasos, Salazar, Linder, Burns, and Doe Defendants were each jointly and severally responsible to not use false evidence against Plaintiff. Each engaged in, knew or should have known of the unconstitutional conduct alleged herein and failed to prevent it, which each had a responsibility to do, and each ratified, approved or acquiesced in it.

346. As a result of the defendants', and each of their, violations of Plaintiff's constitutional right to not have false evidence turned over to the prosecutors handling this case and ultimately to the defense, Plaintiff was damaged as alleged above.

347. Due to the conduct of Defendants, and each of them, Plaintiff has been required to incur attorneys' fees, and will continue to incur attorneys' fees, all to Plaintiff's damage in a sum to be proven at trial and recoverable pursuant to 42 U.S.C. §1988.

348. In acting as alleged herein, Defendants, and each of them, caused Plaintiff severe physical and emotional injuries, and caused Plaintiff other damages, all in an amount to be determined at the time of trial.

349. The individual Defendants named herein acted with a conscious

disregard of Plaintiff's rights, conferred upon him by Section 1983, Title 42 of the United States Code, the Fourth and Fourteenth Amendments to the United States Constitution and California *Civil Code*, § 3333, by virtue of ensuring Plaintiff was arrested, subject to improper police investigation, and subject to prosecution for crimes he did not commit. Defendants had an interest in seeing to it that Plaintiff was prosecuted for a crime he did not commit for purposes of punishing and harming Plaintiff for protecting their fellow officers, and for purposes of asserting that the Defendants had made an arrest. Such conduct constitutes malice, oppression and/or fraud under 42 U.S.C. § 1983 and California *Civil Code*, § 3294, entitling Plaintiff to punitive damages against the individual Defendants in an amount suitable to punish and set an example of.

**SECOND CLAIM FOR RELIEF**

**DEPRIVATION OF CIVIL RIGHTS, 42 U.S.C. § 1983, EXCESSIVE FORCE**

**(Against Defendants Borquez, Hutchins, Joyce, Lobo, Martinez, Pernesky, Thompson, Ingram, Sparkman and Does 1 through 100)**

350. Defendants Borquez, Hutchins, Joyce, Lobo, Martinez, Pernesky, Thompson, Ingram, and Sparkman were acting, "under color of state law," as uniformed, on-duty, armed police officers, employed by Defendant, CLA and LAPD, on the date and time that they investigated, encountered, detained, arrested, assaulted, battered, tased, injured, and violated Plaintiff, thereby depriving him of his Fourth Amendment Rights.

351. Defendants Borquez, Hutchins, Joyce, Lobo, Martinez, Pernesky, Thompson, Ingram, and Sparkman intentionally "seized" Plaintiff, when they initiated a "welfare check that went south," detained, and arrested of his person, thereby preventing Plaintiff, or any reasonable

person under the same circumstances, from physically leaving, walking away, ignoring the DEFENDANT OFFICERS' presence, or believing that they were free to do any of the foregoing actions.

352.  This seizure of Plaintiff was intentional since Defendant Sparkman instructed the DEFENDANT OFFICERS to put gloves on, which DEFENDANT OFFICERS understood to mean they would be "taking the suspect into custody."

353.  Defendant Joyce said to Plaintiff, "[w]e can't have you sitting in the middle of the road right here. You either go with the ambulance or you go with the police, I'm going to let you decide." Defendant Joyce then leaned into the car, removed the keys from the ignition, and tossed them on top of the car.

354.  Plaintiff immediately exited the vehicle and demanded to know what happened to his keys. DEFENDANT OFFICERS told Plaintiff don't worry about it. As Plaintiff turned to reenter the vehicle, Defendants Joyce and Borquez grabbed Plaintiff around the waist ad body, but Plaintiff was able to reenter his vehicle. Defendant Joyce then tased Plaintiff in the chest. The entire physical altercation is set forth in Defendant LAPD's NCUOFR, captured on the three DICVS and is incorporated herein as set forth threat.

355.  DEFENDANT OFFICERS verbally and physically commanded Plaintiff to "stop reaching around," and immediately detained him to the extent that any reasonable person, under the circumstances, would not have felt free to leave or "walk away," especially in light of the nine (9) aggressive, uniformed, armed DEFENDANT OFFICERS, who were present along with the Fire Department personnel and Paramedics.

356.  DEFENDANT OFFICERS proceeded to use physical force to violently grab Plaintiff and tase him six (6) times total, while using their

authority as uniformed, armed police officers to prevent Plaintiff's freedom of movement until Plaintiff was dragged from the vehicle and "handcuffed."

357. The seizure of Plaintiff's person was unreasonable, under the Fourth Amendment, since DEFENDANT OFFICERS proceeded to use excessive force when they repeatedly, feloniously, violently, and unreasonably struck a non-threatening, non-dangerous, responsive, unarmed, and a victim of a prior assault, as Defendant Joyce made his arrest, or were allegedly defending themselves and/or attempting to prevent Plaintiff from fleeing who DEFENDANT OFFICERS.

358. This amount of force used by DEFENDANT OFFICERS, on Plaintiff, was not objectively reasonable, under all of the circumstances known to DEFENDANT OFFICERS, at the time of that they applied physical force upon Plaintiff.

359. The nature of Plaintiff's actions, conduct, and behavior, either alleged or witnessed, or captured on the three DICVS of Defendant LAPD, did not demonstrate an immediate threat to the safety of any person, including DEFENDANT OFFICERS, nor did Plaintiff create a dangerous situation for anyone in the surrounding area.

360. At the time of their encounter, DEFENDANT OFFICERS knew that Plaintiff had not committed any crime of violence that involved the infliction or threatened infliction of serious physical harm nor was he involved in any type of domestic disturbance. DEFENDANT OFFICERS merely indicated that they believed Plaintiff's vehicle was illegally parked when in fact, the vehicle was not illegally parked, i.e., "red zone," "no parking signs," "parked a foot, foot and half, two feet" from the curb, nor was the vehicle blocking the roadway, as DEFENDANT OFFICERS would later claim in the Arrest Report(s),

Follow-Up Investigations, and testimony at the preliminary hearing and both trials, until DEFENDANT OFFICERS arrived and blocked the roadway.

361. At the time of the encounter, DEFENDANT OFFICERS also knew that they were not warranted in using this amount and type of physical force on Plaintiff, in light of the alternative forms of detention and restraint that could have been exercised, especially when Plaintiff was non-threatening, non-dangerous, and unarmed while out numbered nine to one.

362. DEFENDANT OFFICERS also did not provide any warning to Plaintiff, prior to applying this level of physical force upon him, nor could DEFENDANT OFFICERS have been reasonably mistaken about any of the foregoing circumstances, facts, situations, events, observations, or evidence set forth in the previous allegations of this Complaint.

363. Due to the degree of force applied on Plaintiff, the actions of DEFENDANT OFFICERS, in repeatedly, feloniously, violently, unreasonably, and affirmatively striking Plaintiff, tasing Plaintiff six (6) times, and dragging Plaintiff from the vehicle, were the "cause-in-fact" of the injuries that Plaintiff sustained, and will continue to sustain, to his civil and constitutional rights, under the Fourth Amendment. Furthermore, these same actions were the foreseeable and proximate cause of the Plaintiff's damages, at the time that DEFENDANT OFFICERS had decided to act with such force, violence, and aggression.

364. As a result, Plaintiff experienced emotional and psychological distress, pain and suffering, physical injuries, humiliation and embarrassment, fears for this health and well-being, general and special damages, and economic and non-economic damages, in an amount to be proven at

trial.

365. Plaintiff alleges that DEFENDANT OFFICERS had acted with a willful, wanton, malicious, and reckless disregard for his rights, safety, and well-being, thereby warranting the imposition of exemplary and punitive damages. DEFENDANT OFFICERS acted with ill will, spite, and with the purpose of injuring Plaintiff, and acted with complete indifference to his safety and rights, as an absolute misuse and abuse of their authority and power, thereby taking advantage of Plaintiff's vulnerability, weakness, compliance, and helplessness.

366. Plaintiff further claims attorneys' fees and legal costs pursuant to 42 U.S.C. § 1988, under this claim of relief.

**THIRD CLAIM FOR RELIEF**

**JOINT ACTION/CONSPIRACY TO VIOLATE CIVIL RIGHTS**

**42 U.S.C. § 1983, FABRICATION OF EVIDENCE**

**(Against All Defendants)**

367. Defendants CLA, LAPD, Chief Beck, Chief Moore, Borquez, Hutchins, Joyce, Lobo, Martinez, Pernesky, Thompson, Ingram, Sparkman, Whiteman, Ramirez, Hoffman, Tucker, Delieuze, Neal, Baley, Pasos, Salazar, Linder, Burns, and Doe Defendants, were jointly and severally responsible to share material information with each other, and to ensure that any evidence was not fabricated against Plaintiff.

368. Defendants CLA, LAPD, Chief Beck, Chief Moore, Borquez, Hutchins, Joyce, Lobo, Martinez, Pernesky, Thompson, Ingram, Sparkman, Whiteman, Ramirez, Hoffman, Tucker, Delieuze, Neal, Baley, Pasos, Salazar, Linder, Burns, and Doe Defendants, acting under color of state law, acted in concert, conspired and agreed to deprive Plaintiff of rights, privileges, or immunities secured by the Constitution and laws of the United States, in particular the right to not have false evidence

used in the underlying criminal case, as elaborated above. The use of false evidence, as well as other actions related to the use of such evidences, constitutes an overt act in furtherance of said conspiracy.

369. Alternatively, as joint actors with joint obligations, each of them was and is responsible for the failures and omissions of each other.

370. As a result of Defendants', and each of their, violations of Plaintiff's constitutional rights to not have false evidence used against him, Plaintiff was damaged as alleged above.

371. In acting as alleged herein, Defendants, and each of them, caused Plaintiff severe physical and emotional injuries, and caused Plaintiff other damages, all in an amount to be determined at the time of trial.

372. Due to the conduct of Defendants, and each of them, Plaintiff has been required to incur attorneys' fees, and will continue to incur attorneys' fees, all to Plaintiff's damage in a sum to be proven at trial and recoverable pursuant to 42 U.S.C. §1988.

373. The individual Defendants and Doe Defendants named herein, acted with a conscious disregard of Plaintiff's rights, conferred upon him by Section 1983, Title 42 of the United States Code, the Fourth and Fourteenth Amendments to the United States Constitution and California *Civil Code*, Section 3333, by virtue of ensuring Plaintiff was arrested, subject to improper police investigation, Departmental review and oversight and subject to prosecution for crimes he did not commit. Defendants, and each of them, had an interest in seeing to it that Plaintiff was prosecuted for crimes he did not commit for purposes of punishing and harming Plaintiff and to protect the Defendants from a claim of malfeasance. Such conduct constitutes malice, oppression and/or fraud under California *Civil Code*, Section 3294, entitling Plaintiff to punitive damages against the individual Defendants in an

amount suitable to punish and set an example of.

**FOURTH CLAIM FOR RELIEF**

**DEPRIVATION OF CIVIL RIGHTS**

**42 U.S.C. § 1983, SUPERVISORIAL LIABILITY**

**(Against Defendants Chief Beck, Chief Moore, Ingram,**

**Sparkman, Whiteman, Ramirez, Hoffman, Tucker, Delieuze,**

**Neal, Baley, Pasos, Salazar, Linder, Burns, City of Los Angeles,**

**Los Angeles Police Department and Defendant Does)**

374. During the course and scope of the Plaintiff's detention, arrest and investigation, Defendants Borquez, Hutchins, Joyce, Lobo, Martinez, Pernesky, and Thompson were supervised by Defendants Ingram and Sparkman. Defendants Ingram and Sparkman were an experienced Sergeants, and were obligated to ensure that Defendants Borquez, Hutchins, Joyce, Lobo, Martinez, Pernesky, and Thompson performed their duties as police officers within the law, which would also include ensure that Plaintiff's constitutional rights were protected.

375. On September 5, 2016, Labor Day, that day of the use of force incident, upon information and belief, Defendants Ingram and Sparkman were supervising Defendants Borquez, Hutchins, Joyce, Lobo, Martinez, Pernesky, and Thompson during the resistence of an executive officer. Defendants Linder and Salazar were supervisors that approved of the booking of Plaintiff and the Arrest Reports. During the entirety of the investigation, Defendants Ingram and Burns were involved in responding to discovery to the prosecution and the defense and Defendant Ingram was the investigator during trial. The FORCE REVIEW DEFENDANT OFFICERS were assigned the administrative investigation of the use of force incident involving Plaintiff.  Upon information and belief, FORCE REVIEW DEFENDANT OFFICERS,

Defendants Ingram, Sparkman, Burns and Doe supervisors within Defendant LAPD who were responsible for monitoring Defendants Borquez, Hutchins, Joyce, Lobo, Martinez, Pernesky, and Thompson performance and conduct as police officers in the NCUOFR investigation, were on notice of their lack of experience and conduct and failed to take adequate steps to correct it through training or supervision.

376. Upon information and belief, Defendants Borquez, Hutchins, Joyce, Lobo, Martinez, Pernesky, and Thompson received minimal discipline, or no discipline for their use of force actions against Plaintiff, training, and supervision, which level was grossly insufficient to address the inept, inadequate and deceitful investigation and fabrication of evidence in Plaintiff's case. The inept, inadequate, and deceitful investigation and fabrication of evidence was a highly predictable or plainly obvious consequence of the inadequate training and lack of meaningful control or supervision of Defendants Borquez, Hutchins, Joyce, Lobo, Martinez, Pernesky, and Thompson. Defendants Ingram and Burns, and Doe supervisors, acting within the course and scope of their employment had a duty to assure the competence of their employee/agents, including Defendants Borquez, Hutchins, Joyce, Lobo, Martinez, Pernesky, and Thompson and Doe Defendants, but breached their duty and were negligent in the performance of their duties by selecting, training, reviewing, supervising, failing to supervise, failing to control, evaluating the competency and retaining Defendants Borquez, Hutchins, Joyce, Lobo, Martinez, Pernesky, and Thompson and other employees/agents. This breach of the duty of careful selection, training, review, supervision, periodic evaluation of the competency, and retention of such law enforcement officers and/or

employees and/or agents created an unreasonable risk of harm to persons such as Plaintiff.

377. Defendants Ingram, Sparkman, Burns and Doe supervisors knew or should have known that Defendants Borquez, Hutchins, Joyce, Lobo, Martinez, Pernesky, and Thompson were unfit and/or incompetent to investigate the offense of *Penal Code*, § 69 due to their lack of training, experience, unfitness and/or incompetence created a particular risk to others. The negligence of Defendants Ingram and Burns and Doe supervisors in the supervision and training of Defendants Borquez, Hutchins, Joyce, Lobo, Martinez, Pernesky, and Thompson was a substantial factor in the harm caused to Plaintiff by Defendants.

378. Defendants Ingram, Sparkman, Burns and Doe supervisors breached their duty of care to observe, report, monitor and control the investigation by Defendants Borquez, Hutchins, Joyce, Lobo, Martinez, Pernesky, and Thompson and other employees/agents.

379. As a direct and legal result of the aforesaid negligence, carelessness and unskillfulness of Defendants Ingram and Burns and Doe supervisors, and each of them, and as a result of their breach of duty of care to Plaintiff, Plaintiff suffered the damages alleged herein.

380. In acting as alleged herein, Defendants, and each of them, caused Plaintiff severe physical and emotional injuries, and caused Plaintiff other damages, all in an amount to be determined at the time of trial.

381. Due to the conduct of Defendants, and each of them, Plaintiff has been required to incur attorneys' fees, and will continue to incur attorneys' fees, all to Plaintiff's damage in a sum to be proven at trial and recoverable pursuant to 42 U.S.C. §1988.

**FIFTH CLAIM FOR RELIEF**

**DEPRIVATION OF CIVIL RIGHTS**

**42 U.S.C. § 1983, MALICIOUS PROSECUTION**

**(Against All Defendants)**

382.  The Fourth Amendment's protection against unreasonable seizures encompasses the right to be free from malicious prosecution, which is also prohibited by the Fourteenth Amendment's guarantee against the deprivation of liberty without due process of law.

383.  Defendants CLA, LAPD, Chief Beck, Chief Moore, Ingram, Borquez, Hutchins, Joyce, Lobo, Martinez, Pernesky, Thompson, Sparkman, Whiteman, Ramirez, Hoffman, Tucker, Delieuze, Neal, Baley, Pasos, Salazar, Linder, Burns, and Doe Defendants, while acting under color of state law, violated Plaintiff's clearly established right under the Fourth and Fourteenth Amendments by unlawfully and maliciously causing a criminal prosecution to be instituted against Plaintiff.

384.  On July 16, 2019, the Court of Appeals reversed Plaintiff's convictions and held:

> As discussed above, in order to convict on the charge of resisting an executive officer in violation of section 69, the prosecution was required to prove, and the jury had to find that Officer Joyce was engaged in the lawful performance of his duty in attempting to detain appellant when appellant kicked him. Because the excluded evidence would have established the officer had no authority to detain appellant, it would have negated the element of the lawful performance of a duty. And unless the prosecution were able to rebut the defense evidence, proof of the charge would have failed. The trial court's error in excluding the proffered evidence was not harmless.  (*Edmonds, supra*, B291146, p. 16.)

385.  The opinion of the Court of Appeal coupled with Defendant Thompson's Follow-Up Investigation dated October 29, 2019, who along with Defendant Burns and DDA Coletta returned to the scene which revealed to the Defendants that DEFENDANT OFFICERS

fabricated evidence and that there was no probable cause.

386. The Defendants disregarded the opinion of the Court of Appeals and the Follow-Up Investigation showing that DEFENDANT OFFICERS fabricated evidence which FORCE REVIEW DEFENDANT OFFICERS and Defendants CLA, LAPD, Burns ratified by continuing its ongoing prosecution of Plaintiff for *Penal Code*, § 69 even after the remittitur issued on October 17, 2019 by filing an Amended Information and a Second Amended Information, which added additional Counts thereby forcing Plaintiff to incur unnecessary litigation costs to defend against criminal charges at a possible third trial.

387. The Defendants presented no new evidence prior to or during pretrial proceedings that justified retrial to support probable cause and warrant retrying Plaintiff for *Penal Code*, § 69 a third time.

388. A reasonable person in Defendants' position would have known that the facts and circumstances were insufficient to justify a reasonable belief that Plaintiff committed the *Penal Code*, § 69 offense.

389. On September 1, 2020, the Judge Walton dismissed all charges against Plaintiff.

390. Defendants acted maliciously, with reckless disregard of the law and of the legal rights of Plaintiff in causing a criminal proceeding to begin and to continue for a purpose other than bringing Plaintiff to justice.

391. The Defendants continued its prosecution of Plaintiff for the ulterior purpose of extorting an indigent Plaintiff to make a plea deal [numerous time served offer first on a felony than reduced to a Misdemeanor] so as to shield the Defendants from this civil action.

392. As a consequence, Plaintiff was subjected to deprivation of liberty during the criminal proceedings before and after the reversal, humiliation, fear, pain and suffering by the illegal acts of Defendants

1   and suffered injuries as a result of the Defendants' actions.

2   393.   Plaintiff is entitled to compensatory damages, punitive damages,

3   attorney's fees under 42 U.S.C. §1988, and all applicable law in a sum

4   to be proven at trial, and such additional relief as the Court deems just

5   and proper.

6   **SIXTH CLAIM FOR RELIEF**

7   **DEPRIVATION OF CIVIL RIGHTS**

8   **42 U.S.C. § 1983, *BRADY* VIOLATIONS**

9   **(Against All Defendants)**

10   394.   Defendants CLA, LAPD, Borquez, Hutchins, Joyce, Lobo, Martinez,

11   Pernesky, Thompson, Ingram, Sparkman, Whiteman, Ramirez,

12   Hoffman, Tucker, Delieuze, Neal, Baley, Pasos, Salazar, Linder,

13   Burns, and Doe Defendants, while acting under color of law, deprived

14   Plaintiff of his civil rights by violating his right to have material,

15   exculpatory and impeachment information as required by *Brady* turned

16   over to Plaintiff.

17   395.   The actions of each defendant in withholding evidence were done with

18   deliberate indifference to or reckless disregard for Plaintiff's rights or

19   for the truth.

20   396.   The *Brady* violations asserted herein encompass, but are not limited

21   to:

22   A.   Failure to disclose the location of the use of force incident, detention

23   and arrest occurred in Lynwood, a city outside of the jurisdiction of

24   Defendant LAPD.

25   B.   Failure to disclosure the actual location of the detention and arrest of

26   Plaintiff in Lynwood prior to the preliminary hearing that would have

27   prevented Plaintiff from being held to answer. (*Gutierrez, supra*, 214

28   Cal.App. 4th pp. 348-349.)

C.   The NCUOFR listed the address as "Los Angeles" in a further attempt to mislead Plaintiff during his criminal proceedings.

D.   Defendants, and each of them, sought to conceal the actual location within Lynwood to ensure a conviction and shield the DEFENDANT OFFICERS and FORCE REVIEW DEFENDANT OFFICERS, Defendants Linder, Salazar, Burns, Chief Beck, Chief Moore, LAPD and CLA from civil liability.

E.   Defendants Thompson [preliminary hearing], Ingram, Joyce all falsely testified at both trials that there was no parking at the location in an attempt to cover-up their own malfeasance and the malfeasance of the fellow Officers.

F.   Defendants Thompson, Ingram, and Joyce knew or should have known that there were no posted parking regulations at the location. Plaintiff's counsel subpoenaed the Lynwood city officials to establish this fact but rather than verify the information independently, by simply asking the Acting City Engineer [Nick Servin] and Parking Enforcement Officers for Lynwood, who we present in court, Defendants sought to justify their conduct by claiming police officers have state wide jurisdiction.  The *Edmonds* Court found this argument raised by the Attorney Generals Office "lack merit." (*Edmonds, supra*, B291146, p. 16) Rather than admit the error, Defendants were successful in having the prosecution add additional charges in an attempt to extort a plea of time served on a Misdemeanor even though Plaintiff had been incarcerated for over three years at that point.

G.   Failure to adequately investigate that the location of Plaintiff's detention and arrest was not controlled by any parking regulations as Defendants Thompson, Ingram and Joyce and Paramedic Nielsen repeatedly testified that there in fact were "no parking" signs posted at

the location.

H.   Defendants further failed to correct Defendants Thompson, Ingram
     and Joyce's false in-court testimony, not once but twice to secure a
     conviction and shield Defendants from civil liability for their gross
     misconduct. Each Defendant conspired and acted in concert to
     fabricate the phony posted no parking testimony so as to justify
     Defendants' conduct.

I.   Failure to produce evidence in violation of a Court Order. On April 6,
     2018, Judge Schultz issued a Court Order that the LAPD produce the
     DEFENDANT OFFICERS Daily Field Activity. None were produced.
     Following the reversal, Defendant LAPD on December 3, 2019, over
     three years and two months after the initial Request for Informal
     Discovery, Defendant LAPD produced the CAD Summary Reports for
     the Officers. Previously, on April 12, 2018, DDA Smith produced the
     two (2) sergeant logs for Defendants Sparkman and Ingram and a one
     (1) page document "911query", time range 14:45:00-15:45:59,
     requestor listed Defendant Ingram for Defendant Thompson and
     printed 4/2/2018 to Plaintiff's counsel but failed to produced the
     DEFENDANT OFFICERS' Daily Filed Activity Reports as Ordered.
     The Daily Field Activity Reports and the CAD Summary reports would
     have been useful to Plaintiff's defense. Each Defendant acted in
     concert and conspired to prevent this information from being disclosed
     to Plaintiff prior to the first and second trial that was useful to Plaintiff's
     defense.

J.   Subsequent to Plaintiff's convictions in 2018, on July 31, 2019 Plaintiff
     made a Public records Request on Defendant LAPD and it was later
     discovered after the dismissal, that Defendant Martinez had a
     sustained finding for dishonest.

K.   Defendant LAPD has not fully disclosed all information as it relates to the DEFENDANT OFFICERS.

L.   Failure to turn over Defendant Martinez's sustained finding for dishonesty.

M.   Defendant LAPD's own finding for dishonesty were material to impeach and/or discredit Defendants Thompson, Ingram, and Joyce and Paramedic Nielsen.

N.   Failure to disclose material, exculpatory and impeachment information regarding prior acts dishonesty, false arrest, planting of evidence, fabrication of charges and or evidence by any and all Police Officers who participated in investigating the underlying criminal charges, including but not limited to investigations and disciplinary actions initiated against Defendant Martinez and Doe Defendants for the fabrication of evidence in the underlying criminal case as well as any and all other criminal cases they had participated in.

397.   The Defendants withheld this evidence to Plaintiff's detriment and in violation of *Brady*.

398.   The constitutional source of the obligation to provide *Brady* information is primarily the due process clause of the Fifth and Fourteenth Amendments, and Plaintiff's due process rights were violated by the conduct alleged herein. Plaintiff brings this claim as both a procedural and a substantive due process violation. To the extent that any court were to conclude that the source of Plaintiff's right to *Brady* information is a constitutional source other than due process (such as the Fourth Amendment or Sixth Amendment right to a fair trial), this claim is brought on those bases as well.

399.   Defendants CLA, LAPD, Sparkman, Ingram, Linder, Salazar, Burns, and Doe Defendants were each jointly and severally responsible to

produce *Brady* information to Plaintiff. Each engaged in, knew or should have known of the unconstitutional conduct alleged herein and failed to prevent it, which each had a responsibility to do, and each ratified, approved, or acquiesced in it. In acting as alleged herein, Defendants, and each of them, caused Plaintiff severe physical and emotional injuries, and caused Plaintiff other damages, all in an amount to be determined at the time of trial.

400. As a result of each Defendants', and each of their violations of Plaintiff's constitutional right to have *Brady* information turned over to Plaintiff, Plaintiff was deprived of his above described civil rights, and is entitled to damages including, but not limited to general and punitive damages and attorney's fees under 42 U.S.C. §1988.

## SEVENTH CLAIM FOR RELIEF
## JOINT ACTION/CONSPIRACY TO VIOLATE CIVIL RIGHTS
## 42 U.S.C. § 1983, *BRADY* VIOLATIONS
## (Against All Defendants)

401. Defendants CLA, LAPD, Ingram, Whiteman, Burns, and Doe Defendants, were jointly and severally responsible as investigators assigned to the Edmonds case to share material information with each other, and to ensure that *Brady* information was turned over to Plaintiff.

402. Each Defendant and Doe Defendants, acting under color of state law, acted in concert, conspired and agreed to deprive Plaintiff of rights, privileges, or immunities secured by the Constitution and laws of the United States, in particular the right to have *Brady* information as set forth above. Each failure to provide *Brady* information, as well as other actions related to them, constitutes an overt act in furtherance of said conspiracy.

403. Alternatively, as joint actors with joint obligations, each of them was and is responsible for the failures and omissions of each other.

404. In acting as alleged herein, Defendants, and each of them, caused Plaintiff severe physical and emotional injuries, and caused Plaintiff other damages, all in an amount to be determined at the time of trial.

405. As a result of each Defendants', and each of their, violations of Plaintiff's constitutional right to have *Brady* information turned over to Plaintiff, Plaintiff was deprived of his above described civil rights, and is entitled to damages including, but not limited to general and punitive damages and attorneys' fees under 42 U.S.C. §1988.

**EIGHTH CLAIM FOR RELIEF**

**DEPRIVATION OF CIVIL RIGHTS**

**42 U.S.C. § 1983, *MONELL* VIOLATIONS**

**(Against Defendants Chief Beck, Chief Moore, and Doe Defendants)**

406. Plaintiff is informed and believes and thereon alleges that, at all times herein mentioned, Defendants Chief Beck and Chief Moore, and Doe Defendants, with deliberate indifference, and conscious and reckless disregard to the safety, security and constitutional and statutory rights of Plaintiff and others similarly situated, engaged in the unconstitutional conduct and omissions as set forth above, which consist of the following customs and/or policies:

a. The knowing presentation of false evidence by Police Officers;

b. The deliberately indifferent presentation of false evidence by Police Officers;

c. The presentation of false evidence by Police Officers in reckless disregard for the truth or the rights of the accused;

d. The destruction of evidence that is material and exculpatory;

e. Police Officers' failure to provide material, exculpatory, and

impeachment information to prosecutors trying the case involving the criminal defendant;

f.   Failing to adequately train, supervise and control its officers in the investigation and use of evidence, including the prevention of unconstitutional use of fabricated evidence;

g.   Failing to adequately train, supervise and control its officers to disclose to the deputy district attorney prosecuting a defendant all exculpatory and impeachment information, including *Giglio v. United States*, 405 U.S. 150 (1972) and *Brady* information, which would include alternative theories which would support the defense; the disclosure of witness statements who could not identify the criminal defendant; impeachment information concerning the witnesses and officers;

h.   Failing to adequately discipline officers involved in dishonesty, fabrication of evidence, or otherwise abusing their authority;

I.   Condoning and encouraging Police Officers in the belief that they can violate the rights of persons such as Plaintiff with impunity, and that such conduct will not adversely affect their opportunities for promotion and employment benefits;

j.   Condoning and encouraging the withholding and fabrication of evidence including but not limited to the filing of materially false police reports, concealing material evidence, concealing exculpatory evidence, concealing impeachment information, and or making false statements to prosecutors to obtain the filing of false charges and obtaining false convictions.

407.   The Defendants Chief Beck, Chief Moore and Doe Defendants knew or should have known of it's Police Officers' unconstitutional fabrication of evidence and withholding of material, exculpatory and

impeachment information and have a policy, practice and/or custom of not disciplining said peace officers for the unconstitutional conduct, which includes but is not limited to Defendants Ingram, Whiteman, and Burns' fabrication of parking regulations and failing to disclose the actual location of the detention and arrest of Plaintiff and then sought to prevent this information from being presented to the jury.

408.   *Brady* requires the disclosure to a criminal defendant "evidence favorable to the accused" that is "material either to guilt or to punishment." (*U.S. v. Bagley* (1985) 473 US 667, 676; *Brady v. Maryland* (1963) 373 US 83, 87.) The prosecutor's duty to disclose material evidence that is favorable to the accused includes the duty to disclose evidence that would impeach the testimony of material witnesses. (*U.S. v Bagley*, supra; see also *Milke v Ryan* (9th Cir 2013) 711 F.3d 998, 1012 (prosecution had inescapable duty under *Brady* and *Giglio* to disclose court records of police officer's false statements under oath, *Miranda* and other constitutional violations committed during interrogations, and impeachment information contained in officer's personnel file).)

409.   "Exculpatory evidence cannot be kept out of the hands of the defense just because the prosecutor does not have it, where an investigating agency does. That would undermine *Brady* by allowing the investigating agency to prevent production by keeping a report out of the prosecutor's hands until the agency decided the prosecutor ought to have it, and by allowing the prosecutor to tell the investigators not to give him certain materials unless he asked for them." (*United States v. Blanco*, 392 F.3d 382, 388 (9th Cir. 2004).) "*Brady* suppression occurs when the government fails to turn over even evidence that is `known only to police investigators and not to the prosecutor.'" (*Youngblood v.*

*West Virginia,* 547 U.S. 867, 869-70 (2006) (per curium) (quoting *Kyles v. Whitley,* 514 U.S. 419, 438 (1995).)

410. Plaintiff is informed and believes and based thereon alleges that the Defendants Chief Beck, Chief Moore, and Doe Defendants adopted policies, customs and or practices to place an undue burden on criminal defendants to obtain material, exculpatory, and impeachment information from a peace officer's personnel file in violation of *Brady*, such as requiring a criminal defendant to file a *Pitchess* motion.

411. Plaintiff is informed and believes and based thereon alleges that the Defendant Chief Beck, Chief Moore and Doe Defendants have maintained and carried out an unconstitutional policy, practice and or custom of violating the constitutional rights of criminal defendants under *Brady* by refusing to voluntarily produce material exculpatory, and impeachment information under the guise of *Pitchess*, and making the self-serving argument that the privacy rights of its peace officers override that of the criminal defendant thereby unconstitutionally shifting to indigent criminal defendants the initial burden of overcoming the unconstitutional procedures in *Pitchess.*

412. Plaintiff is informed and believes and based thereon alleges that the Defendants Chief Beck, Chief Moore and Doe Defendants adopted policies, customs and or practices to place undue burdens on criminal defendants to obtain material, exculpatory, and impeachment information from a peace officer's personnel file in violation of *Brady*, such as requiring a criminal defendant to file a *Pitchess* motion.

413. Because the conspiracy or conspiracies and the overt actions in furtherance thereof were done and continue to be done with the knowledge and purpose of depriving Plaintiff, who is African American, and numerous other African-American victims of the equal protection

of the laws and equal privilege and immunities under the law, and with racial animus toward the Plaintiff and the other victims of this racially motivated conspiracy, the Defendants also deprived Plaintiff of his right to equal protection of the laws under the Fourteenth Amendment, and 42 U.S.C. § 1985.

414. Additionally or alternatively, Defendants Additionally or alternatively, Defendants Chief Beck, Chief Moore, Borquez, Hutchins, Joyce, Lobo, Martinez, Pernesky, Thompson, Ingram, Sparkman, Burns, together with other as yet unnamed Doe co-conspirators, knowing that the above § 1985 conspiracy to deprive African Americans of their rights, and having the power, authority and duty to prevent or aid in preventing the commission of the acts in furtherance of the conspiracy, neglected and refused to do so, in violation of 42 U.S.C. § l986.

415. As a direct and proximate result of the foregoing, Plaintiff sustained injury and damage as alleged above.

416. Plaintiff is informed and believes and base thereon alleges that the Defendants Chief Beck, Chief Moore, and Doe Defendants to deprive Plaintiff as well as other similarly situated criminal defendants of the rights, privileges, and or immunities secured by the Constitution and laws of the United States, in particular the right to have *Brady* information as set forth above.

417. The Defendants Chief Beck, Chief Moore and Doe Defendants were made aware of the illegal activities of Police Officers, such as Defendant Martinez, and took no action to remedy or address the misconduct and illegal activities of Police Officers.

418. The Defendants Chief Beck, Chief Moore, and Doe Defendants acted in concert, conspired and agreed with the Defendants CLA and LAPD

to suppress *Brady* information regarding Police Officers, such as Defendant Martinez, from similarly situated criminal defendants under the guise of *Pitchess*.

419. Each failure to provide *Brady* information, as well as other actions related to them, constitutes an overt act in furtherance of said conspiracy.

420. The actions, or lack thereof, of the Defendants CLA, LAPD, Chief Beck Chief Moore, and Doe Defendants set forth in this complaint were known or should have been known to the policy makers responsible for the Defendants and occurred with deliberate indifference to either the recurring constitutional violations elaborated above, and or the substantial likelihood that constitutional rights would be violated as a result of failing to train, supervisor or discipline in areas where the need for such training and supervision was obvious.

421. Defendants CLA, LAPD, Chief Beck, Chief Moore, and Doe command personnel's actions as set forth above were a motivating force behind the violations of Plaintiff's rights as well as other similarly situated criminal defendants as set forth in this complaint.

422. As a direct and proximate result of the Defendants' acts and omissions, condoning, encouraging, ratifying and deliberately ignoring the pattern and practice of Defendants Ingram, Whiteman, Burns, FORCE REVIEW DEFENDANT OFFICERS and other police officers Plaintiff has yet to identify, Plaintiff and other similarly situated criminal defendants sustained injury and damage.

423. As a result of each of Defendants violations of Plaintiff's constitutional rights, as set forth herein, Plaintiff sustained injury and damage.

424. As a result of this unconstitutional policy, practices and/or customs, criminal defendants, such as Plaintiff, have been denied material,

exculpatory and impeachment information to defend against criminal charges arising from the investigation of the aforementioned police officers.

425. In acting as alleged herein, Defendants, and each of them, caused Plaintiff severe physical and emotional injuries, and caused Plaintiff other damages, all in an amount to be determined at the time of trial.

426. Due to the conduct of Defendants, and each of them, Plaintiff has been required to incur attorneys' fees, and will continue to incur attorneys' fees, all to Plaintiff's damage in a sum to be proven at trial and recoverable pursuant to 42 U.S.C. §1988.

**NINTH CLAIM FOR RELIEF**

**VIOLATION OF CALIFORNIA CIVIL CODE, §§ 51 *ET. SEQ.* AND 52**

**(Against All Defendants)**

427. Defendants acting within the scope of their duties as City of Los Angeles Police Officers wrongfully caused Plaintiff to be arrested, put in jail, and subjected to criminal felony charges based upon his race and due to coercion, intimidation and threats, in violation of California *Civil Code*, §§ 51 *et. seq.* and 52.1.

428. Pursuant to California *Government Code*, § 815.2, Defendant CLA is hereby liable for the acts, omissions and conduct of its employees Defendants Borquez, Hutchins, Joyce, Lobo, Martinez, Pernesky, Thompson, Ingram, Sparkman, Whiteman, Ramirez, Hoffman, Tucker, Delieuze, Neal, Baley, Pasos, Salazar, Linder, Burns, and Doe Defendants, whose tortuous conduct was a cause in the damages and injuries to Plaintiff.

429.  Plaintiff timely filed a Claim for Damages pursuant to California *Government Code*, § 910 *et. seq.* This action is therefore timely.

430. The conduct of the Defendants constituted interference by threats,

intimidation, or coercion, or attempted interference, with the exercise of enjoyment by Plaintiff of rights secured by the Constitution or laws of the United States, or secured by the Constitution or laws of the State of California, including interference with Plaintiff's rights to be secure in his person and free from unlawful arrest under the Fourth Amendment and Cal. Const. Art. 1 sec. 13 as well as California *Civil Code*, § 43.

431.  As a direct cause of Defendants' conduct, Plaintiff's rights pursuant to California *Civil Code*, § 52.1 were violated, causing injuries and damages in an amount to be proved at the time of trial.

432.  In acting as alleged herein, Defendants, and each of them, caused Plaintiff severe physical and emotional injuries, and caused Plaintiff other damages, all in an amount to be determined at the time of trial.

433.  Due to the conduct of Defendants, and each of them, Plaintiff has been required to incur attorney's fees and will continue to incur attorney's fees, and pursuant to California Cal. Civil Code, § 52.1, Plaintiff is entitled to reasonable attorneys' fees.

434.  The conduct of the Defendants also amounts to oppression, fraud or malice within the meaning of *Civil Code*,  § 3294 et. seq. and punitive damages should be assessed against each individual Defendant, other than the City of Los Angeles, for the purpose of punishment and for the sake of example. Defendant City of Los Angeles is liable for the acts of its employees as they have agreed with and/or ratified the acts of the individual defendants.

## TENTH CLAIM FOR RELIEF

## VIOLATION OF STATE DUE PROCESS, CAL. CONST. ART. I, § 7(a)

## (Against All Defendants)

435.  Defendants acting within the scope of their duties as City of Los

Angeles Police Officers wrongfully caused Plaintiff to be arrested, put in jail, and subjected to criminal felony charges based upon his race and due to coercion, intimidation and threats, in violation of California *Civil Code*, §§ 51 *et. seq.* and 52.1.

436. Pursuant to California *Government Code*, § 815.2, Defendant CLA is hereby liable for the acts, omissions and conduct of its employees Defendants Borquez, Hutchins, Joyce, Lobo, Martinez, Pernesky, Thompson, Ingram, Sparkman, Whiteman, Ramirez, Hoffman, Tucker, Delieuze, Neal, Baley, Pasos, Salazar, Linder, Burns, and Doe Defendants, whose tortuous conduct was a cause in the damages and injuries to Plaintiff.

437. Plaintiff timely filed a Claim for Damages pursuant to California *Government Code*, § 910 *et. seq.* This action is therefore timely.

438. The conduct of the Defendants constituted interference by threats, intimidation, or coercion, or attempted interference, with the exercise of enjoyment by Plaintiff of rights secured by the Constitution or laws of the United States, or secured by the Constitution or laws of the State of California, including interference with Plaintiff's rights to be secure in his person and free from unlawful arrest under the Fourth Amendment and California Const. Art. 1 sec. 13 as well as California *Civil Code*, § 43. (See *Gutierrez, supra*, 214 Cal.App. 4th 343. *Bridgeforth, supra*, 214 Cal.App. 4th 1074 [State Due Process].)

439. As a direct cause of Defendants' conduct, Plaintiff's rights pursuant to California *Civil Code*, § 52.1 were violated, causing injuries and damages in an amount to be proved at the time of trial.

440. In acting as alleged herein, Defendants, and each of them, caused Plaintiff severe physical and emotional injuries, and caused Plaintiff other damages, all in an amount to be determined at the time of trial.

441. Due to the conduct of Defendants, and each of them, Plaintiff has been required to incur attorney's fees and will continue to incur attorney's fees, and pursuant to California *Civil Code*, § 52.1, Plaintiff is entitled to reasonable attorneys' fees.

442. The conduct of the Defendants also amounts to oppression, fraud or malice within the meaning of *Civil Code*, § 3294 et. seq. and punitive damages should be assessed against each individual Defendant, other than the City of Los Angeles, for the purpose of punishment and for the sake of example. Defendant City of Los Angeles is liable for the acts of its employees as they have agreed with and/or ratified the acts of the individual defendants.

## ELEVENTH CLAIM FOR RELIEF
## ASSAULT BY POLICE OFFICER
**(Assault against Defendants Thompson, Joyce, Sparkman and Doe Defendants)**

443. Defendant Thompson assaulted Plaintiff by stating I gotta "taser" and displaying the taser thereby intentionally placing Plaintiff in imminent apprehension of physical violence.

444. Defendant Joyce further assaulted Plaintiff when Defendant Joyce stated "[y]ou either go with the ambulance or you go with the police, I'm going to let you decide" thereby intentionally placing Plaintiff in imminent apprehension of physical violence.

445. Defendant Sparkman further assaulted Plaintiff by instructing the DEFENDANT OFFICERS "to put gloves on," which the DEFENDANT OFFICERS understood to mean they would be "taking the suspect into custody" thereby intentionally placing Plaintiff in imminent apprehension of physical violence.

446. Defendant Joyce further assaulted Plaintiff a second time by deploying

his taser which was clearly visible to Plaintiff prior to Plaintiff turning his back to the DEFENDANT OFFICERS to re-enter the vehicle there by intentionally placing Plaintiff in further imminent apprehension of physical violence.

447.   DEFENDANT OFFICERS then further assaulted Plaintiff telling Plaintiff "[d]on't worry about" then immediately grabbed Plaintiff's person thereby intentionally placing Plaintiff in imminent apprehension of physical violence of being physically grabbed and tased.

448.   DEFENDANT OFFICERS acted with an intent to cause harmful or offensive contact with the Plaintiff and the intended harmful or offensive contact did in fact occur.

449.   The harmful or offensive contact was not privileged nor consented to and was excessive, unreasonable and done with deliberate indifference to the rights and safety of Plaintiff and was done with the intent to inflict punishment, above and beyond the reason for using the force in the first place.

450.   As a result of DEFENDANT OFFICERS' intent to cause harmful or offensive contact with Plaintiff and the fact that the intended harmful or offensive contact did in fact occur, Plaintiff suffered damages according to proof at the time of trial.     DEFENDANT OFFICERS' conduct also amounts to oppression, fraud or malice and punitive damages should be assessed against them for the purpose of punishment and for the sake of example.

**TWELFTH CLAIM FOR RELIEF**

**BATTERY BY POLICE OFFICER**

**(Battery against Defendants Borquez, Hutchins, Joyce, Lobo, Martinez, Pernesky, Thompson, Ingram, and Sparkman and Doe Defendants)**

451.   DEFENDANT OFFICERS acted with an intent to cause harmful or

offensive contact with the Plaintiff and the intended harmful or offensive contact did in fact occur WHEN DEFENDANT OFFICERS physically grabbed, tased, hit and dragged Plaintiff from the vehicle.

452. The sequence of the physical violence (battery) perpetrated on Plaintiff is full set forth in Defendant LAPD's NCUOFR incorporated herein by reference as set forth therein.

453. The harmful or offensive contact was not privileged nor consented to.

454. As a result of the DEFENDANT OFFICERS' intent to cause harmful or offensive contact with Plaintiff and the fact that the intended harmful or offensive contact did in fact occur, Plaintiff was grabbed, tased six (6) times, punched, physically dragged form the vehicle and  Plaintiff suffered damages according to proof at the time of trial.

### THIRTEEN CLAIM FOR RELIEF
### FALSE ARREST AND FALSE IMPRISONMENT
### (Against All Defendants)

455. The Defendants and Doe Defendants, and/or each of them, by their actions caused Plaintiff to be confined or knew to a substantial certainty that Plaintiff would be confined due to their actions.

456. The defendants were instrumental in causing Plaintiff to be arrested and booked on a felony charge and or made material misrepresentations and omissions in the arrest report(s), booking approval, probable cause declaration, and follow-up investigations(s) that they knew was not supported by reasonable suspicion or probable cause.

457. As fully described above, Defendants and Doe Defendants falsified evidence, which resulted in the criminal conviction and incarceration of Plaintiff for at least four years and until the Honorable Judge Walton of the Superior Court of the State of California dismissed the charges

against Plaintiff on September 1, 2020.

458. As fully set forth above, Defendants and Doe Defendants intentionally made misrepresentations of fact and falsified evidence, Arrest Reports, and Follow-Up Investigations which included false testimony at the preliminary hearing and at both trials which was presented in criminal court hearings against Plaintiff. FORE REVIEW DEFENDANT OFFICERS conducted the Departmental administrative review under the NCUOFR and failed to disclose the incident occurred in Lynwood, ratified the falsified evidence and failed to correct the official records of Defendant LAPD's Use of Force Review Division that were false, despite being provided information to correct Departmental official record as well as a request to correct the official record, Defendants refused to correct the Departmental findings and re-evaluate the findings for DEFENDANT OFFICERS.

459. At the time of these misrepresentations and accusations, Defendants and Doe Defendants were aware of their falsity and inaccuracy. As a result of these false allegations, declaration of probable cause, Plaintiff was denied bail and unlawfully tried, convicted and imprisoned for almost ten (10) years. Thankfully the Appellate Court reversed the conviction on Count 1 and remanded the matter for a retrial to allow the "proffered evidence" to be presented to a jury.

460. Plaintiff has been greatly humiliated and held up to public scorn and derision as a result of the foregoing acts of all Defendants. Additionally, Plaintiff has been forced to incur substantial amounts for attorneys' fees, investigation expenses, and other expenses in the vindication of his constitutional rights.

461. The acts and or omissions of Defendants  Borquez, Hutchins, Joyce, Lobo, Martinez, Pernesky, Thompson, Ingram, Sparkman, Whiteman,

Salazar, Linder, Burns, Ramirez, Hoffman, Tucker, Delieuze, Neal, Baley, Pasos, and Doe Defendants as herein alleged, were willful, wanton, malicious, and oppressive, and justify the awarding of punitive damages in an amount subject to proof at trial.

462. California *Government Code*, § 820 provides that a public employee is liable for injury to the same extent as a private person.

463. California *Government Code*, § 820.4 specifically provides that a public employee is liable for false arrest or false imprisonment.

464. California *Government Code*, § 815.2 provides that a public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his/her employment. Defendants CLA and LAPD are liable under a theory of respondeat superior.

465. As a direct and proximate result of the defendants' wrongful conduct, Plaintiff has suffered damages, including, but not limited to, legal expenses, economic losses, loss of reputation, emotional distress, and other damages.

466. As a direct, proximate and foreseeable result of all the Defendants' intentional acts and or omissions, Plaintiff suffered loss of life, liberty and freedom, and other privileges of free society resulting in mental anguish, loss of enjoyment of life, loss of reputation, discomfort, inconvenience, loss of time, loss of wages and other monetary losses; the injuries are permanent or continuing and Plaintiff will suffer such losses in the future a st forth in the Complaint.

467. In doing the things alleged herein, the Defendants' conduct was despicable. The Defendants acted toward Plaintiff with malice, oppression, fraud, and with willful and conscious disregard for Plaintiff's rights, entitling him to an award of punitive damages.

## FOURTEENTH CLAIM FOR RELIEF
## MALICIOUS PROSECUTION
### (Against All Defendants)

468. Defendants Borquez, Hutchins, Joyce, Lobo, Martinez, Pernesky, Thompson, Ingram, Sparkman, Whiteman, Ramirez, Hoffman, Tucker, Delieuze, Neal, Baley, Pasos, Salazar, Linder, Burns, and Doe Defendants, while acting under color of law, intentionally and maliciously instituted and maintained a legal action not supported by reasonable suspicion and or probable cause against Plaintiff.

469. The criminal case against Plaintiff was dismissed on September 1, 2020 by the Honorable Judge Walton of the Superior Court of the State of California resulting in the termination of the charges in his favor.

470. Defendants CLA, LAPD, Borquez, Hutchins, Joyce, Lobo, Martinez, Pernesky, Thompson, Ingram, Sparkman, Whiteman, Ramirez, Hoffman, Tucker, Delieuze, Neal, Baley, Pasos, Salazar, Linder, Burns, and Doe Defendants, while acting under color of law, acted with reckless disregard of the law and of the legal rights of Plaintiff in causing a criminal proceeding to begin.

471. Plaintiff was subjected to humiliation, fear, and pain and suffering by the illegal acts of Defendants, and each of them, and suffered injuries as a result of the Defendants' actions as set forth in the Complaint.

472. Plaintiff is entitled to compensatory damages, punitive damages, attorneys' fees and costs under 42 U.S.C. § 1988, and all applicable state law, and such additional relief as the Court deems just.

\ \ \

\ \ \

\ \ \

**FIFTEENTH CLAIM FOR RELIEF**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**(Against Defendant Borquez, Hutchins, Joyce, Lobo, Martinez, Pernesky, Thompson, Ingram, Sparkman, Whiteman, Linder, Salazar, Burns, and Doe Defendants and Doe Defendants)**

473.   By engaging in the acts alleged herein, Defendants Borquez, Hutchins, Joyce, Lobo, Martinez, Pernesky, Thompson, Ingram, Sparkman, Whiteman, Linder, Salazar, Burns, and Doe Defendants and Doe Defendants who engaged in outrageous conduct with an intent to or a reckless disregard of the probability of causing Plaintiffs to suffer emotional distress.

474.   As a direct, proximate and foreseeable result, Plaintiffs suffered severe emotional distress and the outrageous conduct was the cause of the emotional distress suffered by Plaintiff as in the Complaint.

475.   The conduct of Defendants Borquez, Hutchins, Joyce, Lobo, Martinez, Pernesky, Thompson, Ingram, Sparkman, Whiteman, Linder, Salazar, Burns, and Doe Defendants also amounts to oppression, fraud or malice and punitive damages should be assessed against Defendants for the purpose of punishment and for the sake of example.

**SIXTEENTH CLAIM FOR RELIEF**

**NEGLIGENT HIRING, SUPERVISION, DISCIPLINING AND RETAINING LAPD POLICE OFFICERS**

**(Against Defendant City of Los Angeles and Doe Defendants 1-25)**

476.   Plaintiff is informed and believes, and thereon alleges that Defendants Martinez, Borquez, Joyce, Pernesky, Hutchins, Lobo, Sparkman, and Doe Defendants work a specialized unit and each had a history and propensity for acts of the nature complained of herein and manifested such propensity prior to their employment as City of Los Angeles

1   Police Officers by the Defendant CLA. Defendant Whiteman
2   conducted the NCUOFR which was ratified by the FORCE REVIEW
3   DEFENDANT OFFICERS but simply could not determine that the
4   DEFENDANT OFFICERS were at all times located in Lynwood, a city
5   outside of the jurisdiction of  Defendant LAPD. Plaintiff is further
6   informed and believes and thereon alleges that Defendant CLA knew,
7   or in the exercise of reasonable care should have known of such prior
8   acts at the time such individual defendants were hired by the
9   Defendants CLA and LAPD or shortly thereafter. Defendants CLA and
10  LAPD's disregard of this knowledge or failure to adequately
11  investigate and discover the facts constitutes negligent hiring.
12  477.  Plaintiff is informed and believes and thereon alleges that after being
13  employed and appointed as City of Los Angeles Police Officers for
14  and by the Defendants CLA and LAPD, and prior to the commission of
15  the acts complained of herein, Defendants as set forth in the
16  Complaint Defendants Borquez, Hutchins, Joyce, Lobo, Martinez,
17  Pernesky, Thompson, Ingram, Sparkman, Whiteman, Salazar, Linder,
18  Burns, and Doe Defendants, acting under the color of their authority
19  as LAPD Police Officers, and in the course and scope of their
20  employment as such, committed similar acts and inflicted similar
21  injuries and damages upon other persons without reasonable cause or
22  justification. Plaintiff is further informed and believe and thereon allege
23  that Defendants CLA, Chief Beck and Chief Moore and Doe
24  Defendant supervisors knew, or in the exercise of reasonable care,
25  should have known of these prior acts and that such Police Officers
26  were unfit and prone to commit them but negligently failed to take
27  steps to properly train, supervise, discipline and/or terminate the
28  officer's employment.

478. As a proximate result of the negligence of Defendants CLA and LAPD, Plaintiff was damaged and injured as alleged in the preceding paragraphs.

479. The aforesaid neglect, failure and refusal to instruct and train constituted execution of the policies, customs, and practices of the Defendants CLA and LAPD.

480. The aforesaid neglect, failure and refusal to instruct and train, and promulgation and enforcement of policies, practices and customs constituted an execution of the policies, practices and customs of the Defendants CLA, Chief Beck, Chief Moore Doe Defendant supervisors.

481. As a direct and proximate result of the foregoing, Plaintiff was deprived of his above described civil rights and is entitled to damages including, but not limited to general and punitive damages and attorney's fees.

## PRAYER

WHEREFORE, Plaintiff, Frank Edward Edmonds, requests relief on his own behalf as follows, and according to proof, against each Defendant:

1. General and compensability damages in any amount according to proof;

2. Special damages in any amount according to proof;

3. Exemplary and punitive damages against each Defendant in their individual capacities, other than the City of Los Angeles, in an amount according to proof;

4. Cost of suit, including attorneys' fees, under 42 U.S.C. 1988 and California *Civil Code*, § 52.1 plus a multiplier as determined by the District Court;

5. Prejudgment interest, according to proof, where allowed by law;

6.      Costs of suit;

7.      Injunctive relief barring Defendants from falsifying evidence and ongoing violation of *Brady*; and

8.      Such other relief as may be warranted or as is just and proper.

Respectfully submitted,

Dated: April 11, 2021.          By:_/S/STEPHEN A. SHIKES___

Stephen A. Shikes, Esq.

Steven L. Szocs, Esq.

By: /s/ Bret D. Lewis, Esq.

## **DEMAND FOR JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues in this case.

Respectfully submitted,

Dated: April 11, 2021.          By:_/S/STEPHEN A. SHIKES___

Stephen A. Shikes, Esq.

Steven L. Szocs, Esq.

\ \ \

\ \ \

\ \ \